**Case No. 24-3880**
# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

In re: EAST PALESTINE TRAIN DERAILMENT
---------------------------------
ZSUZSA TROYAN; TAMARA FREEZE; SHARON LYNCH; CARLY TUNNO

      Interested Parties-Appellants

HAROLD R. FEEZLE, On Behalf of Themselves and All Others Similarly Situated; SUSAN E. SCHEUFELE, On Behalf of Themselves and All Others Similarly Situated; DAVID J. SCHEUFELE, On Behalf of Themselves and All Others Similarly Situated; ROLLERENA AUTO SALES, LLC, On Behalf of Themselves and All Others Similarly Situated; MARILYN FIGLEY, On Behalf of Themselves and All Others Similarly Situated; ROSEMARY MOZUCH, On Behalf of Themselves and All Others Similarly Situated; CHARLES MOZUCH, On Behalf of Themselves and All Others Similarly Situated; JON LUKE AFFELTRANGER, On Behalf of Themselves and All Others Similarly Situated; EDWARD E. BARNHOUSE, On Behalf of Themselves and All Others Similarly Situated; LAURA MANN;

        Plaintiffs - Appellees

v.

NORFOLK SOUTHERN RAILWAY COMPANY; NORFOLK SOUTHERN CORPORATION,

        Defendants – Appellees
_____/

## APPEAL FROM THE U.S. DISTRICT COURT, N.D. OHIO

## BRIEF OF INTERESTED PARTIES-APPELLANTS' TROYAN et. al.

**Submitted by:**
David M. Graham, *pro hac vice*
Attorney for Objector-Appellants Troyan, Lynch, Freeze and Tunno
210 E. Forsyth St.
Jacksonville, FL 32202
(904) 567-6529

# TABLE OF CONTENTS

Table of Contents                                                p. i

Corporate Disclosure Statement                                   p. iv

Table of Citations                                               p. v

Statement Regarding Oral Argument                                p. xii

Statement of Jurisdiction                                        p. 1

Statement of Issues                                              p. 2

Statement of the Case                                            p. 3

Summary of the Argument                                          p. 12

Argument                                                         p. 15

    Issue I. The district court clearly erred in approving the class
    notice                                                      p. 15

        Standard of Review                                      p. 15

        Discussion                                              p. 16

        A.  The notice allowed insufficient time for class members to
        opt out or intelligently opt in.                        p. 16

        B.  The notice failed to inform class members they regarding
        punitive damages.                                       p. 19

    Issue II. The district court abused its discretion in approving
    Final Settlement of this class action                       p. 21

        Standard of Review                                      p. 21

        Discussion                                              p. 22

i

A. The district court abused its discretion in approving final settlement, where Class Counsel promoted the settlement to class members by means of a public relations campaign touting the opinion of a purported expert, who assured class members the hazards they faced from environmental toxins is low while settlement value is high, where Class Counsel actively prevented class members from reviewing their own expert's reports contradicting Class Counsel's narrative, thereby suppressing the number of opt- outs and objectors through evidentiary manipulation.  p. 22

B. The district court's approval of the settlement was an abuse of discretion, where supporting findings and reasoning consist entirely of rote recitation or conclusory boilerplate and wholly failed to account for the long-term health risks posed by the pollution produced by the derailment and subsequent "vent and burn", and are demonstrably defective due to intentionally false or misleading data.  p. 36

C. The district court's failure to adequately address Class Counsel's suppression or disregard of critical soil sampling contradicting publicly available environmental assessments, constitutes a material error that undermines the fairness and adequacy of the settlement.  p. 42

D.  The district court gave insufficient judicial scrutiny to both the timing and amount of class counsels' fee.  p. 44

Issue III:  On remand, this case should be reassigned to a different judge.  p. 48

   Standard of Review  p. 48

   Discussion  p. 48

Conclusion  p. 53

Certificate of Compliance  p. 54

Addenda  p. 55

Designation Of Relevant District Court Documents under
6 Cir. R. 28(b)(1)(A)(i) and 6 Cir. R. 30(g)(1)                     p. 55

Copies Of Unpublished Opinions Cited per FRAP 32.1(b) or
6 Cir. R. 32.1(a)                                                   p. 63

    *Rohaley & Son Automotive v. Travelers Cas. Ins. Co. of America*
    (N.D. Ohio No. 1:20-cv-2700, Sept. 3, 2024              p. 64

    *Cajunland Pizza, LLC v. Marco's Franchising, LLC*
    (N.D. Ohio No. 3:20-cv-536, March 8, 2024)             p. 75

    *Virginia Matthews v. Ohio Bell Telephone Co*.,
    82-LW-3765, E-82-8 (Ohio App. Oct 15, 1982)            p. 86

Declaration of Carly Tunno (November 29, 2024)                     p. 98

## CORPORATE DISCLOSURE STATEMENT

Per 6 Cir. R. 26.1(a), Appellants' Troyan et. al. are individuals with no corporate affiliations, not a party to the appeal, that has a financial interest in the outcome.

**TABLE OF CITATIONS**

**Cases**

*In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113
  (2d Cir. 2011)                                              p. 17

*Apel v. Katz*, 697 N.E.2d 600 (Ohio 1998)                   p. 47

*Armco, Inc. v. United Steelworkers of Am.*, 280 F.3d 669
  (6th Cir.2002)                                              p. 48

*Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38 (6th Cir.1990)   p. 21

*Baker v. Shymkiv*, 6 Ohio St.3d 151, 451 N.E.2d 811 (1983)  pp. 28-29

*Banford v Aldrich Chem. Co.*, 126 Ohio St.3d 210, 932 N.E.2d 317
  (2010)                                                      p. 32

*In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935
  (9th Cir.2011)                                              p. 22

*Borland v. Sanders Lead Co., Inc.*, 369 So.2d 523 (Ala.1979)   p. 29

*Bowman v. Columbia Gas Transmission Corp.*, 850 F.2d 692
  (6th Cir. 1988)                                             p. 19

*Brown v. Crowley*, 312 F.3d 782 (6th Cir.2002)              p. 48

*Brown v. Scioto Cnty. Bd. of Comm'rs*, 87 Ohio App.3d 704,
  622 N.E.2d 1153 (1993)                                      p. 29

*Cajunland Pizza, LLC v. Marco's Franchising, LLC*
  (N.D. Ohio No. 3:20-cv-536, March 8, 2024)                  p. 45

*Carey v. Piphus*, 435 U.S. 247 (1978)                       p. 28

*Carlough v. Amchem Prod., Inc.*, 834 F.Supp. 1437 (E.D.Pa.1993)   p. 32

*Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981)  p. 37

*The Cleveland, Columbus and Cincinnati R.R. Co. v. Bartram*,
    11 Ohio St. 457 (Ohio 1860)  p. 47

*In re Community Bank of Northern Virginia*, 418 F.3d 277
    (3rd Cir. 2005)  pp. 16, 43
    44-45

*Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867 (1984)  p. 17

*DeJulius v. New England Health Care Employees Pension Fund*,
    429 F.3d 935, 942 (10th Cir.2005)  p. 15

*Denoyer v. Lamb*, 22 Ohio App.3d 136, 490 N.E.2d 615 (1984)  p. 20

*Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326 (1980)  pp. 31-32

*In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir.2013)  pp. 21-22

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59
    (1978)  p. 32

*Ecuador v Hinchee*, 741 F.3d 1185 (11 Cir. 2013)  p. 36

*Eden Isle Marina, Inc. v. United States*, 89 Fed. Cl.480. (2009)  p. 35

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)  p. 15

*Erhardt v. Prudential Group, Inc.*, 629 F.2d 843 (2d Cir.1980)  p. 16

*Fidel v. Farley*, 534 F.3d 508 (6th Cir. 2008)  pp. 15, 21

*In re Ford Motor Co.*, 86 F.4th 723 (6th Cir. 2023)  p. 21

*Franks v. Kroger Co.*, 649 F.2d 1216 (6th Cir. 1981)  p. 40

*Garcia v. Gillette*, 2014-Ohio-1868, 2014 WL 1800429
    (Ohio Ct. App. May 5, 2014)  p. 47

*Gascho v. Global Fitness Holdings*, LLC, 822 F.3d 269 (6th Cir. 2016) pp. 26, 33

*In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir.1995)                              p. 44

*In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075 (6th Cir. 1984) p. 37

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981)                              pp. 16, 42

*Hickman v. Taylor*, 329 U.S. 495 (1947)                              p. 34

*Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983)            pp. 41-42

*John B. v. Goetz*, 626 F.3d 356 (6th Cir. 2010)                              p. 52

*Kiser v Kamdar*, 831 F.3d 784 (6th Cir. 2016)                              p. 33

*Lavin v. Husted*, 764 F.3d 646 (6th Cir. 2014)                              p. 53

*Little Hocking Water Ass'n, Inc. v. E.I. Du Pont De Nemours & Co.*, 91 F.Supp.3d 940 (S.D. Ohio 2015)                              pp. 29, 32

*Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996)            p. 16

*Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299 (1986)            p. 28

*Moulton v U.S. SteelCorp.*, 581 F.3d 344 (6th Cir. 2009)                  p. 45

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)            p. 15

*Ohio Collieries Co. v. Cocke*, 107 Ohio St. 238, 140 N.E. 356 (1923)    p. 20

*In re Painewebber Ltd. P'ships Litig.*, 147 F.3d 132 (2d Cir. 1998)            p. 17

*Paugh v. Hanks*, 6 Ohio St.3d 72 (1983)                              p. 29

*Payne v. Kerr*, 1986 WL 11028 (Ohio Ct. App. Sept. 15, 1986)            p. 47

*Pearl v. Pic Walsh Freight Co.*, 112 Ohio App. 11, 168 N.E.2d 571
    (1960)      p. 28

*Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157
    (5th Cir. 1978)      p. 39

*Plummer v. Chemical Bank*, 91 F.R.D. 434 (S.D.N.Y.1981),
    aff'd, 668 F.2d 654 (2d Cir.1982)      p. 40

*Prandini v. Nat'l Tea Co.*, 557 F.2d 1015 (3d Cir.1977)      p. 44

*Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513
    (6th Cir.1993)      p. 22

*Rohaley & Son Automotive v. Travelers Cas. Ins. Co. of America*
    (N.D. Ohio No. 1:20-cv-2700, Sept. 3, 2024)      p. 45

*In re Seagate Tech.*, LLC, 497 F.3d 1360 (Fed. Cir. 2007)      p. 34

*Shane Group, Inc. v. Blue Cross Blue Shield*, 825 F.3d 299
    (6th Cir. 2016)      p. 37

*Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281 (6th Cir. 2015)      p. 30

*Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355 (2d Cir. 2003)      p. 17

*Solomon v. Aetna Life Ins. Co.*, 782 F.2d 58 (6th Cir. 1986)      p. 42

*Solomon v. United States*, 467 F.3d 928 (6th Cir.2006)      p. 48

*State ex rel. Dewine v. Marietta Indus. Enterprises, Inc.*,
    2016 Ohio 7850 (Ohio App, 2016)      p. 30

*Stevenson v. Morris*, 37 Ohio St. 10 (Ohio 1881)      p. 47

*Sutton v. St. Jude Medical S.C., Inc.*, 419 F.3d 568 (6th Cir. 2005)      p. 32

*Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521
    (E.D. Ky. 2010)      p. 26

*U.A.W. v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007)          pp. 10, 21, 37-38

*United States v. City of Miami*, 614 F.2d 1322 (5th Cir. 1980),
    modified on other grounds, 664 F.2d 435 (5th Cir.1981)
    (en banc)          p. 40

*United States v. Nobles*, 422 U.S. 225 (1975)          p. 34

*United States v Winchester Mun. Utilities*, 944 F.2d 301 (6th Cir. 1991) p. 30

*US Citizens Ass'n v Sebelius*, 754 F.Supp.2d 903 (N.D. Ohio 2010)          p. 33

*Victor v. Big Sky Energy, Inc*., 124 N.E.3d 283 (Ohio Ct. App. 2018)          p. 47

*Virginia Matthews v. Ohio Bell Telephone Co*., 82-LW-3765,
    E-82-8 (Ohio App. Oct 15, 1982)          pp. 19-20

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc*., 396 F.3d 96 (2d Cir. 2005)          p. 15

*Weinberger v. Great Northern Nekoosa Corp*., 925 F.2d 518
    (1st Cir. 1990)          pp. 45-46

*Widmer v. Fretti*, 95 Ohio App. 7, 116 N.E.2d 728 (1952)          p. 32

*Zolin v. United States*, 491 U.S. 554 (1994)          p. 35

## Constitutional Provisions

US Const, Art. III          p. 32

U.S. Const., Amend. V          p. 13

## Statutes

28 U.S.C. §144          p. 48

28 U.S.C. § 2106          p. 48

42 U.S.C. §1983                                                                    p. 28

42 U.S.C. §9607(a) (§107(a) of the Comprehensive Environmental
    Response, Compensation and Liability Act of 1980)         p. 30

**Court Rules**

Fed.R.Civ.P. 23                                                                    *passim*

Fed.R.Civ.P. 26(a)(2)(B)                                                           p. 36

Fed.R.Civ.P. 26(b)(3)                                                              pp. 34-35

Ohio RPC 1.7(a)(2)                                                                 p. 35

N.D. Ohio L.Civ.R. 7.1(d)                                                          p. 50

N.D. Ohio L.Civ.R. 83.7(a), Rules of Professional Conduct                          p. 35

**Miscellaneous**

49 CFR §831.11(b)                                                                  p. 35

49 CFR §831.13                                                                     p. 35

Lewis Carroll, *Through the Looking-Glass and What Alice Found
    There* 124 (1872)                                          pp. 32-33

Court Awarded Attorney Fees, Report of the Third Circuit Task
    Force, 108 F.R.D. 238, 266 (1985)                          p. 44

Fed. Jud. Ctr., Judges' Class Action Notice and Claims Process
Checklist and Plain Language Guide 4 (2010), https://www.fjc.gov/
sites/default/files/2012/NotCheck.pdf (last visited October 31, 2024)   pp. 17-18

Manual for Complex Litigation, Fourth, § 21.321, at 298                            p. 17

https://www.ncbi.nlm.nih.gov/books/NBK304415/                                      p. 24

4 NEWBERG on Class Actions § 11:53, at 167          pp. 15-16

3 Newberg and Rubenstein on Class Actions, §8:16 (6th ed.)          p. 18

Ohio Admin. Code, Chap. 3745-15, Rule 3745-15-07,          pp. 29-30

72 O.Jur.3d, Nuisances §1          p. 29

https://progressreport.cancer.gov/after/economic_burden          pp. 18-19

Prosser and Keeton on the Law of Torts (5th Ed.1984), §87          p. 29

https://pubchem.ncbi.nlm.nih.gov/compound/
Benz_a_anthracene#section=Toxicity          p. 24

https://pubchem.ncbi.nlm.nih.gov/compound/Benzo_k_
fluoranthene#section=Toxicity          p. 24

https://pubchem. ncbi.nlm.nih.gov/compound/Chrysene#section=
Toxicity          p. 24

https://pubchem.ncbi.nlm.nih.gov/compound/Indeno_1_2_3-cd_
pyrene#section= Toxicity          p. 24

https://www.sciencedirect.com/science/article/abs/pii/
S0887233319302152          p. 24

4 Restatement of the Law 2d, Torts (1965), §929          p. 20

61 Toxicology in Vitro 104645, "Cytotoxic and genotoxic
effects of Benzo[g,h,i]perylene on the human bronchial cell line
NL-20" (December, 2019)          p. 24

https://www.youtube.com/ watch?v=ICWHTEFU7yg 34:30          p. 6

## STATEMENT REGARDING ORAL ARGUMENT

Undersigned counsel firmly adheres to the philosophy that, in a typical appeal, whatever the subject matter, counsel have been rationed however many pages or words of argument the rules (or the Court on motion) allows, and thus should have said, and supported, everything they have to offer in support of their arguments. Thus, the purpose, and value, of oral argument is for the judicial panelists to ask questions, to help clarify their understanding of the facts or issues or to better inform their evaluation of the arguments. Accordingly, undersigned counsel respectfully requests oral argument IF a member of this Court has one or more questions he or she wishes to pose, or, alternatively, if counsel for appellees requests and is granted oral argument, then undersigned counsel will appear to listen, possibly offer brief rebuttal, and then respond to any questions that may arise.

**STATEMENT OF JURISDICTION**

A.  The District Court had jurisdiction under 28 U.S.C. §1332.

B.  This Court has jurisdiction under 28 U.S.C. §1291, the order appealed (ECF No. 557) being a final judgment as to class claims.

C.  Final judgment:  September  27, 2024; Notice of Appeal:  October 8, 2024 (ECF No. 570).

D.  The September 27, 2024 order approving final settlement disposes of all class plaintiffs' claims (ECF No. 557, PageID#.14584-5, ¶¶15-16, 20-21).

# STATEMENT OF ISSUES

**Issue I. Did the district court clearly err in approving the class notice?**

**A.   Did the notice allow insufficient time for class members to opt out or intelligently opt in?**

**B.  Did the notice fail to inform class members regarding recovery of punitive damages?**

**Issue II. Did the district court abuse its discretion in approving Final Settlement of this Class Action?**

**A. Did the district court abuse its discretion in approving final settlement, where Class Counsel promoted the settlement by means of a public relations campaign touting the opinion of a purported expert, who assured class members the hazards they face from environmental toxins is low while settlement value is high, where Class Counsel actively prevented class members from reviewing their own expert's reports contradicting Class Counsel's narrative, thereby suppressing the numbers of opt-outs and objectors through evidentiary manipulation?**

**B. Was the district court's approval of the settlement an abuse of discretion, where supporting findings and reasoning consist entirely of rote recitation or conclusory boilerplate and wholly fail to account for the long-term health risks posed by the pollution produced by the derailment and subsequent "vent and burn", and are demonstrably defective due to intentionally false or misleading data?**

**C.   Is the district court's failure to adequately address Class Counsel's suppression or disregard of critical soil sampling data contradicting publicly available environmental assessments a material error that undermines the fairness and adequacy of the settlement?**

**D.  Did the district court give insufficient judicial scrutiny to both the timing and amount of class counsels' fee?**

**Issue III:  On remand, should this case be reassigned to a different judge?**

## STATEMENT OF THE CASE

Objectors appeal a September 27, 2024 order (ECF No. 557) of the Northern District of Ohio, Hon. Benita Y. Pearson presiding, granting final approval to a settlement of this class action.

On February 3, 2023, Norfolk Southern Train 32N was eastbound on the Fort Wayne Line through northeast Ohio. (ECF No. 138 at ¶165), passing three wayside defect detectors before derailing. Plaintiffs allege Car 23, owned by General American Marks Company (GATX), derailed due to a failed wheel bearing. (ECF No. 138 at ¶146), resulting in the derailment of 38 railcars. (ECF No. 138 at ¶155). On February 6, 2023, Norfolk Southern and its contractors "vented and burned" all five vinyl chloride cars, causing a massive explosion that Plaintiffs allege dispersed toxic chemicals over the East Palestine area. (ECF No. 138 at ¶183-85, 279).

Numerous lawsuits (24 class actions, 10 individual actions—ECF No. 452, PageID#.6006-6007)) were eventually consolidated by Judge Pearson, who designated several law firms as class counsel (ECF No. 30, May 2, 2023). On behalf of 195,383 households in the Settlement Class Area (ECF No. 518-1, PageID#.10924), class counsel filed their Consolidated Master Class Action Complaint May 31, 2023 (ECF No. 31). asserting 17 causes of action, of which

Counts XIII[1]-XV were specifically focused on medical monitoring, and with medical monitoring also serving as the sole basis for injunctive relief (ECF No. 31, PageID#.713-716), and partially for relief sought under Counts I-VI (*id.*, PageID#.724, ¶40, PageID#.726, ¶249, PageID#.728, ¶261PageID#.731, ¶273), PageID#.733, ¶286 and PageID#.736, ¶297), as well as part of plaintiffs' general prayer for relief (*id.*, PageID#.758, ¶e).

On April 26, 2024, class counsel filed their Motion for Preliminary Approval of Settlement, Appointment of Lead Class Counsel, and Approval of Notice (ECF No. 452). Their supporting brief (ECF No. 452-2, PageID.6021, §XII) summarized the key settlement components: Norfolk Southern would pay $600 million to settle property damage and personal injury claims for those residing within a 20 mile radius, *including* $180 million for class counsels' attorney fees ($162 million) and costs (*id.*, PageID#.6059). Medical monitoring claims were expressly excluded *and released* (*id.*, PageID#.6011 ¶HH and 6012 ¶MM). Class representatives were to be awarded $15,000 each (*id.*, PageID#.6059), roughly seven times (7X) the average available to other class members. To share in the settlement fund, class members had to complete and submit an opt in form within

---

[1] ECF No. 428 granted Norfolk Southern's motion for summary judgment as to Count XIII, but provided plaintiffs could use medical monitoring as an element of damages for any underlying Ohio tort.

31 days; class members wishing to opt out had to submit another form within 31 days. Over 130,000 households (2/3) failed to do either, resulting in barring their claims.

Class counsel's motion included a proposed "Long Form Notice" (ECF No. 452-5) to be mailed or otherwise delivered to class members. However, many class members relocated, their mailed notices were not delivered, and the record is silent as to whether additional efforts were made to notify them. The notice failed to: (1) inform class members of the need to opt out to preserve specific claims, like emotional distress or non-physical injuries, (2) adequately disclose a system for calculating compensation, (3) accurately inform class members of potential recoveries, and (4) mention waiver of medical monitoring claims.

The district court granted preliminary approval by order of May 21, 2024 (ECF No. 458). On June 25, 2024, the Settlement Administrator certified notice had been sent according to the parameters set by the district court (ECF No. 476), thereby starting the running of the 31-day periods.

Starting May 22, 2024, Class Counsel launched a campaign in which they publicly reassured class members—presenting their newly-hired expert, Dr. Arch Carson, in support—that environmental risks were minimal. However, Class Counsel withheld reports of their original expert, Stephen Petty, whose soil sampling data indicated significant levels of harmful contaminants, such as

polycyclic aromatic hydrocarbons (PAHs)[2]. With class members misinformed about real health risks, the numbers of opt-outs and objections was artificially suppressed.

Nonetheless, objections were filed, with some objectors represented by counsel (ECF Nos. 485, 486, 487, 487-1, 487-2, 489, 516) and others proceeding *inops consilii* (ECF Nos. 490, 491, 493). The district court summarily denied requests to extend the opt-out period (ECF Nos. 510).

The Notice to Class Members informed potential objectors, under the heading "**Your Legal Rights and Options in this Settlement**" (ECF No. 452-5, PageID#.6130), that one option would be to (*id.*, PageID#.6131:

| **Object to the Settlement by June 24, 2024** | If you do not think the Settlement is fair, you may write to the Settlement Administrator to object to its approval by the Court. |
|---|---|

Objectors Troyan (ECF No. 516-6, PageID#.10850), Lynch (*id.*, PageID#.10830), Freeze (*id.*, PageID#10822) and Tunno (ECF No. 711, PageID#.51592-6) followed that course. The Settlement Administrator claims not to possess Tunno's objection

---

[2] Likewise, the airborne contamination throughout the "controlled burn" and for some hours thereafter for many miles downwind (Robert Kroutil Declaration, ECF No. 457, PageID#.13486 ¶34) went unmentioned, as was EPA's position (June 6, 2023 Information Session on East Palestine derailment, Dr. Arthur Chang, MD, CDC Chief Environmental Medical Officer, https://www.youtube.com/ watch?v=ICWHTEFU7yg 34:30) that breathing vinyl chloride tainted air produces automatic bodily absorption, which medical science cannot remove—the only treatment is when cancer (*e.g.*, angiosarcoma or hepatocellular sarcoma) or liver disease results, making medical monitoring for such conditions imperative.

(ECF No. 467-2, PageID#.46378, Scott Fenwick Declaration). Only those opting into the Settlement could object (ECF No. 452-5, PageID#.6134, ¶9).

Troyan's objections were multifarious (ECF No. 516-6, PageID#.10850-10852): (1) the settlement is inadequate—"residents are not able to move out of the impacted area for the amount awarded, even at max"; (2) Norfolk Southern withheld critical information "that ultimately endangered my life and my family's forever"; (3) "We will not know full impacts for several years and a cap for $10,000 is not enough to cover health care"; (4) relocation costs were conditional, only for temporary shelter, but she was forced to accept the insufficient compensation "to keep a roof over our heads"; (5) class counsel never contacted her and made no effort to determine her situation or opinion; (6) insufficient time allowed to evaluate options, while new information constantly emerges.

Lynch (ECF No. 516-6, PageID#.10830-10832) objected (1) to using a circle to define the class, when the EPA established the vent and burn plume was oblong, (https://www.epa.gov/east-palestine-oh-train-derailment/event-reconstruction-plume-map); (2) the 10-mile radius for personal injury claims is inadequate—Lynch lives 16 miles from ground zero and documented "exposure and symptoms" in her statement to the Pennsylvania Senate Committee investigating the derailment; (3) soil sampling, limited to locations with ash, was conducted after precipitation, thus skewing the data; (4) Subtraction of Value Assurance Program

7

benefits from Settlement benefits makes Settlement chimerical for class members entitled to both; affected residents cannot safely remain in their homes, cannot sell them except at grossly lowered valuations, and cannot afford safe replacement housing; (5) lack of medical monitoring; and (6) insufficient time to evaluate whether to opt in or out.

Carly Tunno's objections (ECF No. 711, PageID#.51592-6) repeated some of those made by Troyan, Lynch and Freeze, adding an objection to having to opt in or out by household—Tunno wished to opt out, but her husband wanted to opt in. Tunno attended meetings arranged by class counsel where questions were not satisfactorily answered or could not be asked; Assistance Center personnel lacked sufficient knowledge or training to provide necessary or accurate information. Tunno attempted to testify at the final hearing, but could not enter the courtroom due to prohibition of access by the court.

Freeze filed her handwritten objections July 10, 2024 (ECF No. 493), noting her home is 176 yards from the derailment (*id*., PageID#.8860, ¶1). Freeze objected that EPA had recently found four "pockets of vinyl chloride" "within seconds of a walk from our home" (*id*., PageID#.8861-2, ¶3), and complained at having to opt in or out "within less than a week after the NTSB's final report", requesting "more time to evaluate our own situations." (*id*., PageID#.8862-3, ¶4).

On June 12, 2024, Troyan, Lynch, Freeze and Tunno (ECF No. 495-2,

8

PageID#.8929, 8931-2), joined in the Unity Council's questions to class counsel regarding barring claims by minors, non-disclosure of chemical testing, prematurity, and lack of punitive damages, *inter alia* (*id*., PageID#.8927-8). Class counsels' responses (ECF No. 495-3) were obfuscatory and false (pp. 35-6 below).

On September 6, 2024, class counsel moved for final approval of (a) the settlement (ECF No. 518), (b) the Plan of Distribution (ECF No. 519, supplemented ECF No. 525), and (c) attorney fees and costs of $180 million (ECF No. 520). A September 23 order (ECF No. 539) allowed objectors' counsel to file supplemental or clarifying affidavits or declarations up to 4:30 p.m. September 24.

During the September 25, 2024 fairness hearing (ECF No. 553), Judge Pearson's hostility toward objectors was tellingly clarified when attorney Daniel Abraham, representing 36 objectors (ECF No. 553, PageID#.14424), requested evidentiary hearing so Mr. Petty could testify. Abraham's request was phrased in terms of class counsel having "handcuffed" Petty with confidentiality restrictions (ECF No. 553, PageID#.14464). Judge Pearson first amused herself by doubting whether Petty was physically handcuffed, denounced Abraham's oral request as "ridiculous", then stated that, had Abraham made the request in writing, "I would have articulated in writing the rejection that I'll give you now." (ECF No. 553, PageID#.14465). Judge Pearson then granted motions to supplement or withdraw objections, and granted class counsels' motions to finally approve the settlement,

9

attorney fees, expenses, and the Plan of Distribution (ECF Nos. 555-557),

concomitantly denying all objections, opining in conclusory fashion (ECF No. 553,

PageID.#114-116):

- class members were given sufficient notice;

- the notice given was the best practicable;

- class members were adequately represented;

- the settlement reached was negotiated at arms' length and in good faith, free of fraud or collusion;

- the relief provided by the settlement fund is fair, adequate, and reasonable;

- the fees and expenses requested are reasonable;

- $15,000 awards to lead plaintiffs are reasonable.

In her written orders, Judge Pearson slightly expanded her findings (ECF

No. 557, PageID#.14582-14584):

> 7. The Court gives final approval to the Settlement and finds that the Settlement is fair, reasonable and adequate and in the best interest of Settlement Class Members. The Court has specifically considered the factors relevant to class settlement approval. *See, e.g.,* Fed.R.Civ.P. 23; *U.A.W. v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007). Among the factors supporting the Court's determination are: the significant relief provided to the Settlement Class Members; the risk of ongoing litigation, trial and appeal; the extensive discovery completed to date; and, the positive reactions of Settlement Class Members.
>
> 8. The Court finds that the Class Representatives and Class Counsel have adequately represented the Class. Class Representatives were engaged in the litigation, assisted with or participated in the

discovery process, and appeared before the Court at hearings, including at the Final Approval Hearing. Class Counsel has engaged in extensive discovery, robust litigation, and negotiated this Settlement over the course of several months.

9. The Settlement was vigorously negotiated, conducted at arm's length, entered in good faith, and is free of fraud or collusion. The Settlement was negotiated with experienced, adversarial counsel. The terms of the Settlement were reached with the assistance of a highly qualified mediator, retired United States District Judge Layn Phillips, * * *. Judge Phillips presented a Mediator's Recommendation to the Parties * * * which the Parties agreed to * * *. * * *, the Parties continued frequent negotiation discussions and ultimately reached the Settlement Agreement.

10. The relief provided for in the Settlement Fund and Settlement Agreement is fair, adequate, and reasonable. This is particularly true considering the complexity and likely duration of litigation in this Action, including any appeals, and likelihood of success on the merits.

11. Class Counsel have extensive experience handling toxic tort and environmental class actions.

12. The Settlement, Plan of Distribution (ECF No. 519-2), and Supplement to the Plan of Distribution Relating to Appeals of Claim Determinations (ECF No. 525 at PageID #.11564-66) treat Class Members equitably relative to each other.

13. Class Members overwhelmingly support the settlement. Approximately 28.1% of households within 20 miles of the Derailment Site filed a claim, including about 80% of homes within two miles of the Derailment Site. Only 47 businesses have opted out. Of the 463,271 household Class Members, only 370, or about .083%, have chosen to opt out.

14. Only 84 individuals filed timely objections to the Settlement. In summary, the objectors take issue with the following: Class Counsel did not discover, collect, or consider sufficient evidence before reaching the Settlement; Class Counsel withheld or suppressed evidence; Direct Payments are distributed by household rather than by individual; Class Members were not aware of their exact award, or the award formula, prior to the opt-out cutoff date; settlement awards will unfairly be net of any prior payments made by Norfolk Southern; the Personal Injury Payments are not high enough, are unfairly binding or should extend beyond 10-miles from the Derailment Site; the Personal

Injury Payments were not properly obtained as a Class benefit; the Settlement does not adequately compensate Class Members for their damages, including mental and emotional injuries and medical monitoring; the Released Parties are overly broad; and, expected attorneys' fees are too high.

15. The Court has considered all objections made in the time and manner provided in the Preliminary Approval Order and any subsequent Order and hereby overrules all objections to the fairness, adequacy, or reasonableness of the Settlement. All Class Members who objected to the Settlement, and did not validly elect exclusion from the Settlement Class, are hereby bound by this Order.

## SUMMARY OF THE ARGUMENT

In this toxic tort class action, the district court approved a settlement in which class counsel are paid $180 million in fees and expenses ($162 million in fees) out of a $600 million settlement fund, with class representatives receiving $15,000 each, while the average recovery available to the other 195,583 class households is 1/7th that amount. In promoting settlement, class counsel suppressed their original expert's (Stephen Petty's) report, promoting the speculative opinion of newly-retained Arch Carson, who reassured class members the health hazards they face are minimal or non-existent, when late obtained measurements and analyses show lingering toxins substantially exceeding established human health standards. The settlement releases defendants for all medical monitoring liability—a centerpiece of the Master Class Action Complaint—without

explanation or justification from class counsel[3].

Notice of settlement to class members made no mention of (a) preferential treatment of class representatives, (b) class counsels' $180 million in fees and costs, (c) release of all medical monitoring claims, or (d) applicable strict liability under governing tort law and allowed only a 31-day opt out period, when every authority on class actions recommends 60-90 days, with no analysis or explanation justifying such a truncated time frame for class members to absorb, evaluate, contemplate, and intelligently determine their appropriate household choice.

---

[3] In their brief in support of final approval (ECF No. 518-1, PageID#.10931-2), class counsel asserted *ipse dixit*:

> Class Counsel considered the merits of medical monitoring claims and in light of the Court's dismissal of Plaintiffs' standalone medical monitoring claim under Ohio law, while also preserving medical monitoring as a remedy under Ohio law (and preserving of all other Plaintiffs' claims and remedies), determined that releasing these claims in exchange for the agreed compensation was fair, reasonable, and adequate. In negotiating the settlement, the availability of compensation to allow Settlement Class Members access to funds to pay for medical testing, if desired, was considered and achieved. Settlement Class Members can use their Direct Payment and exposure supplement as they see fit, including to cover the cost of medical monitoring.

So class counsel rely on class members who opt in to use their share of the *property damage* settlement for *medical* monitoring, or (*id*., PageID#.10932) to apply to Norfolk Southern for funding out of a paltry $25 million fund, paid over 15-20 years, for up to 10 medical exams for those within 2 miles of ground zero (not nearly far enough or money enough) . In other words, a lick and a promise, provided to class members by a federal agency and not by dint of class counsel's advocacy.

In approving preferential treatment of class representatives and class counsels' attorney fees, the district court rubber-stamped class counsels' every request, parroting formulaic phrases but utterly failing to fulfill its judicial obligation under F.R.Civ.P. 23 to protect the class members' rights, while demanding no actual proof of *any* representation of pertinent fact. In generic terms, Judge Pearson overruled all objections, discussing the merits of none. In a situation where, under governing law, strict liability applies, the district court opined in rote fashion that continued litigation is fraught with risk, thus justifying settlement. Judge Pearson ignored class counsels' misleading propaganda as to the nature and extent of the long term health hazards facing class members, had nothing to say about newly released expert testing contradicting that narrative, and, when requested to conduct evidentiary hearing to allow class counsel's original expert to testify, she mocked the request, suggested that it should have been submitted in writing (which it was, see ECF No. 485, and 486) then declared it would have been rejected in whatever form presented.

Although class action settlements are favored, such public policy is not intended to protect settlements that utterly trample class members' rights and interests. District courts are duty-bound to carefully scrutinize the fairness of such settlements and to assure that class counsel have not subordinated the class interests to their own self-interest in claiming a windfall fee. Class actions exist to

14

protect individuals who could not otherwise afford to pursue individual claims, not to enrich the lawyers at their clients' expense. The district court failed to fulfill its Rule 23 duties; this Court must reject the district court's desultory charade and remand with direction to substantively review all settlement parameters in detail, with the interests of absent class members foremost in mind.

## ARGUMENT

**Issue I. The district court clearly erred in approving the class notice.**

### Standard of Review

" '[W]hether a particular class action notice program satisfies the requirements of Fed.R.Civ.P. 23 and the Due Process Clause is a legal determination we review de novo.' " *Fidel v. Farley*, 534 F.3d 508, 513 (6th Cir. 2008) (quoting *DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935, 942 (10th Cir.2005)). Factual findings regarding notice are reviewed for clear error. *Id*.

Rule 23(c)(2)(B) and (e)(2) requires notice to class members who would be bound by a proposed settlement. The Due Process Clause, moreover, gives unnamed class members the right to notice of class action settlement. *DeJulius*, 429 F.3d at 943-44, citing *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 313 (1950); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). To be adequate, any notice must be understandable to average class members. *Wal-Mart*

*Stores, Inc. v. Visa U.S.A. Inc*., 396 F.3d 96, 113-14 (2d Cir. 2005), citing 4 NEWBERG § 11:53, at 167.

### Discussion

Because the advantage of class action litigation comes at the cost of binding absent class members through the res judicata effect of litigation over which they lack control, district courts must closely monitor the notice process and safeguard class members from "unauthorized [and] misleading communications from the parties or their counsel." *Erhardt v. Prudential Group, Inc*., 629 F.2d 843, 846 (2d Cir.1980). District courts have "both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981); Fed.R.Civ.P. 23(d). "Misleading communications by soliciting counsel have a detrimental effect on the class notice procedure and, therefore, on the fair administration of justice." *In re Community Bank of Northern Virginia*, 418 F.3d 277, 311 (3rd Cir. 2005) (hereafter "*Community Bank*").

**A. The notice allowed insufficient time for class members to opt out or intelligently opt in.**

A class action judgment binds each class member unless, in a class action certified under Rule 23(b)(3), the class member timely elects to opt out. *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 379 (1996) ( "[U]nder F.R.

16

Civ.P. 23, all members of the class * * * are bound by the judgment entered in the action unless, in a Rule 23(b)(3) action, they make a timely election for exclusion"); *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984).

Appellate review of a district court's denial of a request for an enlargement of time to opt out of a class action settlement is for abuse of discretion. *In re Painewebber Ltd. P'ships Litig.*, 147 F.3d 132, 135 (2d Cir. 1998). District courts are accorded wide latitude, provided their conclusion was "reached upon a weighing of the relevant factors." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 129 (2d Cir. 2011), quoting *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 362 (2d Cir. 2003).

The notice herein allowed only 31 days for class members to opt out or in, insufficient time given the chemical complexity of the toxic stew poisoning their homes and businesses and concomitant remediation expenses (assuming complete abandonment is not medically advisable).  By contrast, the Manual for Complex Litigation, Fourth, § 21.321, at 298, counsels a minimum 60-day opt out period. The Federal Judicial Center expresses a preference for 60-90 day opt-out time periods.  Fed. Jud. Ctr., Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide 4 (2010), https://www.fjc.gov/ sites/default/files/2012/NotCheck.pdf (last visited October 31, 2024) states:

**Does the notice plan allow enough time to act on rights after notice exposure?**
Class members need time to receive a notice by mail or in a publication. A minimum of 30 days is necessary from completed dissemination before deadlines, with 60–90 days preferred. This allows for re-mailings, fulfillment of requests for more information, and consideration of rights and options.

Accord: 3 Newberg and Rubenstein on Class Actions, §8:16 (6th ed.), calls for a 60-day minimum.

In response to this objection, class counsel argued (ECF No. 495, PageID#.8872, n. 2) the settlement received prominent reportage in newspapers (identifying only a *Washington Post* article on April 9, 2024, with no proof a significant number of class members subscribe[4] or can otherwise access that source) and local television (*id.*), again with nothing showing how many viewers tuned in. Moreover, journalistic accounts of the settlement are neither claimed, nor demonstrated, to include all, or even most, of the crucial details found (or which should be included) in the actual notice herein. Simply put, $600,000,000 sounds bountiful—until class members learn that, with the class consisting of 195,583 households, a $420 million net recovery represents only $2,147.43 per household[5].

---

[4] The *Washington Post* allows only paid subscribers to review its online content.
[5] With 55,000 households opting in (ECF No. 518-1, PageID#.10924), that number rises to $7,636.36—but businesses are entitled to share the $420 million net amount, but their allotment has not been reliably estimated. That average compares *unfavorably* to cancer treatment costs, which the National Cancer Institute reports ranges from $24,881 to $190,305 for an initial round, increasing to

Class counsel clearly strove to minimize class members' opportunity to evaluate the limited, tendentious, and inaccurate information class counsel provided them while protecting their $180 million fee. No valid reason justifies rushing to judgment—the district court adopted class counsels' timeline without independently weighing any of the relevant factors.

**B.  The notice failed to inform class members they were positioned to recover punitive damages.**

Among multiple deficiencies, the Notice herein fails to advise class members that, under Ohio law, they are likely entitled to punitive damages for trespass- or nuisance-related claims predicated on reckless or wanton behavior (regarded as "actual malice"). *Bowman v. Columbia Gas Transmission Corp*., 850 F.2d 692, Part III (6th Cir. 1988).

Norfolk Southern's toxic discharges over a broad area (defined as a 20 mile radius around East Palestine[6]) was, *inter alia*, a tortious invasion of affected landowners' and residents' privacy:

> We recognize, of course, that these guarantees of rights operate on behalf of the governed in restricting action by government against its citizens. Nevertheless, we find the analogy to be pertinent. In order to invade the privacy of one's house the government, whether it be the police to investigate a crime and search for evidence, the health

---

as much as $249,124 if the cancer persists. https://progressreport. cancer.gov/after/economic_burden

[6] Applying the formula $\pi r^2$ for determining the area of a circle of radius r, where $\pi$ = 3.1415927, this case concerns 1,256.64 square miles.

department to investigate violations of health codes or the inspector to check on safety or other code violations, must obtain a warrant which can only be authorized by a proper magistrate after a showing of probable cause. Is it logical, then, for us to give tacit approval to appellant to do, as a private company, what even the governments of the United States, the state of Ohio and the city of Sandusky are not permitted to do? We think not! The rights protected by the Fourth Amendment to the United States Constitution and the similar provision of the Ohio Constitution (Article I, Section 14) are some of the most sacred of rights which the framers of our Constitutions attempted to protect from unwarranted intrusion by the government into the lives, persons, homes, offices and affairs of all the people. We find it to be proper that private companies and individuals not be given by court decision, whether directly or by implication, greater rights to invade privacy.

*Virginia Matthews v. Ohio Bell Telephone Co.*, 82-LW-3765, E-82-8 (Ohio App. Oct 15, 1982) (ECF No. 711, PageID#.51587-8).

Under the rule in *Ohio Collieries Co. v. Cocke*, 107 Ohio St. 238, 140 N.E. 356 (1923), property owners may recover damages for the reasonable cost to restore damaged property and the reasonable value of lost use of the property. Additionally, affected persons may recover damages for personal annoyance and discomfort. *Denoyer v. Lamb*, 22 Ohio App.3d 136, 138–139, 490 N.E.2d 615 (1984) (applying 4 Restatement of the Law 2d, Torts (1965), §929, which allows damages for costs to repair the property, lost use, and personal annoyance and discomfort in cases where property has been damaged but not totally destroyed).

Class members were thus impaired in their ability to weigh the advantages of opting in to the settlement against the advantages of opting out by receiving deficient information.

**Issue II. The district court abused its discretion in approving Final Settlement of this Class Action.**

### Standard of Review

Pursuant to Fed.R.Civ.P. 23(e), "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Federal policy favors settlement of class actions. *United Auto., Aerospace and Agr. Implement Workers of American v. General Motors Corp*., 497 F. 3d 615, 632 (6ᵗʰ Cir. 2007) (hereafter "*UAW*") ("And in view of the other factors we must consider—the federal policy favoring settlement of class actions . . . ."). This policy takes into account costs, delays and the risk of continued litigation that might overwhelm or delay any potential benefit to class members. Appellate review of a district court's approval of a settlement is for abuse of discretion. *Fidel v. Farley, id*., citing *Bailey v. Great Lakes Canning, Inc*., 908 F.2d 38, 42 (6ᵗʰ Cir.1990). A district court abuses its discretion by applying the wrong legal standard or misapplying the right one. *In re Ford Motor Co*., 86 F.4ᵗʰ 723, 727 (6ᵗʰ Cir. 2023). <u>Failing to perform a rigorous analysis of the class action requirements is one way to misapply the right legal standard</u>. *Id*.

Rule 23 imposes obligations on class representatives, class counsel, and the

district court to protect the interests of absent class members. Fed.R.Civ.P. 23(a)(4), (g)(4), (e)(2). This Court has previously described class counsel's duty as "fiduciar[ies]" of the class, whose performance "courts must carefully scrutinize." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir.2013); see also *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir.1993). The Ninth Circuit has warned that courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 947 (9th Cir.2011).

## Discussion

**A. The district court abused its discretion in approving final settlement, where Class Counsel promoted the settlement to class members by means of a public relations campaign touting the opinion of a purported expert who assured class members the hazards they faced from environmental toxins was low while the settlement value was high, but where Class Counsel actively prevented class members from reviewing their own expert reports contradicting Class Counsel's narrative, thereby suppressing the number of opt-outs and objectors through evidentiary manipulation.**

In recommending the proposed settlement to class members, class counsel produced a video featuring "plaintiffs' expert", Dr. Arch Carson, wherein he indicates the level of toxins within the subject area (1,256.64 square miles) resulting from the derailment is below EPA (US Environmental Protection Agency)

ecological screening levels. However, Dr. Carson seems to have reviewed only data furnished by EPA and the Ohio EPA, which are compromised (see ECF No. 547, PageID#.13474 ff, Robert Kroutil affidavit); he was either not provided, or failed to consider, the findings and test results generated by class counsel's original expert, Stephen Petty, meanwhile expressing opinions of dubious scientific validity (Dr. George Thompson declaration, ECF No. 537, PageID#.12315-12318) ¶¶3-end; Stephen Petty declaration, ECF No. 543-4, PageID#13268-9 ¶¶9, 12).

On August 19 and 26 and September 11, 2024, previously undisclosed EPA testing data regarding pollution in the East Palestine subject area, generated by EPA's contractor, Tetra Tech, under the supervision of lead scientist Adam Peterca, were obtained by Scott Smith (Scott Smith Declaration, ECF No. 551-3, PageID#.13704-5, ¶¶3-4). The August 26 report, based on samples taken July 27, 2023, reveals measured amounts of seven (7) toxic polycylic aromatic hydrocarbons ("PAH's") previously publicly reported by EPA as "non-detectable"—benzo[a]anthracene, benzo[a]pyrene, benzo[b]fluoranthene, benzo[g,h,i]perylene, benzo[k]fluoranthene, chrysene, and indeno[1,2,3-cd]pyrene—in amounts above the "acceptable levels" set by both EPA and Norfolk Southern's contractor, Arcadis (ECF No. 551-3, PageID#.13713-4, ¶28d[7]).

---

[7] Unfortunately, subparagraph lettering was duplicated in part, subparagraph d being followed by subparagraphs a-d.

Benzo[a]anthracene is a mutagen and carcinogen[8].  Benzo[a] pyrene is a carcinogen[9].  Benzo[g,h,i]perylene is a cytotoxic and genotoxic compound with mutagenic properties.[10]  Benzo[k]fluoranthene is an eye and skin irritant and probable carcinogen[11], on the Hazardous Substance List because it is regulated by OSHA and cited by ACGIH, NIOSH, NTP, IARC, HHAG and EPA as a probable cancer-causing agent in humans.  Chrysene is toxic to humans and probable carcinogen[12].  Indeno[1,2,3-cd]pyrene is known to have toxic, mutagenic, and carcinogenic properties.[13]

The August 26, 2024 Tetra Tech test data, comprising the test results on samples collected August 1, 2023, reveal the benzo[a]anthracene, benzo[a]pyrene, benzo[g,h,i]perylene, benzo[k]fluoranthene,  and indeno[1,2,3-cd] pyrene (together with other PAH's previously reported as non-detectable), again above the "acceptable levels" set by EPA and Arcadis (Scott Smith Declaration, ¶¶28c).

---

[8]https://pubchem.ncbi.nlm.nih.gov/compound/Benz_a_anthracene#section=Toxicity
[9] https://www.ncbi.nlm.nih.gov/books/NBK304415/
[10]  61 Toxicology in Vitro 104645, "Cytotoxic and genotoxic effects of Benzo[g,h,i]perylene on the human bronchial cell line NL-20" (December, 2019), summarized at
https://www.sciencedirect.com/science/article/abs/pii/S0887233319302152
[11]https://pubchem.ncbi.nlm.nih.gov/compound/Benzo_k_fluoranthene#section=Toxicity
[12] https://pubchem. ncbi.nlm.nih.gov/compound/Chrysene#section=Toxicity
[13] https://pubchem.ncbi.nlm.nih.gov/compound/Indeno_1_2_3-cd_pyrene#section=Toxicity

The September 11, 2024 Tetra Tech test data similarly reveal previously non-public data points for PAHs above "acceptable levels" based on samples collected February 15, 2023 (Scott Smith Declaration, ¶28b, pp. 12-13 and ¶28d, pp. 13-14), mainly involving the same chemicals iterated in the July 27, 2023 testing.

In an August 13, 2024 Declaration (ECF No. 537, PageID#.12315-12319)[14], acquired by objector's counsel September 9, 2024, Dr. George Thompson, Ph.D. toxicologist[15] avers he reviewed Dr. Carson's August 1, 2024 video presentation to class members, which Dr. Thompson assesses as "incomplete and unreliable", containing "inaccurate, if not dangerously misleading information." (ECF No. 537, PageID#.12315 ¶3). Dr. Thompson proceeded to detail his expert opinion as to the proper conclusions drawn from the testing data, and the errors and dubious science underlying Dr. Carson's claims (*id.*, ¶¶4-end). Stephen Petty is in accord (ECF 543-4, PageID#.13268-9, ¶¶9, 12).

Scott Smith's understanding of the newly acquired EPA data, its congruence with Smith's independent testing and analysis, and the disparity in comparison with previously published EPA data (Scott Smith Declaration, ECF No. 551-3, PageID#.13711-13725 ¶¶26-28, 30-32, 36-39, 47-48) are confirmed as consistent with his own testing and analysis by Stephen Petty, class counsel's original sole

---

[14] Supplemented September 18, 2024 (ECF 543-3, PageID#.13246 ff)
[15] (ECF No. 537-1, Dr. Thompson's *curriculum vitae*).

expert (ECF No. 543-3 Declaration of Stephen Petty, PageID#.13268-13270 ¶¶7, 10-11, 13-20), whose reports and conclusions were withheld from class members by class counsel (pp. 33-34 below).

Objectors urged rejection of the Proposed Settlement as unfair to class members, who were misled as to the environmental dangers facing them, misled as to Norfolk Southern's strict liability, deprived of the opinions of class counsel's chosen experts, and being asked to accept grossly insufficient compensation. The district court, despite accepting this evidence, without any discussion or analysis of it nonetheless granted the Settlement final approval.

The absence of fraud or collusion in class action settlements is presumed "unless there is evidence to the contrary." *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 531 (E.D. Ky. 2010) (internal quotation marks omitted) The involvement of a mediator (Hon. Layn R. Phillips, formerly judge of the Oklahoma US District Court), is deemed highly probative there was no collusion. *Gascho v. Global Fitness Holdings*, LLC, 822 F.3d 269, 277 (6th Cir. 2016). But herein, the late-discovered (by objectors) evidence—including "insider" reports—powerfully indicates class counsel suppressed key evidence, unbeknownst to Judge Phillips.

Particularly disturbing is the claim class counsel "worked extensively with their experts", while concomitantly admitting "though no expert reports from

26

Plaintiffs have been exchanged in this litigation." (ECF No. 518-1, PageID#.10909, footnote 4). Thus, the reports and findings of class counsels' retained experts, excepting only selected portions of Dr. Carson's opinion, remained a closely guarded secret. Of the "approximately 70 depositions" taken by class counsel (ECF No. 495, PageID#.8872; ECF No. 518-1, PageID#.10908)[16], *none* involved an expert of any kind. (ECF No. 518-1, PageID#.10909). Yet class counsel consistently touted the settlement as favorable to class members on the theory any ongoing human and animal health hazard from exposure to derailment-engendered pollution is insignificant—a fact inherently requiring expert analysis.

Class counsel also included in their Motion for final settlement approval a recitation that defendants sought dismissal of class claims based on preemption, suggesting this posed "substantial risk" (ECF No. 518-1, PageID#.10907-8)—which was possibly true, until the district court, *six weeks earlier* (ECF No. 428) denied dismissal except as to "stand alone" medical monitoring claims. The inclusion and placement of such misleading information was likely to lead the unwary (and especially class members reviewing it *inops consilii*) to understand class claims stood on the brink of dismissal, so grabbing half a loaf (or one small slice of loaf) would seem attractive.

---

[16] At this late date, failure to specify an exact number is mystifying—counting to 70 ought not tax the abilities of even the dyscalculic.

The Class Notice was misleading; while the Notice informed class members "Released Claims" exclude "personal injury claims" unless a class member separately executes a personal injury release, non-lawyer class members were required to parse the settlement's non-standard definition of "personal injury" as excluding "claims for medical monitoring, or mental or emotional injury or harm", when such matters are part and parcel of the "normal" understanding of "personal injury" in Ohio tort jurisprudence, in order to decipher the fact that opting in would waive medical monitoring claims (ECF No. 452-2, PageID#.6011-6012, ¶¶HH, MM), *a matter nowhere mentioned in the Notice itself*.

Damages under 42 U.S.C. §1983 must be measured by normal tort law principles, to prevent juries from awarding arbitrary amounts without evidentiary basis, and from using their unbounded discretion to punish unpopular defendants. *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 310 (1986); *Carey v. Piphus*, 435 U.S. 247 (1978). However, presumed damages, long used to remedy torts, may also be awarded whenever "a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish." 477 U.S. at 310-11. In this case, as recognized in ECF No. 428, trespass and nuisance are the common law torts most applicable, and Ohio's damages rules apply.

In Ohio, *every* trespass constitutes a legal injury, which entitles the property owner to *some* damages. *Pearl v. Pic Walsh Freight Co.*, 112 Ohio App. 11, 168

28

N.E.2d 571, 573 (1960). Ohio jurisprudence provides that trespass damages include those for emotional injury. *Baker v. Shymkiv*, 6 Ohio St.3d 151, 451 N.E.2d 811 (1983) (awarding damages for emotional distress caused by intentional trespass). Expert testimony is not a prerequisite to prove the severity of the emotional distress. *Paugh v. Hanks*, 6 Ohio St.3d 72, 79 (1983).

Regarding nuisance, Norfolk Southern had a specific duty not to interfere with neighboring property owners' right to undisturbed enjoyment of their premises. See 72 O.Jur.3d, Nuisances §1; Prosser and Keeton on the Law of Torts (5th Ed.1984), §87.

> For an indirect invasion to amount to an actionable trespass, there must be an interference with plaintiff's exclusive possessory interest; that is, through the defendant's intentional conduct, and with reasonable foreseeability, some substance has entered upon the land itself, affecting its nature and character, and causing substantial actual damage to the *res*. For example, if the smoke or polluting substance emitting from a defendant's operation causes discomfort and annoyance to the plaintiff in his use and enjoyment of the property, then the plaintiff's remedy is for nuisance; but if, as a result of the defendant's operation, the polluting substance is deposited upon the plaintiff's property, thus interfering with his exclusive possessory interest by causing substantial damage to the *res*, then the plaintiff may seek his remedy in trespass, though his alternative remedy in nuisance may co-exist.

*Little Hocking Water Ass'n, Inc. v. E.I. Du Pont De Nemours & Co.*, 91 F.Supp.3d 940, 980 (S.D. Ohio 2015), citing *Brown v. Scioto Cnty. Bd. of Comm'rs*, 87 Ohio App.3d 704, 717, 622 N.E.2d 1153, 1161–62 (1993), in turn citing *Borland v.*

*Sanders Lead Co., Inc.*, 369 So.2d 523, 530 (Ala.1979). See also Rule 3745-15-07[17], Ohio Admin. Code Chap. 3745-15.

Most importantly, Ohio jurisprudence imposes *strict liability* for toxic torts such as air, water, or ground pollution. *State ex rel. Dewine v. Marietta Indus. Enterprises, Inc.*, 2016 Ohio 7850, ¶26 footnote 5 (Ohio App, 2016) ("However, we also recognize that air pollution violations in Ohio are subject to strict liability. *State ex rel. DeWine v. Musleh*, 7th Dist. Mahoning No. 12MA121, 2013-Ohio-4323, ¶¶ 36-37."). Federal law does likewise. *United States v Winchester Mun. Utilities*, 944 F.2d 301, 304 (6th Cir. 1991) (air pollution); *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 284 (6th Cir. 2015) (pollution of navigable waters); 42 U.S.C. §9607(a) (Comprehensive Environmental Response, Compensation and Liability Act of 1980, §107(a)). Hence, class counsels' taking "70 depositions" to explore Norfolk Southern's *negligence* was wasted effort; any suggestion or imputation Norfolk Southern's liability is somehow doubtful cannot withstand

---

[17] (A) The emission or escape into the open air from any source or sources whatsoever, of smoke, ashes, * * * fumes, gases, vapors,* * *, in such manner or in such amounts as to endanger the health, safety or welfare of the public, or cause unreasonable injury or damage to property, is hereby found and declared to be a public nuisance. It shall be unlawful for any person to cause, permit or maintain any such public nuisance.
(B) The emission or escape into the open air from any source* * * in such a manner to emit such amounts of odor as to endanger the health, safety, or welfare of the public, or cause unreasonable injury or damage to property, is hereby found and declared to be a public nuisance. It shall be unlawful for any person to cause, permit or maintain any such public nuisance.

objective judicial scrutiny.

In their Master Consolidated Class Action Complaint (and 1ˢᵗ Amended version, ECF No. 138), class counsel asserted 17 causes of action, of which Counts XIII-XV[18] were specifically focused on medical monitoring. "Medical monitoring" also served as sole basis for injunctive relief independent of the 17 counts (ECF No. 31, PageID#.713-716), and partially for relief under Count I (Negligence and Negligence Per Se) (*id*., PageID#.724, ¶40), Count II (Strict Liability) (*id*., PageID#.726, ¶249), Count III (Statutory Nuisance—Ohio) (*id*., PageID#.728, ¶261), Count IV (Statutory Nuisance—Pennsylvania) (*id*., PageID#.731, ¶273), Count V (Private Nuisance) (*id*., PageID#.733, ¶286), and Count VI (Public Nuisance) (*id*., PageID#.736, ¶297), as well as part of plaintiffs' general prayer for relief (*id*., PageID#.758, ¶e).

Yet, *without explanation*, the Settlement both excludes medical monitoring claims and *operates to bar them*. A principal benefit of class action treatment is aggregating small claims that, as a practical matter, will not be pursued individually. This abandonment by class counsel leaves class members without effective recourse for what may be their most important remedy. *Deposit*

---

[18] Each medical monitoring count was for a different state—Ohio (XIII), Pennsylvania (XIV), and West Virginia (XV). Count XIII was dismissed on summary judgment as a "stand alone" claim, but the order expressly recognized medical monitoring damages could be claimed in connection with any tort under Ohio law (ECF No. 428).

*Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.").

A landowner's nuisance damages may include diminution in property value, repair costs, loss of use, and compensation for annoyance, discomfort, and inconvenience. *Banford v Aldrich Chem. Co.*, 126 Ohio St.3d 210, 213, 932 N.E.2d 317 (2010), citing *Widmer v. Fretti*, 95 Ohio App. 7, 16–17, 116 N.E.2d 728 (1952). Accord: *Little Hocking Water Ass'n, Inc., supra*, 91 F.Supp.3d at 975. Medical monitoring, following exposure to carcinogens with potentially fatal  or life-altering health consequences, is well within the scope of "annoyance, discomfort, and inconvenience".  See *Duke Power Co. v. Carolina Envtl. Study Group, Inc*., 438 U.S. 59, 73-74 (1978) (finding standing where plaintiffs had not yet manifested any physical injury as a result of exposure to nuclear emission); *Sutton v. St. Jude Medical S.C., Inc.*, 419 F.3d 568, 572 ff (6th Cir. 2005)( medical monitoring due to increased risk of future harm confers standing to sue under US Const, Art. III), citing *Carlough v. Amchem Prod., Inc*., 834 F.Supp. 1437, 1454 (E.D.Pa.1993) (conferring standing from mere exposure to asbestos) with approval.

Defining "personal injury" to exclude what Ohio law clearly includes bespeaks Humpty Dumpty's lexicographical approach:  " 'When I use a word,'

Humpty Dumpty said in a rather scornful tone, 'it means just what I choose it to mean—neither more nor less.' " Lewis Carroll, *Through the Looking-Glass and What Alice Found There* 124 (1872), quoted in *Kiser v Kamdar*, 831 F.3d 784, 788 (6th Cir. 2016). " 'The question is,' said Alice, 'whether you *can* make words mean so many different things.' " *US Citizens Ass'n v Sebelius*, 754 F.Supp.2d 903, 924 n. 9 (N.D. Ohio 2010). Alice had a point—all the more so where "different" becomes "contradictory", as in this instance. Perhaps lawyers might reasonably be expected, given their training and experience in scrutinizing documents for meaning, loopholes, omissions, and exceptions, to figure out that the Settlement creates an unexpected, wholly non-standard definition of "personal injury". But there is no basis for expecting average citizen class members to achieve that exalted level of literary sleuthing, and no indication class counsel carefully advised each of the claimed 11,000 visitors to its Assistance Center of this strangely deviant usage of otherwise familiar terminology.

As *Gascho v. Global Fitness Holdings, LLC, supra*, 822 F.3d at 297-298, abjures, "Confronted with counsel's uncorroborated sworn statements, the district court should not have been so trusting." Here, likewise, class counsel carefully shielded from review by both the district court and class members the reports of their only expert, Stephen Petty, opting instead to flog Dr. Carson's pre-recorded video presentation, formulated under the guidance of a public relations firm. Class

33

counsel further withheld documentary evidence demonstrating that their prior assurances health hazards are relatively minimal are not only grossly untrue, but represent active concealment of key data. This late-discovered evidence exposing the deficiencies in class counsels' narrative should preclude settlement approval.

Under these circumstances, class counsel can claim no valid privilege to bar release of their expert reports. First, class members are their clients; **the attorney-client privilege belongs to the client,** *In re Seagate Tech*., LLC, 497 F.3d 1360, 1372 (Fed. Cir. 2007). For class counsel to assert such privilege *against* the class stands the privilege on its head.

Similar considerations apply to class counsels' potential assertion of work product privilege, Fed.R.Civ.P. 26(b)(3)(A). "An attorney's work product is reflected 'in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways ....' " *Hickman v. Taylor*, 329 U.S. 495, 511 (1947). Work-product privilege is intended to prevent a litigant from taking a "free ride" on the research and thinking of his *opponent's* lawyer, and to avoid deterring a lawyer from committing thoughts to paper. *United States v. Nobles*, 422 U.S. 225, 236-39 (1975); *Hickman*, *supra*, 329 U.S. at 510-11 and at 516 (Jackson, J., concurring).

*When the client seeks the information, none of these factors properly applies*. The client, moreover, is paying for the attorney's services—here,

34

$162,000,000.00. There's *zero* possibility of a "free ride". The *clients* are attempting to determine whether they received the vigorous advocacy to which the applicable Rules of Professional Conduct, N.D. Ohio L.Civ.R. 83.7(a), entitle them, *e.g.*, Ohio RPC 1.7(a)(2) (lawyer may not continue representation of client if lawyer's own personal interests *may* materially limit the lawyer's ability to consider, recommend, or carry out an appropriate course of action for that client).

The crime-fraud exception, *Zolin v. United States*, 491 U.S. 554, 565 (1994), logically applies equally to work-product privilege. Importantly, the work product privilege can be waived <u>by the client</u>. *Eden Isle Marina, Inc. v. United States*, 89 Fed. Cl.480, 503-04. (2009). Class counsel may be ordered to release their experts' reports to class members, subject only to protecting "against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney * * * concerning the litigation." Fed.R.Civ.P. 26(b)(3)(B).

Class counsel <u>falsely</u> informed the class (ECF No. 495-3, PageID#.8940 ¶11) a protective order (ECF No. 127) and 49 CFR §831.13 prohibited them from sharing their expert reports with their clients. But the protective order merely protects the confidentiality of information *furnished by an adversary* during discovery (ECF No. 127, PageID#.1516-8). 49 CFR §831.13 applies only to "parties" to a NTSB investigation, <u>a category which *excludes* claimants or their lawyers</u>, 49 CFR §831.11(b).

On another occasion, class counsel hid behind ¶P of the Settlement

Agreement (ECF No 452-2, PageID#.6035):

> P. Non-Use of Work Product. Unless inconsistent with their ethical
> obligations or order of the Court, or as otherwise agreed to in writing
> * * *, Class Counsel agree that they will not use * * * any work
> product derived from any discovery in this Action, whether or not any
> such work product includes information designated protected under
> the protective order in this case* * *.

Although some EPA test data originated with Arcadia, Petty's reliance thereon falls

outside the scope of ¶P, as facts and data are not protected "work product".

Fed.R.Civ.P. 26(a)(2)(B); *Ecuador v Hinchee*, 741 F.3d 1185, 1195 (11 Cir. 2013).

Class counsel thus fraudulently concealed Stephen Petty's alarming findings

from class members, silenced Petty with threats of dire consequences should he

violate his NDA, then affirmatively misled class members by trumpeting the

benign, pre-recorded, PR-manufactured informercial by Dr. Carson in an

informational vacuum they constructed.

**B. The district court abused its discretion in approving settlement, where supporting findings and reasoning consisted entirely of rote recitation or conclusory boilerplate and wholly fail to account for the long-term health risks posed by the pollution produced by the derailment and subsequent "vent and burn" and are demonstrably defective due to intentionally false or misleading data.**

In exercising its discretion over class action settlements, the district court

must not "decide the merits of the case or resolve unsettled legal questions," but,

rather, must "judge the fairness of a proposed compromise" by "weighing the

plaintiffs['] likelihood of success on the merits against the amount and form of the relief offered in the settlement." *UAW* at 631, quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n. 14 (1981). "[B]efore approving a settlement, a district court must conclude that it is 'fair, reasonable, and adequate.'" *UAW* at 631; Fed. R. Civ. P. 23(e)(1)(C); Fed. R. Civ. P. 23(e)(1)(A). The factors relevant to that determination are:

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*Id*.

"The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits. The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984) (citation omitted). When considering final approval, "the district court must specifically examine what the unnamed class members would give up in the proposed settlement, and then explain why — given their likelihood of success on the merits — the tradeoff embodied in the settlement is fair to unnamed members of the class." *Shane Group, Inc. v. Blue Cross Blue Shield*, 825 F.3d 299, 309 (6th Cir. 2016).

Judge Pearson completely failed to evaluate the probability of success on the merits, or even to discuss what rights class members relinquished in exchange for the settlement. Both her oral ruling (ECF No. 553, PageID.#114-116) and written decision (ECF No. 557, PageID#.14582-3) consist of conclusory boilerplate, devoid of specific facts, and bereft of legal authority (other than a desultory reference to Fed.R.Civ.P 23 and the *U.A.W.* case). She utterly ignored class counsel's abandonment of medical monitoring, and complete lack of justification (ECF No. 452-1) for doing so. Indeed, class counsel's supporting brief relies almost exclusively on unsworn, self-congratulatory, subjective representations of the quality of their advocacy, *e.g.*, "Interim Class Counsel have thoroughly investigated the factual and legal issues involved, conducted substantial discovery, engaged in extensive motion practice before this Court, and worked with experts to establish liability and assess the Settlement Class's damages." (ECF No. 452-1, PageID#.5974-5).

But, as earlier noted, the claimed "substantial discovery" included *no* expert depositions (especially as to toxic pollution, class damages, or the cause of derailment—assuming, given strict liability, p. 29 above, the latter even matters). The "extensive motion practice" consisted of a motion to dismiss the Master Complaint (ECF Nos. 205-207), which resulted in, at best, a harmless partial victory for the railroad (ECF No. 428), class counsel's motion to inspect the

wheelset physical evidence (ECF No. 417, reconsideration ECF No. 433), a joint

motion of all parties to extend expert deadlines (ECF No. 431), and a status

conference-related scheduling motion (ECF No. 327). Unopposed motions

concerned appearances pro hac vice, adding/removing class plaintiffs. Even

accepting that class counsel "obtained more than 1,345,000 documents", no

showing is made, or attempted, to indicate each was relevant, substantive, or even

reviewed by them.

Objective indicia of vigorous advocacy are sorely absent. The district court

failed in its obligation to independently evaluate the quality of class counsel's

performance.

Class counsel and Judge Pearson trumpet the fact few objections were filed.

But that attitude reflects a misunderstanding of Rule 23's requirements.

> We stress that this is not a dispute over the allocation of a settlement
> fund, with respect to which the court should not allow a majority, no
> matter how large, to impose its decision on the minority. In such
> circumstances, objection by a few dissatisfied class members should
> trigger close judicial scrutiny to ensure that the burden of the
> settlement is not shifted arbitrarily to a small group of class members.

*Pettway v. American Cast Iron Pipe Co*., 576 F.2d 1157, 1217 (5th Cir. 1978).

Similarly, Judge Pearson gave no serious consideration to class

representatives' $15,000 awards. When settlement explicitly provides preferential

treatment for named plaintiffs in a class action, a substantial burden falls upon

settlement proponents to demonstrate and document its fairness—and the district court then must carefully scrutinize those proofs "to guard against settlements that may benefit the class representatives or their attorneys at the expense of absent class members." *United States v. City of Miami*, 614 F.2d 1322, 1331 (5th Cir. 1980), modified on other grounds, 664 F.2d 435 (5th Cir.1981) (en banc). "[W]here representative plaintiffs obtain more for themselves by settlement than they do for the class for whom they are obligated to act as fiduciaries, serious questions are raised as to the fairness of the settlement to the class." *Plummer v. Chemical Bank*, 91 F.R.D. 434, 441-42 (S.D.N.Y.1981), aff'd, 668 F.2d 654 (2d Cir.1982). This Court has refused class action settlement approval because a disparity in benefits for representative plaintiffs evidenced either substantive unfairness or inadequate representation. *Franks v. Kroger Co*., 649 F.2d 1216, 1226 (6th Cir. 1981) ("the 'preferred position' of the named plaintiffs should have signaled the district court of potential inequities in this proposed settlement").

Again, Judge Pearson relied on *ipse dixit* to justify those awards, while class counsel *made no mention of these preferential awards* in its brief seeking preliminary approval, and instead affirmatively misled readers thereof by falsely claiming "Allocation of funds among class members is also equitable, reflecting both relative amounts of damages as estimated by expert analysis to date, and likelihood of recovery given relative strength of claims." (ECF 452-1,

PageID#.5986). And class counsel again made no mention whatsoever of the $15,000 class representative awards in their brief seeking final settlement approval (ECF No. 518-1).

Judge Pearson's obsequious reliance on class counsel to justify such preferential awards signals failure to properly conduct her judicial oversight task; as held in *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1150-1151 (11th Cir. 1983):

> Without intending any disparagement of the eminent class counsel in this case, we conclude that the attorney's opinion is an insufficient basis upon which to approve the disproportionate and facially unfair allocation of this back pay award. * * * Reliance on counsel's opinion tends to render the district court captive to the attorney and fosters rubber stamping by the court rather than the careful scrutiny which is essential in judicial approval of class action settlements. Such a practice offers the same host of dangers that underlies the evidentiary rule against the admissibility of hearsay testimony. The objectors and the court must judge the evidence second hand and determine the credibility, not of the actual witnesses, but of the attorney for such witnesses. Further, the class attorney may not be aware of individual claims of absent class members. In the present case, class counsel testified at the fairness hearing that his primary contact with the class was through its named representatives and that he knew little about the merits of absent class members' individual claims. Finally, the conversion of attorneys' opinions into evidence will usually be met in kind with one attorney's opinion being countered by another's. This results in a reduction in the overall quality and quantity of evidence available to the district court.

> Thus, at least in connection with the disparate allocation of a finite settlement fund among many class members, the following guideline articulated in the Manual for Complex Litigation §1.46 is pertinent:

In certain cases in which many of the facts relevant to settlement are undisputed, it may be desirable to permit those facts to be established by the uncontradicted representations of counsel in briefs or otherwise. Normally, however, in view of the complexity which obviously attends settlement issues, it is wise in most cases to rely upon proven facts, particularly economic facts.

As in *Pettway IV*, the "fundamental problem facing us in our task today is the absence of an adequately developed factual record." 576 F.2d at 1183. Because the district court approved the settlement distribution on the basis of a deficient record, we reverse and remand for further proceedings.

## C. The district court's failure to adequately address Class Counsel's suppression or disregard of critical soil sampling data contradicting publicly available environmental assessments constitutes a material error that undermines the fairness and adequacy of the settlement.

In rejecting objector's reliance on the Smith, Petty, and Thompson analyses of toxic pollution resulting from the derailment as contradicting class counsels' blandishments, the district court similarly provided no discussion or rationale. Channeling Julius Caesar's "*Veni, vidi, vici*", Judge Pearson opined *ex cathedra*, I "considered all objections", I "overrule[] all objections" (ECF No. 557, PageID#.14584, ¶15). Such conclusory rulings are unacceptable, preventing this Court from determining the propriety of a discretionary ruling other than by speculation. *Gulf Oil Co. v. Bernard, supra*, 452 U.S. at 103; *Solomon v. Aetna Life Ins. Co.*, 782 F.2d 58, 61 (6th Cir. 1986). "A proper exercise of discretion * * * requires the District Court to do more than just recite the * * * formula * * *."

*Id*.

A similar situation was addressed by the Third Circuit in *Community Bank, supra*, 418 F.3d at 300 (highlighting added):

> We are bound by the Supreme Court's decision in *Anderson v. Bessemer City*, 470 U.S. 564, 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), holding that a district court's verbatim adoption of a party's proposed findings of fact and conclusions of law, although highly disapproved of, is not per se grounds for reversal. *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp*, 4 F.3d 1209, 1215-16 (3d Cir. 1993). However, there must be evidence in the record demonstrating that the district court exercised "independent judgment" in adopting a party's proposed findings. *Bright v. Westmoreland County*, 380 F.3d 729, 731-32 (3d Cir. 2004); see also *Pa. Envtl. Def. Found. v. Canon-McMillan Sch. Dist*., 152 F.3d 228, 233 (3d Cir. 1998) ("The central issue is whether the district court has made an independent judgment.").

Here, the district court did not even bother to reference whatever arguments class counsel made in opposition. Thus, the Third Circuit's actual ruling, *id*. at 301, rejecting a similar conclusory judicial "finding", applies *a fortiori*:

> In the context of meeting the requirements of Rule 23(a) and (b), we are not satisfied that the bare statement that the "proposed findings and conclusions are fully supported in the record" meets the minimum standard of accepting verbatim adoption as contemplated in the teachings of *Anderson*, 470 U.S. at 572. We believe that a court must set forth persuasive reasons, stated with objectivity, why the submissions of counsel totally reflect the independent judgment of the court. The act of accepting as its own these critical suggestions is an important judicial conclusion whose acceptability is merited only to the extent that sound reason stated publicly supports the acceptance. [Highlighting added.]

The absence of "sound reason stated" requires reversal and remand.

**D.  The district court gave insufficient judicial scrutiny to both the timing and amount of class counsels' fee.**

This lack of independent judicial evaluation is exacerbated by the fact the settlement agreement includes a negotiated fee of $180 million (inclusive of expenses) for class counsel, *payable from the $600 million settlement fund* (ECF No. 452-2, PageID#.6021, §XII).  As recognized in *Prandini v. Nat'l Tea Co*., 557 F.2d 1015, 1021 (3d Cir.1977), there exists a special danger of collusiveness when the attorney fees, ostensibly stemming from a separate agreement, were negotiated simultaneously with the settlement. See also *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig*., 55 F.3d 768, 803 (3d Cir.1995); Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 238, 266 (1985).  Here, aside from class counsels' self-serving claims their fees were negotiated after settlement was agreed (ECF No. 520-1, PageID#.11322), no other record evidence supports that claim[19], so the situation is akin to that denounced by the 3rd Circuit in *Community Bank, supra*, 418 F.3d at 307-308:

> Aside from class counsels' own assertions that fees were discussed after negotiations of the settlement had concluded, JA at 1383 (Declaration of Carlson), no other record evidence supports such an assertion. Furthermore, "even if counsel did not discuss fees until after

---

[19] Not that it matters—because class counsels' fees and expenses are deducted from the settlement fund, Norfolk Southern had "no dog in the fight" when negotiating those numbers with class counsel, having already limited its exposure to $600 million.

they reached a settlement agreement, [such a fact] would not allay our concern since the Task Force recommended that fee negotiations be postponed until the settlement was judicially approved, not merely until the date the parties allege to have reached an agreement." *G.M. Trucks*, 55 F.3d 804.

The district court seems to have been blissfully unaware of—or at least unconcerned with—the dangers of collusion, or simply the risk class counsels' eagerness to grasp the brass ring ($162 million in fees[20]) might diminish the vigor of their advocacy:

> Over a decade ago, we first spoke about the important nexus between judicial scrutiny and the avoidance of excessive or

---

[20] Accepting at face value class counsels' claim (ECF No. 520-4, PageID#.11523) that, up to the final hearing, they had performed 59,042.63 hours of work, means their fee averages $2,743.78 per hour, including both senior partners and neophyte subalterns. Of course, it would be miraculous if there were not significant duplications of effort and other padding among those claimed hours (the number itself is inadmissible hearsay, FRE 802—declarant makes no claim she, personally, did the addition, let alone vetted the time sheets for each individual attorney). No detailed time records were provided; no lodestar was calculated. Earlier in September, 2024, the same district court calculated a lodestar at $220/hour for partners and $200/hour for associates. *Rohaley & Son Automotive v. Travelers Cas. Ins. Co. of America* (N.D. Ohio No. 1:20-cv-2700, Sept. 3, 2024), pp. 2-5) (ECF No. 711, PageID#.51558-61). Earlier in 2024, the same court awarded attorney fees at an average hourly rate of $424.56. *Cajunland Pizza, LLC v. Marco's Franchising, LLC* (N.D. Ohio No. 3:20-cv-536, March 8, 2024), pp. 5-6 ($93,234 for 219.6 hours) (ECF No. 711, PageID#.51572-3).

Note that class counsel belabored the notion that their fees should be a percentage of the common fund rather than related to the lodestar amount (ECF No. 520-1, *passim*). By their own lights (*id*., PageID#.11325), per *Moulton v U.S. SteelCorp.*, 581 F.3d 344, 352 (6th Cir. 2009), one relevant "*Ramey*" factor is "(d) the value of the services on an hourly basis." Class counsels' fees are more than 6.45 times the highest hourly rates in the vicinage.

undeserved fee awards in the class action environment. *Furtado v. Bishop*, 635 F.2d 915, 919 (1st Cir.1980). * * * While the conflict between a class and its attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery, there is also a conflict inherent in cases like this one, where fees are paid by a quondam adversary from its own funds—the danger being that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees. See *Saylor v. Lindsley*, 456 F.2d 896, 900-01 (2d Cir.1972); * * *. It is because of the potential risk that plaintiffs' attorneys and defendants will team up to further parochial interests at the expense of the class that the Rule 23(e) protocol employed by several circuits explicitly includes scrutinizing settlements for indicia of collusion, see, [citations omitted]. We approve the protocol and believe it can logically be extended to the situation at hand.

Here, * * * G-P's agreement not to contest fees up to a stated maximum exacerbated the potential conflict of interest between the plaintiff class and class counsel. See *Malchman v. Davis*, 761 F.2d 893, 906-08 (2d Cir.1985) (Newman, J., concurring), cert. denied, 475 U.S. 1143 (1986); *In re WICAT Secur. Litigation*, 671 F.Supp. 726, 729 n. 1 (D.Utah 1987).

*Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1990)

(highlighting added).  But here, again, in declaring class counsels' 9-figure fee

"fair and reasonable", the district court merely regurgitated class counsels'

boilerplate recitations.  Class members expect, and are entitled to, more from a

district court tasked to protect their rights by employing fiduciary standards, and

this Court should require the district court to fulfill its responsibilities by providing

*actual, rigorous* judicial scrutiny to class action settlements, including more

skeptical weighing of the relevant factors, as contrasted with pious platitudes and

rote incantations of formulaic constructs.

Moreover, class counsels' failure to pursue punitive damages correlatively surrendered the opportunity to include attorney fees as part of compensatory damages payable by Norfolk Southern *in addition to* its tort liability. Ohio common law allows the prevailing party in a trespass action to recover attorney fees as compensatory damages. *Garcia v. Gillette*, 2014-Ohio-1868, 2014 WL 1800429, at *4 (Ohio Ct. App. May 5, 2014) (citing *Payne v. Kerr*, 1986 WL 11028, at *3 (Ohio Ct. App. Sept. 15, 1986), *The Cleveland, Columbus and Cincinnati R.R. Co. v. Bartram*, 11 Ohio St. 457 (Ohio 1860); and *Stevenson v. Morris*, 37 Ohio St. 10 (Ohio 1881)). To recover attorney fees on this basis, there must be concomitant recovery of punitive damages. *Apel v. Katz*, 697 N.E.2d 600, 603 n.1 (Ohio 1998) ("Attorney fees are potentially recoverable as a part of compensatory damages when punitive damages have been awarded.") (citations omitted); *Victor v. Big Sky Energy, Inc*., 124 N.E.3d 283, 298 (Ohio Ct. App. 2018) ("an award of punitive damages is necessary to justify attorney's fees", citing cases). Again, nowhere has class counsel explained the failure to seek or pursue punitive damages so as to make attorney fees an *addition* rather than a *deduction* from class recovery.

**Issue III:  On remand, this case should be reassigned to a different judge.**

**Standard of Review**

This Court has authority pursuant to 28 U.S.C. § 2106 to remand the case to a different district judge, This extraordinary power should rarely be invoked, and then only with the greatest reluctance. *Armco, Inc. v. United Steelworkers of Am.*, 280 F.3d 669, 683 (6th Cir.2002); *Solomon v. United States*, 467 F.3d 928, 935 (6th Cir.2006).  The factors governing such a request are:

> (1)whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously expressed views or findings, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.*; accord:  *Brown v. Crowley*, 312 F.3d 782, 792 (6th Cir.2002).

If this Court detects bias, however, reassignment may be order under 28 U.S.C. §144.

**Discussion**

Particularly since entry of final judgment, Judge Pearson's antipathy toward objectors generally has blatantly manifested.  During an October 1, 2024 post-judgment hearing (to which undersigned counsel was not invited), Judge Pearson, gratuitously impugned undersigned counsel (ECF No. 566, PageID#.14632)

I know there was already a notice of appeal, and I know it was filed by someone who wasn't even courageous enough to sit inside of the bar[21] or speak with the Court beyond being invited to do so[22].

After *ex parte* communications with class counsel (Mr. Katz), on October 1, 2024, Judge Pearson scheduled a hearing for October 3, 2024, and instructed Mr. Katz to notify undersigned counsel, David Graham. Mr. Katz represented during the October 3 hearing he had e-mailed Graham on October 1[23] and 3, without response (ECF No. 688, PageID#.51069-70). *Defense counsel* creditably noted October 3 was Rosh Hashanah, and that Graham was understood to be observant (*id*., PageID#.51070). Noting acerbically Oct. 1 was not a religious holiday (*id*., PageID#.51071), Judge Pearson stated she had listened to the radio interviews of both Rev. Sheely and undersigned counsel's Oct. 1 interview (*id*.), and that Graham had not advised of unavailability (*id*., PageID#.51071-2) [24].

---

[21] This infamy represents a *volte face*—during the September 25, 2024 hearing, Judge Pearson recognized undersigned counsel's seating choice merely as indicating he did not intend to offer oral argument, not as insulting the court (ECF No. 533, PageID#.14433).

[22] Having submitted objections and arguments in writing and heard Judge Pearson state on the record "I have read what's been submitted" (ECF No. 553, PageID#.4437), undersigned counsel saw no compelling reason to repeat himself orally, or subject himself voluntarily to the demeaning treatment visited upon attorney Abraham

[23] Katz's October 1 e-mail was a demand that this appeal be withdrawn within 3 hours 32 minutes, *with no mention of a hearing being scheduled for October 3*.

[24] Undersigned counsel is hard pressed to understand how he could provide notice of unavailability without first receiving notice of hearing.

Mr. Katz then represented Rev. Sheely had been heard on radio saying he instructed undersigned counsel not to appeal on his behalf (*id.*, PageID#.51072), and inquired as to Judge Pearson's attitude toward appeal bonds (*id.*, PageID#.51073).

Judge Pearson proceeded to advise class counsel what steps to take to forestall pursuit of this "improvidently filed appeal" so as to circumvent her limited post-appeal jurisdiction (*id.*, PageID#.51073-4), even volunteering "to manipulate the date for responding" by reducing the time allowed (*id.*, PageID#51077).

On October 7, 2024, Mr. Katz duly filed a motion (ECF No. 567, PageID#.14646) to require Rev. Sheely to post an $850,000 appeal bond. In the supporting memorandum (ECF No. 567-1, PageID#.14648), citing no authority or justification for shortening the standard 14 days under L.Civ.R. 7.1(d) (knowing he needed none), Katz requested Judge Pearson require response by 4:00 p.m. October 9. On October 8, Judge Pearson duly ordered any answer be filed by 4:30 p.m. October 9 (ECF 573).

Judge Pearson's grossly unfair treatment of Rev. Sheely's efforts to oppose the motion are detailed in his separate brief in Docket No. 24-3852 (pp. 47-48). But as concerns appellants herein, as to whom no such motion has ever been filed, on November 1, 2024, Judge Pearson *sua sponte* ordered class counsel to file a

50

reply regarding appeal bond, addressing both the revised response AND this separate appeal (ECF No. 570)—thereby precluding objectors Troyan, Freeze, Lynch and Tunno from addressing the reply (ECF No. 667) even though it raises new issues and arguments as to *them* specifically (*id.*, PageID#.46371-46373) and is supported by a new declaration (ECF No. 667-1) addressing appellant Tunno.

*Ex parte* communication is the only reasonable explanation for Judge Pearson's advance knowledge of Mr. Katz's substantive topic or her review of radio broadcasts prior to the Oct. 3 hearing[25]. Judge Pearson also accepted Mr. Katz's incorrect version of the claimed Katz-Graham e-mails. She next, literally and on the record, conspired with Mr. Katz on ways to overcome her jurisdictional limitations, while *sua sponte* offering Katz a blueprint both for what to do and how to procedurally disadvantage Rev. Sheely by reducing the time for response. Judge Pearson exacerbated that unfair treatment by suddenly applying local court rules in Draconian fashion regarding pages allowed, spacing of quotations and footnotes, and the leeway accorded all other practitioners making good faith effort to comply with those rules. Candor requires noting that she has not yet ruled on the appeal bond motion.

*Ex parte* communication is the only reasonable explanation for Judge

---

[25] During the October 1 hearing Judge Pearson even thanked class counsel and Norfolk Southern's counsel for having "consulted with" her. (ECF No 566, PageID#.14633).

Pearson's advance knowledge of Mr. Katz's substantive topic or her review of radio broadcasts prior to the Oct. 3 hearing[26]. Judge Pearson also accepted Mr. Katz's incorrect version of the claimed Katz-Graham e-mails. She next, literally and on the record, conspired with Mr. Katz on ways to overcome her jurisdictional limitations, while *sua sponte* offering Katz a blueprint both for what to do and how to procedurally disadvantage Rev. Sheely by reducing the time for response. Judge Pearson exacerbated that unfair treatment by suddenly applying local court rules in Draconian fashion regarding pages allowed, spacing of quotations and footnotes, and the leeway accorded all other practitioners making good faith effort to comply with those rules. Candor requires noting she has not yet ruled on the appeal bond motion.

Concerning the three factor test, factor two, the appearance of justice, clearly applies. Remand will occur only because this Court concludes Judge Pearson did not fulfill her independent review obligations, meaning she failed to invest the time and effort to familiarize herself with the claimed justifications for settlement, and the fairness and adequacy both of the settlement and class counsels' representation. Thus, factor three will also be apposite.

As this Court commented in *John B. v. Goetz*, 626 F.3d 356, 365 (6th Cir.

---

[26] During the October 1 hearing Judge Pearson even thanked class counsel and Norfolk Southern's counsel for having "consulted with" her. (ECF No 566, PageID#.14633).

2010), also a class action:

> We are mindful that as appellate judges, we cannot manage litigation as trial judges do. But despite our recognition of our role, there are occasions when we must intervene. * * * This situation combines serious management failures, fundamental misunderstandings that potentially prejudice defendants, and a developing adversarial relationship between the judge and the defendants. Here, the unusual decision to reassign the case is justified.

Accord: *Lavin v. Husted*, 764 F.3d 646, 651-653 (6th Cir. 2014) (concluding reassignment necessary "to avoid the appearance of partiality" and citing *Williams v. Renal Care Grp*., 696 F.3d 518, 532 (6th Cir. 2012) and *Rorrer v City of Stow*, 743 F.3d 1025, 1050 (6th Cir. 2014).

*This* IS that rare case in which, reluctantly, this Court must remand to a different judge.

## CONCLUSION

The September 25, 2024 judgment of the district court (ECF No. 557), overruling all objections and granting final approval to the Settlement, and related orders, such as the contemporaneous order approving class counsel's fees (ECF No. 556), should be vacated, and the cause remanded (1) to require revision of the Long Form Notice to apprise class members sufficiently of (a) applicable strict liability principles, (b) relevant toxicity measurements and associated health and property value concerns, and (c) the waiver of medical monitoring claims by those opting into the settlement, all in an objective and scientifically accurate manner,

53

followed by (2) the providing of new notice to class members, with an objection period of not less than 60 days (including an opportunity for those who previously opted out to opt in, and vice versa), and thereafter (3) to conduct a full, independent, and substantive judicial review of (a) the fairness, adequacy, and reasonableness of the settlement, (b) the substantive merit of new and prior objections, and (c) class counsel's fees, consistent with F.R.Civ.P. 23 and applicable case law. Remand should be to a different judge.

Respectfully submitted,

/s/ David M. Graham, *pro hac vice*
Attorney for Objector-Appellants Troyan, Lynch, Freeze and Tunno
210 E. Forsyth St.
Jacksonville, FL 32202
(904) 567-6529

## CERTIFICATE OF COMPLIANCE per FRAP 32(g)(1) and 6 Cir. R. 32(a)

David Graham, appearing *pro hac vice*, certifies, under FRAP 32(a)(7)(B) that this Brief contains 12,936 words, inclusive of headings, footnotes, citations and quotations, as counted by Microsoft Word 2010, the word processing software used to create this Brief. The typeface is Times New Roman 14 point, a serif font in conformity with FRAP 32(a)(6).

By: /s/ David M. Graham                    Dated: December 10, 2024
David M. Graham, *pro hac vice*
Attorney for Objectors-Appellants Troyan, Lynch, Freeze and Tunno

# ADDENDA

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

## under 6 Cir. R. 28(b)(1)(A)(i) and 6 Cir. R. 30(g)(1)

| ECF# | Page ID # | Description |
|---|---|---|
| R. 28 | Page ID#549-571 | 4-5-2023 Order designating class counsel |
| R. 30 | Page ID#665-666 | 5-2-2023 Order consolidating cases |
| R. 31 | Page ID#667-760 | 5-4-2023 Master Consolidated Class Action Complaint |
| R. 68 | Page ID#959-970 | 5-31-2023 Order closing cases as subsumed by Master Class Action Complaint |
| R. 98 | Page ID#1164-1171 | Case management conference plan/order |
| R. 102 | Page ID#1200-1203 | 6-30-2023 stipulated order re inadvertent disclosure of privileged or protected information |
| R. 124 | Page ID#1490-1492 | 7-28-2023 Order re wording of protective order |
| R. 127 | Page ID#1513-1531 | 8-2-2023 Protective order re experts |
| R. 128 | Page ID#1532-1536 | Motion for filing of First Amended Master Consolidated Class Action Complaint |
| R. 137 | Page ID#1768-1770 | 8/14/2023 Order allowing filing of First Amended Master Consolidated Class Action Complaint |
| R. 138 | Page ID#1771-1876 | First Amended Master Consolidated Class Action Complaint and jury demand |
| R. 163 | Page ID#2039-2041 | 8/31/23 Order consolidating additional underlying individual case based on order ECF No 28 |

| | |
|---|---|
| R. 213 Page ID#2440 | 9/28/2023 Order substituting parties and amending ECF 138 |
| R. 266 Page ID#3314-3316 | 4/5/2023 Order consolidating additional underlying individual case based on class action order ECF No 28 |
| R. 425 Page ID#5536-5538 | 3-13-2024 Order dismissing superseded underlying individual cases based on order ECF No 28 |
| R. 428 Page ID#5541-5578 | 3-13-2024 Order granting summary judgment in favor of Norfolk Southern dismissing Count XIII but providing for medical monitoring as element of damages for any underlying Ohio tort |
| R. 448 Page ID#5833-5835 | Order closing superseded underlying individual cases based on class action order ECF No 28 |
| R. 452 Page ID#5955-5957 | Motion for preliminary approval of settlement, appointment of lead class counsel, and approval of notice |
| R. 452-1 Page ID#5958-6000 | Brief in support of motion for preliminary approval of settlement |
| R. 452-2 Page ID#6001-6074 | Class Action Settlement Agreement |
| R. 452-3 Page ID#6075-6087 | Order of Preliminary Settlement |
| R. 452-4 Page ID#6088-6128 | Finnegan declaration and proposed notice plan |
| R. 452-5 Page ID#6129-6135 | Long Form Notice |
| R. 452-6 Page ID#6136-6138 | Short Form Publication Notice |
| R. 452-7 Page ID#6139-6146 | Proposed Order Granting Preliminary Approval of Settlement, etc. |
| R. 458 Page ID#6174-6182 | 5-21-2024 Order granting preliminary approval of |

settlement

| | |
|---|---|
| R. 476 Page ID#7205-7207 | Notice of filing declarations from Class Action Settlement Administrator |
| R. 476-1 Page ID#7208-7213 | Finnegan Declaration regarding notice compliance |
| R. 476-2 Page ID#7214-7218 | Fenwick Declaration regarding notice compliance |
| R. 479 Page ID#7237-7239 | Order closing related cases per ECF No 28 |
| R. 483 Page ID#7291-7292 | Motion for David Graham to appear *pro hac vice* |
| R. 485 Page ID#7304-7318 | Objection to class settlement agreement and motion to enlarge time to opt out by Rev. Sheely. |
| R. 486 Page ID#7971-7990 | Objection to class settlement agreement and motion to enlarge time to opt out by Jami Wallace |
| R. 487 Page ID#8643-8645 | Notice of Appearance and Objections filed by class members represented by attorney Daniel Abraham |
| R. 487-1 Page ID#8646-8680 | Exhibit 1 of Objections - Atty Abraham |
| R. 487-2 Page ID#8681 | Exhibit 2 of Objections - Atty Abraham |
| R. 488 Page ID#8682 | 7-2-2024 Order granting attorney David Graham permission to appear *pro hac vice* |
| R. 489 Page ID#8683-8684 | Objection filed by class member Jennifer Gray |
| R. 490 Page ID#8695-8696 | Objection filed by class member Tracy Mascher |
| R. 491 Page ID#8698-8699 | Objection filed by class member Gregory Mascher |
| R. 493 Page ID#8860-8864 | Objection filed by class member Tamara Freeze |
| R. 495 Page ID#8867-8882 | Class plaintiffs' response to objections (ECF Nos. 485 and 486) |

R. 495-2 Page ID#8925-8933    Unity Council (including all appellants) questions regarding settlement

R. 495-3 Page ID#8934-8944    Class counsel's responses to Unity Council's questions

R. 500 Page ID#9053-9057    7-22-2024 Reply to response to motion to enlarge time to opt out of settlement

R. 502 Page ID#9060-9062    7-23-2024 Motion to extend time to respond to Rev. Sheely's objections

R. 503 Page ID#9063-9066    8-5-2024 Rev. Sheely motion to extend time

R. XXX XX    8-7-2024 order granting extension of time for reply to 8-19-2024

R. 508 Page ID#9076-9102    8-18-2024 Reply to class plaintiffs' motion to enlarge time to opt out of settlement

R. 510 Page ID#9129-9134    8-20-2024 Order denying motion to enlarge time to opt out of class settlement

R. 516-6 Page ID#10821-10855 Objections of Zsuzsa Troyan, Carol Lynch, and Tamara Freeze

R. 518 Page ID#10896-10898    9-6-2024 Motion for approval of final settlement

R. 518-1 Page ID#10899-10941 Class plaintiffs' memorandum in support of final approval of settlement

R. 519 Page ID#11212-11214    9-6-2024 Motion for approval and implementation of plan of distribution

R. 520 Page ID#11304-11306    9-6-2024 Motion for award of attorney fees and expenses

R. 520-1 Page ID#11307-11351    Brief in support of attorney fees

R. 520-4 Page ID#11520-11524      Michelle Krantz declaration

R. 525 Page ID#11562-11567      Supplement motion for distribution plan approval

R. 529 Page ID#11590-11606      Response to Motion for Final Approval of Settlement and brief in support of objections by Daniel Abraham

R. 530 Page ID# 11607-11612      Reply in support of Motion for Final Approval of Settlement by co-lead counsel

R. 534 Page ID#11627-11633      Declaration of Stephen Petty

R. 536 Page ID#11635-11661      Declaration of Scott Smith

R. 537 Page ID#12314-12319      Declaration of Dr. George Thompson

R. 537-1 Page ID#12320-12343 *Curriculum vitae* of Dr. George Thompson

R. 539 Page ID#12401-12403      9-23-2024 Order allowing counsel for objectors to more fully explain clients' positions by serving and filing sworn declarations or affidavits before 9-24-2024 4:30 p.m. EDT

R. 540 Page ID#12404-12410      Declaration of Stephen Petty and Index of Exhibits

R. 542 Page ID#12541      Supplemental Declaration of Scott Smith

R. 543 Page ID#12542-12558      Motion for leave to file supplemental objection to settlement post-deadline by Rev. Sheely with memorandum

R. 543-1 Page ID#12559-12564      Exhibit A  Supplemental Objection to Class Settlement Agreement

R. 543-2 Page ID#12565-13244      Declaration of Scott Smith

R. 543-3 Page ID#13245-13265      Declaration of Dr. George Thompson

R. 543-4 Page ID#13266-13427        Declaration of Stephen Petty

R. 543-5 Page ID#13428-13429        Supplemental Declaration of Scott Smith

R. 547 Page ID#13474-13496        Declaration of Robert Kroutil

R. 550 Page ID#13500-13501        Declaration of Lesley Pacey

R. 550-1 Page ID#13502-13524        Affidavit of Robert Kroutil

R. 550-2 Page ID#13525-13539        Exhibit letter—rebuttal to denial of
whistleblower allegations

R. 551 Page ID#13540-13542        Notice of filing by Daniel Abraham

R. 551-1 Page ID#13543-13549        Declaration of Stephen Petty

R. 551-2 Page ID#13550-13703        Exhibit:  index for Stephen Petty

R. 551-3 Page ID#13704-13730        Declaration of Scott Smith

R. 551-4 Page ID#13731-14382        Exhibit:  index for Scott Smith

R. 551-5 Page ID#14383        Supplemental Declaration of Scott Smith

R. 551-6 Page ID#14384-14389        Affidavit of Dr. George Thompson

R. 551-7 Page ID#14390-14413        Dr. George Thompson curriculum vitae

R. 552 Page ID#14414-14422        Notice of exclusions to class action
settlement by co-lead counsel

R. 553 Page ID#14423-14541        Transcript of fairness hearing 9-25-2024

R. 555 Page ID#14543-14546   9-27-2024 order approving plan of distribution

R. 556 Page ID#14547-14579   9-27-2024 order approving class counsels' fees

R. 557 Page ID#14580-14586    9-27-2024 order for final approval of class settlement

R. 558 Page ID#14587    Notice of appeal (Rev. Sheely)

R. 559 Page ID#14588-14594    Norfolk Southern motion to stay 3rd party complaint pending effective settlement date

R. 563 Page ID#14607    10-3-2024 Order for telephonic conference

R. 566 Page ID#14610-14645    Transcript of telephonic conference held on 10-1-2024

R. 567 Page ID#14646-14647    Class Plaintiffs' motion to require Rev. Sheely to post appeal bond

R. 567-1 Page ID#14648-14659    Memorandum in support of motion to require Rev. Sheely to post appeal bond

R. 567-2 Page ID#14660-14661 Declaration of Scott Fenwick in support of motion to require Rev. Sheely to post appeal bond

R. 570 Page ID#14768    Notice of appeal by Tamara Freeze, Zsuzsa Troyan, Sharon Lynch, Carly Tunno

R. 573 Page ID#14773    Order reducing time for answer to motion to require Rev. Sheely to post appeal bond

R. 614 Page ID#25134-25135    Answer to motion to require Rev. Sheely to post appeal bond

R. 614-1 Page ID#25161-25170 Memorandum in support of answer [STRICKEN]

R. 614-2 Page ID#25161-25170    Declaration of Rev. Sheely

R. 614-3 Page ID#25171-25173    Motion to file memorandum of law in excess of 15 pp

R. 648 Page ID#45669-45670    Order rejecting motion to exceed page limits

| | |
|---|---|
| R. 649 Page ID#45671-45675 | Motion for leave to file Memorandum of Law in Excess of 15 pp by Rev. Sheely |
| R. 650 Page ID#45676 | 10-15-2024 Order denying Motion for leave to file Memorandum of Law in Excess of 15 pp |
| R. 660 Page ID#46292-46307 | Response to Motion to Require Rev. Sheely to post appeal bond |
| R. 661 Page ID#46318 | Request for 9-25-2024 transcript for Appeal by Rev. Sheely |
| R. 667 Page ID#46364-46375 | Reply brief of class plaintiffs in support of motion for appeal bond |
| R. 667-1 Page ID#46376-46378 | Supplemental declaration of Scott Fenwick re appeal bond |
| R. 688 Page ID#51067-51078 | Transcript of 10-3-2024 hearing re Rev. Sheely's appeal |
| R. 711 Page ID#51557-51596 | Addenda to District Court record per 6 Cir. R. 28(a)(1) |

**I.     Copies Of Unpublished Opinions Cited Per FRAP 32.1(b) OR 6 Cir. R. 32.1(a)**

| Citation | Cited in Brief | Addendum Pages |
|---|---|---|
| *Rohaley & Son Automotive v. Travelers Cas. Ins. Co. of America* (N.D. Ohio No. 1:20-cv-2700, Sept. 3, 2024) ECF No. 711, PageID#.51558-68 | p. 44 | 64-74 |
| *Cajunland Pizza, LLC v. Marco's Franchising, LLC* (N.D. Ohio No. 3:20-cv-536, March 8, 2024) ECF No. 711, PageID#.51569-79 | p. 44 | 75-85 |
| *Virginia Matthews v. Ohio Bell Telephone Co.*, 82-LW-3765, E-82-8 (Ohio App. Oct 15, 1982) ECF No. 711, PageID#.51580-91 | pp. 17-18 | 86-97 |

**II.    Declaration of Carly Tunno "misplaced" by Settlement Administrator** ECF No. 711, PageID#.51592-6

|  | pp. 4, 6 | 98-102 |
|---|---|---|

**Rohaley & Son Auto. v. Travelers Cas. Ins. Co. of Am.**,

1:20-CV-2700

United States District Court, N.D. Ohio, Eastern Division

Sep 3, 2024

OPINION AND ORDER

CHRISTOPHER A. BOYKO United States District Judge.

THOMAS M. PARKER MAGISTRATE JUDGE

A discovery dispute in this matter resulted in defendant Travelers Casualty Insurance Company of America ("Travelers") being awarded reasonable costs incurred in bringing its motion to compel. ECF Doc. 39. Travelers claims $11,029 in attorney fees, representing 45.2 hours at an associate rate of $200 and 9 hours at a partner rate of $220. ECF Doc. 36. Plaintiff Rohaley and Son Automotive, Inc. ("RSA") filed a response, arguing that no money be awarded for lack of substantiation. Travelers filed a reply brief and, after an order to do so, a supplement to its bill of costs. ECF Doc. 40; ECF Doc. 42. The matter is now before me for preparation of a report and recommendation ("R&R") on the reasonableness of Travelers's costs. ECF Doc. 39.

As will be discussed below, Travelers's bill of costs is not so lacking in detail as to preclude an award of reasonable costs. And upon review, I recommend that Travelers be awarded $10,012.60.

2

Travelers seeks $11,029 in attorney fees accrued in litigating the motion to compel. ECF Doc. 36. To support that figure, Travelers has submitted the below paraphrased table:

| Description | Hours | Amount |
|---|---|---|
| Correspondence with RSA identifying deficiencies in its discovery disclosures and | .7 at $200/hour | $140.00 |

requesting a supplement

| | | |
|---|---|---|
| Preparation of motion to dismiss/compel and supporting brief | 17.2 at $200/hour | $3,440.00 |
| Legal research to support motion | 1.6 at $200/hour | $320.00 |
| Review of RSA's opposition brief and preparation of reply brief | 4.2 at $200/hour<br>1.0 at $220/hour | $1,060.00 |
| Legal research to support reply brief | 1.4 at $200/hour | $280.00 |
| Communication with plaintiff's counsel and the court about the discovery dispute | .7 at $220/hour | $154.00 |
| Preparation for telephone conference on Travelers's motion to dismiss/compel | 2.0 at $220/hour | $440.00 |
| Conference with plaintiff's counsel on discovery dispute | .5 at $220 | $110.00 |
| Participation at telephone conference and review of court's April 27, 2022 order | .7 at $220 | $154.00 |
| Preparation of proposed stipulation on use of discovery from previous civil case | 2.3 at $200 | $460.00 |
| Review of R&R and RSA's supplemental discovery disclosures | 4.1 at $200<br>2.9 at $220 | $1,458.00 |
| Review of RSA's supplemental document production | 7.3 at $200 | $1,460.00 |
| Review of RSA's objections to the R&R and preparation of response | 6.4 at $200<br>.7 at $220 | $1,434.00 |
| Communication with plaintiff's counsel and the court regarding RSA's objections and | .5 at $220 | $110.00 |

Travelers's response

| | | |
|---|---|---|
| Total[2] | 45.2 at $200 | |
| | 9 at $220 | $11,020 |

ECF Doc. 36 at 1-2.

The $200/hour rates represent work performed by associate attorney Donald J. Parthum Jr. and research attorney Catherine L. Coash. ECF Doc. 42-2 at 3 (Parthum affidavit); ECF Doc.

3

42-3 at 3 (Coash affidavit); ECF Doc. 42-4 at 3, 6, 9, 12, 14, 18 (redacted invoices). The $220/hour rate represents work performed by partner attorney Kurt D. Meyer. ECF Doc. 42-1 at 3-4 (Meyer affidavit); ECF Doc. 42-4 at 9-10, 12, 14, 16. Parthum has been a member of the State Bar of Michigan since 1993, with experience in insurance law since 1994 and as his primary focus since 2016. ECF Doc. 42-2 at 2-3. Coash was admitted to practice in Michigan in 1992 and has practiced insurance law specifically since 2017. ECF Doc. 42-3 at 2-3. And Meyer has been admitted to practice in Michigan (1985), Ohio (2011), and Wisconsin (2020) and has practiced insurance law since 1986. ECF Doc. 42-1 at 2.

All three attorneys work for Gregory, Meyer & Chapnick, P.C. ("GMC"). ECF Doc. 421 at 2; ECF Doc. 42-2 at 2; ECF Doc. 42-3 at 2. GMC is an insurance defense law firm consisting of seven attorneys. ECF Doc. 42-1 at 3. According to Meyer, the rates claimed by Travelers were the amounts customarily charged by GMC for defense matters involving Travelers's entities in Ohio through June 28, 2022, after which the rates increased. ECF Doc. 421 at 3.

If a motion to compel is granted, even in part, the court "may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." Fed.R.Civ.P. 37(a)(5)(C); see also Fed.R.Civ.P. 37(a)(5)(A). To calculate attorney fees, courts use the "lodestar method": the number of hours reasonably expended multiplied by a reasonable hourly rate. *Ellison v. Balinski*, 625 F.3d 953, 960 (6th Cir. 2010). The burden is on the party seeking attorney fees to establish "entitlement to an award and documenting the appropriate hours expended and hourly rates." *Yellowbrook Inc. v. Brandeberry*, 708 F.3d 837, 848 (6th Cir. 2013) (internal quotation marks omitted).

4

A. Reasonable Hourly Rate

The burden is on Travelers to prove that the hourly rates requested are reasonable. *Disabled Patriots of Am., Inc. v. Reserve Hotel, Ltd*., 659 F.Supp.2d 877, 885 (N.D. Ohio 2007). Whether the hourly rates claimed are reasonable is determined by reference to the prevailing market rate, *i.e.*, "the rate that is customarily paid in the community to attorneys of reasonably comparable skill, experience, and reputation." *Id.* (internal quotation marks omitted). Courts within this district have historically turned to the Ohio State Bar Association's study of attorney fees for guidance on determining reasonable attorney's fees. See *Wheatt v. City of E. Cleveland*, No. 1:17-CV-377, 2019 U.S. Dist. LEXIS 147551, at *26-28 (N.D. Ohio Aug. 29, 2019); *Postovic v. D2Mgmt., LLC*, No. 5:19-CV-1222, 2019 U.S. Dist. LEXIS 213392, at *6-7 (N.D. Ohio Dec. 11, 2019); *Goff v. Ruff Neon & Lighting Maint., Inc*., No. 1:16-CV-194, 2017 U.S. Dist. LEXIS 19917, at *6-10 (N.D. Ohio Feb. 13, 2017).

Travelers's claimed hourly rates are reasonable. Neither rate is out of proportion with rates customarily paid in Cleveland. The Economics of Law Practice in Ohio in 2019, Ohio State Bar Association, 44-45; (2022), https://www.ohiobar.org/membership/Practice-Management-Tools-Services/economics-of-law-practice-study/. Both rates are less than the median hourly billing rate for firms of similar size to GMC ($240) and to firms with an office in Cleveland ($250-$313). *Id*. at 44. A $200 associate rate is consistent with the median hourly billing rate for attorneys with 3 to 10 years in practice ($200-$215) and less than the median hourly billing rate for attorneys with more than 25 years in practice ($250). *Id*. at 44, 49. A $220 partner rate is less than the median hourly billing rate for an attorney with over 35 years of experience ($250). *Id*. at 44. And both hourly rates are between the median ($170) and 75th percentile ($275) for insurance law. *Id*. at 45.

5

Thus, I find that the $200/hour rate claimed for work performed by Parthum, an associate with over 25 years of experience in insurance law, and Coash, a research attorney with at least 5 years of experience in insurance law, is reasonable. I further find that the $220/hour rate for work performed by Meyer, a partner with over 35 years of experience, is reasonable.

B. Reasonable Number of Hours

RSA raises various objections to the reasonable necessity of the hours Travelers claims. See ECF Doc. 38. I will address each in turn.

1. Lack of Dates

RSA objects to the lack of dates for each of the entries listed in Travelers's bill of costs. ECF Doc. 38 at 2, 4-5. That issue has been rendered moot, however, by Travelers's reply and supplement. See ECF Doc. 40 at 3-5; ECF Doc. 42-4.

2. Block-Billing

RSA further objects to Travelers's use of entries for work on blocks of tasks with undifferentiated time on each discrete task. ECF Doc. 38 at 2-3. RSA takes specific issue with the billing entries claiming: (i) 17.2 hours for preparation of the motion to dismiss and supporting brief; and (ii) 14.4 hours for reviewing RSA's supplemental document production, reviewing the R&R, and preparing a response to objections. Id.

The practice to which RSA refers is known as "block-billing": "a time-keeping method where a lawyer enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Benoist v. Titan Med. Mfg., LLC*, No. 2:19-cv-02704, 2021 U.S. Dist. LEXIS 186829, at *9 (W.D. Tenn. Sept. 29, 2021) (internal quotation marks omitted). Although the practice is discouraged, it is not fatal to a claim for the award of attorney fees. *Id.*; see also *Potter v. Blue Cross Blue Shield of Mich.*, 10 F.Supp.3d 737, 763 (E.D. Mich. 2014).

6

So long as the billing entry adequately describes the work performed, fees can be awarded. *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 705 n.7 (6th Cir. 2016). If not, "the district court may reduce the award accordingly." *Howe v. City of Akron*, 705 Fed.Appx. 376, 383 (6th Cir. 2017) (internal quotation marks omitted).

RSA is correct that the bill of costs submitted by Travelers consists entirely of blockbilling. See ECF Doc. 36. But the descriptions provided, when supplemented by Travelers's billing invoices, are sufficient to describe the work performed, the time spent on each discrete task, and by whom. Compare ECF Doc. 36, with ECF Doc. 42-4; see also Roberts v. Beshear, No. 2:20-CV-054, 2022 U.S. Dist. LEXIS 177243, at *16 (E.D. Ky. Sept. 29, 2022) ("the tasks complained of, including drafting, researching, and editing specific documents, are sufficient to describe the work performed" (alterations and internal quotation marks omitted)). A review of Travelers's redacted billing invoices reveals no duplication between the amount of time spent on preparing the motion to compel/dismiss and the time claimed for legal research. ECF Doc. 42-4 at 3, 5-6. And Travelers's billing invoices properly itemized the time spent on "review," on what, by whom, and when. ECF Doc. 42-4 at 12-14, 17. That leaves the issue of determining the reasonableness of the time claimed to have been spent on each task, which is next.

3. Reasonableness

RSA argues that it was excessive for Travelers to spend two hours preparing for a telephone conference on the discovery dispute when the discovery issues had already been briefed. ECF Doc. 38 at 3. RSA disputes the need for 2.3 hours to prepare a stipulated order on the use of discovery for the previous lawsuit between the parties. ECF Doc. 38 at 3. RSA disputes as duplicative the .7 hours claimed for attending a court proceeding. ECF Doc. 38 at 4.

7

And RSA disputes the need for .5 hours to communicate with the court regarding objections to the R&R. ECF Doc. 38 at 4-5.

I do not find it excessive that Travelers devoted two hours to prepare for the April 27, 2022 telephone conference on the parties' discovery dispute. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1193 (6th Cir. 1997) ("courts should ... exclude excessive, redundant, or otherwise unnecessary hours"). Briefing on Travelers's motion to compel/dismiss concluded on March 14, 2022. See ECF Doc. 18; ECF Doc. 19; ECF Doc. 20. Given the temporal gap between the conclusion of briefing and the date for the telephone conference, it was not unreasonable for Meyer to devote two hours to refreshing himself on the matter before participating.

69

It was likewise not excessive for Travelers to spend 2.3 hours preparing a stipulated order on the use of discovery produced in the previous lawsuit between the parties. The billing invoices reflect that the 2.3 claims reflected work performed by Coash on April 28, 2022: (i) .6 hours reviewing the course of discovery in the previous proceeding; and (ii) 1.7 hours drafting and revising the order. ECF Doc. 42-4 at 11-12. That was not unnecessary or excessive. Whether or not RSA should be required to pay that amount, however, is a separate issue to which I will return when adjusting the lodestar amount.

I do not find any duplication in the .7 hours claimed for communication with RSA and the court and the .7 hours claimed for attending the April 27, 2022 telephone status conference. See ECF Doc. 42-4 at 10-11. However, I find unnecessary the .5 hours claimed by Travelers for communications with RSA and the court regarding RSA's objections to the April 29, 2022 R&R. The billing invoices reflect that the .5 hours claimed represent: (i) .1 hours for an email to the court on June 10, 2022; (ii) .2 hours for emails to RSA on June 13, 2022; and (iii) .2 hours for

8

emails exchanged with the court on June 20, 2022. ECF Doc. 42-4 at 14, 16. Travelers has not attempted to establish why these emails were necessary, especially the June 20, 2022 emails, which were exchanged because Travelers was untimely in filing a response to RSA's objections to the R&R. Accordingly, I will deduct the .5 hours claimed for Meyer's communications with RSA and the court in June 2022.

I have also independently reviewed the billing invoices and compared them to the amounts claimed in the bill of costs. I do not find any of them excessive, redundant, or otherwise unnecessary. See *U.S. Structures, Inc.*, 130 F.3d at 1192.

C. Lodestar Amount

After deducting the .5 hours for communications by Meyer with RSA and the court in June 2022, the resulting lodestar calculation is: ($200 x 45.2 hours) + ($220 x 8.5 hours) = $10,910.

D. Adjusted Lodestar Calculation

RSA argues that it should not have to pay for the time spent by Travelers drafting the stipulated order on the use of discovery from the previous litigation and reviewing that evidence. ECF Doc. 38 at 3-4. RSA argues that that it should also not bear the cost of Travelers's response to RSA's objections to the April 29, 2022 R&R because Travelers made "demonstrably incorrect statements" and "bad faith arguments" pressing for dismissal as a sanction. ECF Doc. 38 at 5-6. RSA argues that Travelers: (i) has "pretend[ed]" not to understand the nature of its insurance claim; (ii) raised objections in this case to evidence that was accepted in the previous lawsuit without objection; and (iii) refused to communicate with RSA on the discovery issues until ordered to do so by the court, preferring to engage in expensive motions practice. ECF Doc. 38 at 6.

9

After establishing the "lodestar," the court may adjust the fee amount to reflect considerations particular to the case. *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000). Applicable factors may include:

> (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Geier v. Sundquist*, 372 F.3d 784, 792 (6th Cir. 2004) (quoting *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

I agree with RSA that it should not have to bear the costs associated with the discovery that was produced in the previous lawsuit. The parties had "substantially completed" paper discovery in their initial lawsuit by August 7, 2019. CM/ECF for N.D. Ohio, No. 1:18-cv-02825, Doc. 13. Despite this case being essentially a continuation of that lawsuit, the court learned on April 27, 2022 that neither party had considered whether to make the discovery already produced available for use in this case. Docket Entry dated 4/27/2022. Both parties are equally responsible for

that omission. I therefore find it inappropriate to award Travelers the 2.3 hours ($460) it seeks for preparing the stipulated order.

I also agree that some reduction should be made with respect to Travelers's response to RSA's objections to the April 29, 2022 R&R. My April 29, 2022 R&R recommending dismissal as a sanction for RSA's discovery violations left open the possibility of lesser sanctions if RSA cured its discovery deficiencies in the 14-day period within which to file objections. ECF Doc. 26. The discovery deficiencies to be cured consisted of: (i) incomplete initial disclosures; (ii) inadequate responses to Interrogatories No. 2, 5, 6, and 8; and (iii) inadequate responses to

10

Requests for Production No. 1, 2, 6-8, 13, 15, 18, 21-26. See ECF Doc. 26 at 14-17. RSA attempted to cure, but, as successfully argued by Travelers in responding to RSA's objections, RSA's responses remained deficient as to Interrogatories Nos. 2, 6, and 8 and Requests for Production Nos. 15 and 21-25. See ECF Doc. 35 at 6-8, 10-13, 17-21. And Travelers correctly identified deficiencies in RSA's revised responses to Requests for Production Nos. 1, 2, 16, and 26, though I concluded that the RSA's responses nevertheless complied with its discovery obligations. ECF Doc. 35 at 14-17, 21-23. However, Travelers also asserted deficiencies to three requests for production that it had not previously contested, two of which were meritless. ECF Doc. 35 at 5-6. In consideration of the results obtained, I find it inappropriate to award Travelers the full amount claimed for responding to RSA's objections. Geier, 372 F.3d at 791. I will therefore deduct 30% ($437.40) to the total amount claimed for reviewing the R&R and preparing a response to RSA's objections.

RSA's remaining arguments do not warrant any further reductions. RSA has repeatedly argued over the course of this discovery dispute that Travelers's objections are unwarranted because, as a party to the underlying insurance claim, it has the insurance claim file and knows the basis of RSA's claim. As previously stated, "that RSA may have provided information to Travelers in the claim adjustment process does not absolve RSA of its obligation[s] under the Federal Rules of Civil Procedure." ECF Doc. 26 at 15-16; see also *McFerrin v. Allstate Prop. & Cas. Co.*, 29 F.Supp.3d 924, 932 (E.D. Ky. 2014) ("The fact that the other party already knows of a potential witness or has a document, does not, by itself, achieve a critical purpose of the Rule 26(a)(1)(A) disclosures." (internal quotation marks omitted)); *SEC v. Cymaticolor Corp.*, 106 F.R.D. 545, 549 (S.D. N.Y. 1985)

("[I]t is irrelevant that the party seeking discovery already knows the facts as to which he seeks discovery.").

11

RSA appears to argue that a reduction is warranted because the discovery in this case is duplicative to that of the previous lawsuit, to which Travelers has raised no objection. The argument appears to be that Travelers should, therefore, not recover for its efforts in litigating deficiencies it did not argue about in the previous proceeding. RSA's two-sentence argument is insufficiently developed to warrant consideration. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

Relatedly, RSA argues that Travelers has made the discovery dispute more expensive by not conferring with RSA after the November 30, 2021 order and instead engaging in motions practice. RSA's argument fails to recognize that the discovery dispute stems from RSA's failure to participate in discovery or communicate with Travelers regarding discovery between June (when RSA failed to respond to Travelers's report of planning meeting) and November 2021 (when Travelers notified the court of the discovery dispute). The November 30, 2021 order was not a re-initiation of discovery; it was a set of final deadlines for RSA to comply with its discovery obligations, with an authorization that Travelers could immediately move for sanctions if RSA failed to meet any one of them. ECF Doc. 16 at 3; Minute Order dated 11/30/2021. Travelers was not required to confer with RSA over the quality of its discovery production before exercising that authorization. It's also worth noting that Travelers did attempt to address the deficiencies in RSA's discovery production. ECF Doc. 18-7. RSA neither responded nor communicated to Travelers as to why it could not timely respond to the deficiency letter. ECF Doc. 18 at 3.

12

The above-discussed reductions amount to $897.40. The adjusted loadstar amount is therefore $10,012.60. Thus, I recommend that Travelers be awarded $10,012.60 in attorney fees.

13

Objections, Review, and Appeal

Within 14 days after being served with a copy of this report & recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Fed.R.Civ.P. 72(b)(2); see also 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs*., 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 301875, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. See *United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

---------

Notes:

[1] Travelers claimed $149 for the .7 hours worked at the $200 rate, which is mathematically incorrect. The table reflects the correct calculation. The total amount has been adjusted accordingly.

[2] The total amount was independently calculated by the court.

---------

**CajunLand Pizza, LLC, et al., Plaintiffs,**
**v.**
**Marco's Franchising, LLC, et al., Defendants.**

No. 3:20-cv-536

United States District Court, N.D. Ohio, Western Division

March 8, 2024

MEMORANDUM OPINION AND ORDER

JEFFREY J. HELMICK, UNITED STATES DISTRICT JUDGE.

I. Introduction & Background

On February 12, 2021, Plaintiffs CajunLand Pizza, LLC and five former Louisiana pizza shop franchisees, (the "Franchisees),[1] filed an Amended and Supplemental Complaint against Defendants Marco's Franchising, LLC ("MFLLC"), Marco's Pizza Holdings, LLC ("MPH"), and Tony Libardi. (Doc. No. 55). In this Complaint, Plaintiffs asserted claims for: (1) violations of the Ohio Deceptive Trade Practices Act ("ODTPA"); (2) tortious interference with contract; and (3) breach of contract with CajunLand.

Collectively, the three Defendants filed a motion to dismiss this Complaint. (Doc. No. 57). In response, Plaintiffs filed both an opposition brief, (Doc. No. 61), and a motion for leave to file a Second Amended and Supplemental Complaint. (Doc. No. 60). With the motion to amend, Plaintiffs sought to add claims for: (1) unfair competition; (2) tortious inference with business relationships; (3) breach of contract with the Franchisees; and (4) violation of the Ohio Business

Opportunity Plan Act ("BOPA"). (Doc. No. 60-1). Defendants opposed Plaintiffs' motion to amend, (Doc. No. 64), and filed a reply in support of their motion to dismiss. (Doc. No. 63). The briefing on this matter then concluded with Plaintiffs' reply in support of the motion to amend. (Doc. No. 66).

On June 8, 2021, Senior United States District Judge James G. Carr issued a ruling on both motions. (Doc. No. 67). Through this Order, Judge Carr dismissed all claims brought by CajunLand and the Franchisees' claims under the ODTPA, but he permitted the Franchisees to amend the Complaint to add the BOPA claims. After further motion practice and discussions regarding the merits of the potential BOPA claim, the Franchisees filed their Third Amended Complaint on August 30, 2021. (Doc. No. 74). In this Complaint, the Franchisees asserted claims against only MFLLC for: (1) breach of contract; and (2) violation of the BOPA. MFLLC then moved to dismiss the BOPA claim, (Doc. No. 76), and Judge Carr granted that motion on December 8, 2021.[2] (Doc. No. 80).

With only the Franchisees' breach of contract claim remaining, MFLLC filed its Answer on January 10, 2022. (Doc. No. 82). Within that Answer, MFLLC asserted counterclaims against now-dismissed CajunLand, the Franchisees, and certain individuals who were "principals, Franchise Owners, and guarantors" of CajunLand or the Franchisees. (Id. at 29). With these counterclaims, MFLLC alleged, in part, that CajunLand and the Franchisees had breached contracts between themselves and MFLLC by failing to pay attorney fees.

3

CajunLand and the Franchisees filed a motion to dismiss the counterclaims on March 15, 2022.[3] (Doc. No. 89). MFLLC filed an opposition brief on April 25, 2022, (Doc. No. 91), and the reply was filed on May 23, 2022. (Doc. No. 96).

Judge Carr issued a ruling on this motion on August 8, 2022.[4] (Doc. No. 98). There, he determined that:

As an initial matter, I find it is more appropriate to construe MFLLC's counterclaims as a request for attorney's fees. While MFLLC alleges that the contract requires plaintiffs and their attorneys (counter-defendants) to pay its fees, it does not allege that counter-defendants have failed to or refuse to do so. Simply put, it does not appear to me that MFLLC has pled facts indicating counter-defendants are in breach.

(Doc. No. 98 at 3). Judge Carr then concluded MFLLC was entitled to recover attorney fees for "successfully defending" against only the ODTPA and the BOPA claims under Section 22.9 of the Area Representative Agreement between MFLLC

and CajunLand, (Doc. No. 13-3 at 42), and Section 21.11 of the respective Franchise Agreements between MFLLC and the Franchisees. (Doc. No. 13-4 at 56; Doc. No. 13-5 at 56; Doc. No. 13-6 at 58; Doc. No. 13-7 at 58; Doc. No. 13-8 at 5253). He concluded MFLLC could not recover attorney fees for any other claims.

Nearly a year after Judge Carr ruled on the subject of attorney fees, MFLLC filed a motion to determine the amount of fees to which they were entitled for the successful defense of the ODTPA and BOPA claims. (Doc. No. 112). In response, Plaintiffs filed a brief: (1) moving for reconsideration of Judge Carr's determination that MFLLC was entitled to fees; and (2) opposing certain fees sought by MFLLC. (Doc. No. 20). MFLLC then filed two briefs: an opposition to

4

Plaintiffs' motion to reconsider, (Doc. No. 125), and a reply in support of the motion to determine the amount of fees. (Doc. No. 124). Plaintiffs did not file a reply in support of their motion to reconsider.

### III. Motion to Reconsider

Plaintiffs move for reconsideration on the issue of whether MFLLC is entitled to attorney fees under the Franchise Agreements, which they now argue are contracts of adhesion. MFLLC opposes this motion, alleging none of the circumstances warranting reconsideration are present here. I agree with MFLLC.

As stated by Judge Carr,

> Motions for reconsideration are disfavored, and a motion for reconsideration is unfounded unless it either calls my attention to an argument or controlling authority that was overlooked or disregarded in the original ruling, presents evidence or argument that could not previously have been submitted, or successfully points out a manifest error of fact or law.

*Davie v. Mitchell*, 291 F.Supp.2d 573, 634 (N.D. Ohio 2003). "'[A]n intervening change in controlling law'" falls within this scope of circumstances which may warrant reconsideration. *Johnson v. Peterson*, 2020 WL, 2126686, at *1 (N.D. Ohio May 5, 2020) (quoting *Plakson Elec. Materials, Inc. v. Allied-Signal, Inc.*, 904 F.Supp. 644, 669 (N.D. Ohio 1995)).

Here, Plaintiffs do not allege Judge Carr overlooked or disregarded any meritorious argument previously raised nor do they contend reconsideration is necessary to correct a manifest error of fact or law. Instead, they argue they are entitled to reconsideration because they "point to new jurisprudence regarding Ohio's interpretation and enforceability of unilateral attorney's fees provision under Ohio law." (Doc. No. 120 at 3). Specifically, Plaintiffs allege the "recent analysis" in *Total Quality Logistics, LLC v. EDA Logistics LLC,* No. 1:21-cv-164, -- F.Supp.3d --, 2023 WL 5057333 (S.D. Ohio July 31, 2023), supports a conclusion that the unilateral attorney fee provision in the Franchise Agreements cannot be enforced. (*Id.*).

5

As correctly noted by MFLLC, the Southern District of Ohio opinion on which Plaintiffs rely is not controlling authority. Therefore, I conclude this opinion is not an "intervening change in controlling law" justifying reconsideration and deny Plaintiffs' motion.

IV. Motion to Determine the Amount of Fees

Through its motion for attorney fees, MFLLC asserts the fees should be calculated using the lodestar method and "seeks $93,234 in fees based on 219.6 hours spent between February 12, 2021, and June 30, 2023." (Doc. No. 112 at 6). Because Plaintiffs do not dispute the method of calculation, I see no reason not to apply it here.

Under this method, "the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983) (quoted by *Bittner v. Tri-County Toyota, Inc.*, 569 N.E.2d 464, 467 (Ohio 1991)). To be awarded fees,

> [t]he party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

> The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S.Rep. No.

94-1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall*, 205 U.S.App.D.C. 390, 401, 641 F.2d 880, 891 (1980) (en banc) (emphasis in original).

*Hensley*, 461 U.S. at 433-34.

In support of its motion, MFLLC submits a spreadsheet detailing date-by-date the number of hours for which it seeks fees and the individual who expended those hours. (Doc. No. 112-1 at 48-54). To show those hours were "reasonably expended," MFLLC submits time records that

6

provide a description of the work performed during those hours. (Id. at 10-47). And to support the hourly rate claimed, MFLLC submits the attestations of attorney W. Barry Blum, (id. at 5-6, 9), and biographies of the attorneys who performed the work. (*Id*. at 55-70).

Plaintiffs do not challenge the reasonableness of the hourly rates sought but seek exclusion of certain hours from the fee calculation. Specifically, Plaintiffs assert MFLLC is not entitled to any fees after the ODTPA and BOPA claims were dismissed and also dispute whether it is entitled to certain fees for hours expended prior to the dismissal.

I also agree the proposed hourly rates are reasonable. Accordingly, the only remaining dispute is whether the hours to which Plaintiffs object were "reasonably expended" by MFLLC in "successfully defending" against the ODTPA and BOPA claims.

A. Fees for Litigating the Fee Issue

Plaintiffs first purport to object to "fees after August 8, 2022," arguing these fees "do not fall under the plain meaning of the [Franchise] Agreement[s]." (Doc. No. 120 at 6). In support, Plaintiffs allege that, "[o]n August 8, 2022, this Court issued its order dismissing plaintiffs ODTPA and BOPA claims," and MFLLC's "successful defense" of the subject claims concluded. (*Id.*). Therefore, Plaintiffs argue any fees after the claims were dismissed do not fall under Section 21.11 of the Franchise Agreements because they were not "incur[red] ... in ... successfully defending a claim that Franchisor defrauded Franchisee into signing this Agreement." (See, e.g., Doc. No. 13-4 at 56). Instead, Plaintiffs allege those fees following dismissal are "fees for collection and costs of enforcement" that fall under Section 21.13 of the Franchise Agreements, which permit MFLLC to recover fees in circumstances that are indisputably not present at this time. (Doc. No. 120 at 6).

First, as an administrative matter, I note that Plaintiffs appear to have erred in their recitation of the procedural history. Judge Carr did not issue an Order dismissing the subject claims on August 8, 2022, but instead issued his first Order regarding attorney fees on this date. (Doc. No.

7

98). Judge Carr issued the Order dismissing the subject claims as to CajunLand on June 8, 2021, (Doc. No. 67), and the Order dismissing the final subject claim as to the Franchisee Plaintiffs on December 8, 2021, at the latest. (Doc. No. 80). Because Plaintiffs substantively challenge MFLLC's entitlement to fees incurred after "the claims had been successfully dismissed," (Doc. No. 120 at 6), I consider this objection to be to all hours expended after December 8, 2021.[5]

Perhaps because of the flaw in Plaintiffs' challenge, MFLLC does not substantively address whether it is contractually entitled to fees for litigating the fee issue. Instead, MFLLC asserts, "Section 21.11 of the Franchise Agreement (like Section 22.9 of the ARA) applies to MFLLC's right to fees for successfully defending certain claims by Plaintiffs, [and] Section 21.13 ... does not apply to the fees awarded in the August 8 Order." (Doc. No. 124 at 4 (emphasis in original)). But the issue now is not which Section applies to fees for "successfully defending certain claims." It is which, if either, Section grants MFLLC the right to fees for litigating the fee issue.

While MFLLC does not address this issue in the context of the contract interpretation, it relies on case law to support its "fees for fees" requests. (Doc. No. 124 at 6-7). But none of the cases cited are on point. Each involves attorneys' fees provided by statute, not contract, and applies reasoning that is not applicable in this case.[6] For example, many of the cases cited adopt the

8

reasoning of the *Prandini* court, which relied on public policy to conclude fees for litigating the issue of statutorily authorized fees could be awarded under the statutory fee authorization, explaining,

> If an attorney is required to expend time litigating his fee claim, yet may not be compensated for that time, the attorney's effective rate for all the hours expended on the case will be correspondingly decreased. Recognizing this fact, attorneys may become wary about taking Title VII cases, civil rights cases, or other cases for which attorneys' fees are statutorily authorized. Such a result would not comport with the purpose behind most statutory fee authorizations, *viz*, the encouragement of attorneys to represent indigent clients and to act as private attorneys general in vindicating congressional policies.... Indeed, courts have consistently held that attorneys may be awarded, under statutory fee authorizations, compensation for the expenses of and time spent litigating the issue of a reasonable fee . for time spent on the fee application and successful fee appeals.

585 F.2d at 53-54 (citations omitted) (quoted by *Ne. Ohio Coal. for the Homeless*, 831 F.3d at 723-24; *Gagne*, 594 F.2d at 343-44; and *Turner*, 746 N.E.2d at 706).

Those public policy concerns do not apply here. MFLLC is not an indigent client seeking to vindicate congressional policy. Instead, it is a sophisticated business entity who contracted for the award of attorneys' fees in certain limited circumstances. MFLLC cites no authority to show "fees for fees" have been awarded under these circumstances absent contractual authorization. Therefore, I cannot conclude MFLLC is entitled to any fees for litigating this fee issue by law or under contract.

Because MFLLC may only recover fees for hours expended to "successfully defend" against the ODTPA and BOPA claims, as previously concluded by Judge

Carr, I sustain Plaintiffs' objections to all fees incurred after the last of those claims were dismissed on or after December 8, 2021, as well as the following entries preceding that Dated:

> 1.) 6/16/2021, WBB, Research re counterclaims re prevailing party fees and claims against guarantors for breach of contract damages (.8), (Doc. No. 112-1 at 21);

> 2.) 10/27/2021, WBB, Review of fee shifting provisions and strategize re same re claims against individuals affiliated with CajunLand (.3), (Doc. No. 112-1 at 19);

9

> 3.) 11/18/2021, WBB, follow up research and correspondence to Twatson re status of other claims and issues regarding relation back and statute of limitations issues (1)[7], (Doc. No. 112-1 at 28); and

> 4.) 12/6/2021, WBB, Preparation of answer and affirmative defenses to breach of contract claims and assess availability of counterclaims based on dismissal of all claims against CajunLand and all non-contract claims against franchisee principals (2.0) telephone conference with TWatson re CajunLand Order, next steps and potential counter claims against principals (.5), (Doc. No. 112-1 at 24).

(See Doc. No. 120-1 at 1-2). Accordingly, the requested fee amount is reduced by $29,831.[8]

> B. Disputed Fees Related to the Successful Defense

Remaining are Plaintiffs' objections to nearly thirty other entries dated prior to the dismissal. While Plaintiffs provide an itemized list of those disputed hours, they do not state a legal or factual challenge to any. (See Doc. No. 120-1). Instead, they generally allege those hours were not sufficiently related to the defense of the ODTPA and BOPA claims. With no meaningful objection, I will briefly critique these disputed entries.

First, I will address Plaintiffs' objections to the following four entries related to motions for deadline extensions filed by MFLLC on April 16, 2021, and September 8, 2021, respectively, (Doc. Nos. 62 and 75):

> 1.) 4/7/2021, BB, Correspondence with Plaintiffs' counsel re agreement to extend time for response to DE 60 motion for leave to amend (0.1), (Doc. No. 112-1 at 16);

> 2.) 4/16/2021, BB, Multiple correspondence with opposing counsel re extension of time to file response to motion to amend to 4/26 (.3); draft, review, and file unopposed motion for extension (.3), (Doc. No. 112-1 at 16);

10

> 3.) 8/31/2021, WBB, Correspondence to opposing counsel re extension request re response to Third Amended Complaint; prepare agreed motion for extension (.3), (Doc. No. 112-1 at 21); and

> 4.) 9/7/2021, WBB, Attention to motion for extension of time to respond to Second Amended Complaint (0.3), (Doc. No. 112-1 at 21).

> (See Doc. No. 120-1 at 1-2). I find it is not reasonable to require Plaintiffs pay attorney fees for extensions sought by MFLLC, especially because Plaintiffs did not oppose either request. Accordingly, I exclude these 1.3 hours and reduce MFLLC's requested fees by $585.[9]

Aside from these, all disputed hours appear to have been "reasonably expended" by MFLLC's counsel to successfully defend against the ODTPA and BOPA claims. MFLLC's counsel has affirmed MFLLC's request does not include fees incurred for hours spent on this case for matters unrelated to these claims. (Doc. No. 112-1 at 3-4). Still, MFLLC admits that some of the fees sought "may have also related to the dismissal of other claims" but urges me to grant the request for these fees because those claims "'involve[d] a common core of facts or [were] based on related legal theories,' [and] it [is] 'difficult to divide the hours expended on a claim-by-claim basis.'" (Doc. No. 112 at 7 (quoting *Hensley*, 461 U.S. at 435)) (altered by me). I agree and see no basis to challenge that assertion. As such, I overrule Plaintiffs' conclusory objections to the remaining entries and conclude MFLLC is entitled to those disputed fees.

11

V. Conclusion

For the foregoing reasons, Plaintiffs' motion for reconsideration is denied, (Doc. No. 120), and MFLLC's motion to determine fees is granted in part and denied in part. (Doc. No. 112). While MFLLC's $93,234 request is reduced by $30,416, I conclude MFLLC has shown it is entitled to the remaining $62,818.

The manner of how these fees should be apportioned between CajunLand and the respective Franchisees and the timeline for when these fees should be paid are not issues presently before me. Accordingly, I find it premature to order any fees be paid at this time. Instead, I order these parties to confer and submit a proposal for such payment for my approval by March 26, 2024.

So Ordered.

---------

Notes:

[1] The Franchisees are Ole Tyme Pizza, LLC; Crescent City Pizza, LLC; Partners Pizza, LLC; SELA PIZZA #1, LLC; and SELA PIZZA #2, LLC.

[2] It appears Judge Carr initially issued this Order on December 6, 2021. But this Order is no longer on the public docket. Instead, the public Order adjudicating this motion was filed on December 8, 2021. Therefore, I consider December 8, 2021, the date of issuance for purposes of this analysis.

[3] Crescent City did not join this motion but had withdrawn its claim against MFLLC and had been dismissed as a Plaintiff before the motion to dismiss was filed. (Doc. No. 87). Default was entered against Crescent as to the counterclaims on May 18, 2022. (Doc. No. 95). No default judgment has issued.

[4] Judge Carr subsequently issued a Revised Order on August 31, 2022. (Doc. No. 100). The Revised Order did not alter the conclusions of his August 8, 2022 Order that are relevant here.

[5] On Plaintiffs' list of objections, they fault specific post-December 8, 2021 entries but do not do the same for any post-August 8, 2022 entry. (Doc. No. 120-1). I admit this seems to indicate Plaintiffs intended their broad "cost of enforcement" objection to apply only to those post-August 8, 2022 fees. But this position does not align with the substantive nature of their challenge.

[6] See *Turner v. Progressive Corp.*, 746 N.E.2d 702 (Ohio Ct. App. 2000) (FLSA, 29 U.S.C. § 216(b)); *Clark v. City of Los Angeles*, 803 F.2d 987 (9th Cir. 1986) (Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988(b)); *Northcross v. Bd. of Educ. of Memphis City Schs.*, 611 F.2d 624 (6th Cir. 1979) (same); *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 868 (6th Cir. 2016) (same); *Gagne v. Maher*, 594 F.2d 336 (2d Cir. 1979) (same); *Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610 (6th Cir. 2007) (False Claims Act); *Prandini v. Nat'l Tea Co.*, 585 F.2d 47 (3d Cir. 1978) (42 U.S.C. § 2000e-5(k)); *Tech. Rubber Co. v. Buckeye Egg Farm, L.P.*, No. 2:99-cv-1413, 2001 WL 1842478 (S.D. Ohio Mar. 7, 2001) (28 U.S.C. § 1447(c)).

[7] In full, this entry requested fees for 1.2 hours of fees for the tasks excluded as well as "correspondence from TWatson regarding reply re motion." (Doc. No. 112-1 at 28). Because this remaining task is arguably related to the successful defense of the subject claims, I have only excluded 1 hour from the request and have found 0.2 hours to have been reasonably expended on this correspondence related to the reply filed days earlier on November 15, 2021. (Doc. No. 78).

[8] The requested is reduced by $28,886 for those fees incurred on and after December 6, 2021, for what MFLLC describes as Phases 5 and 6 of the litigation. (See Doc. No. 112-1 at 52-53). The remaining 2.1 hours were performed by WBB at an hourly rate of $450 - reducing the fee by $945. (Id. at 50-51).

[9] For each of these dates BB or WBB's hourly rate was $450. (See Doc. No. 112-1 at 49 & 51).

---------

**Virginia Matthews APPELLEE,**

v.

**Ohio Bell Telephone Company APPELLANT.**

No. E-82-8, TRIAL COURT NO. 43709.

82-LW-3765 (6th)

Court of Appeals of Ohio, Sixth District, Erie

October 15, 1982

DECISION AND JOURNAL ENTRY

PER CURIAM

    Finding all assignments of error not well taken, judgment of the Erie County Common Pleas Court is affirmed at appellant's costs and cause is remanded to said court for assessment of costs. See Opinion by Douglas, J., and dissent by Connors, P.J., on file.

    A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. See also Supp. R. 4, amended 1/1/80.

Andy Douglas, and John H. Barber, JJ., concur.

**Virginia Matthews Plaintiff-Appellee,**

**v.**

**Ohio Bell Telephone Company Defendant-Appellant.**

C. A. No. E-82-8, C. P. No. 43709.

Court of Appeals of Ohio, Erie County.

October 15, 1982.

Messrs. Michael R. Oker and John A. Pietrykowski, Counsel for appellant.

Mr. James J. Martin, Counsel for appellee.

DOUGLAS, J.

OPINION

1. The sanctity of the home is protected by statutory and constitutional guarantees.

2. Entrance into a private home without permission or consent, even under color of authority, is trespass and thereby a breach of the peace.

3. Compensatory Damages, Punitive Damages, and Attorney's Fees are properly awarded upon a showing that there has been an outrageous violation of a personal right, even absent malice and/or a contemporaneous physical injury.

This case comes before this court on appeal from judgment of the Erie County Court of Common Pleas.

On or about September 18, 1980, an employee of appellant entered the home of appellee, without appellee's knowledge or permission, and removed two telephones from the premises. The employee was acting pursuant to promulgated and published company policy effective July 10, 1980, and known as "P.U.C.O. No. 4 General Exchange Tariff" (hereinafter referred to as "Tariff"). The pertinent part of the Tariff, for our purposes herein, is Section 2(C)(1), which provides that:

> "Equipment, telephones and lines furnished by the Telephone Company on the premises of a subscriber are the property of the Telephone Company, whose agents and employees shall have the right to enter said premises at any reasonable hour for the purpose of installing, inspecting, maintaining or repairing the equipment, telephones and lines, or for the purpose of making collections from coin boxes, or upon termination of the service, for the purpose of removing such equipment, telephones or lines. . ." (Emphasis added).

At the time of the removal of the telephones, appellee was not at home. Upon her return, and sometime later, she discovered that the telephones were missing from her kitchen and master bedroom. Subsequently, on November 4,

1980, appellee filed a complaint in the Erie County Court of Common Pleas against appellant, alleging that the conduct of appellant's employee constituted a willful invasion of appellee's privacy and willful trespass upon appellee's property. Appellee sought to recover compensatory and punitive damages for mental and physical injuries allegedly sustained as a result of the improper entry of her residence by appellant's employee.

In its answer, filed December 4, 1980, appellant admitted that its employee had entered appellee's home without her consent, but denied that such entry was improper. Appellant contended, in its answer and at trial, that its employee was acting lawfully pursuant to its published policy and that the employee had taken great care before and after entering the home. The employee had first knocked on the door and, receiving no answer, the employee checked with a neighbor to see if appellee was home. The neighbor did not know. The employee returned to appellee's home and, finding the door unlocked, entered the home announcing "telephone man". When there was no response, the employee went to the kitchen and then the master bedroom and removed the telephones. The employee then left the premises, having been inside for no more than two minutes.

Upon this set of facts, the appellee, on March 13, 1981, filed a motion seeking partial summary judgment in her favor on the issue of appellant's liability for trespass and invasion of privacy. On October 16, 1981, the trial court granted appellant's motion for partial summary judgment. Thereafter, the matter proceeded to trial on the issue of damages.

On January 13, 1982, the jury returned its verdict, awarding appellee $5,000.00 as compensatory damages and $20,000.00 as punitive damages. On January 29, 1982, the trial court entered judgment upon the jury's verdict. The trial court subsequently denied appellant's motion for judgment notwithstanding the verdict. Appellant then brought this appeal, presenting the following assignments of error:

"FIRST ASSIGNMENT OF ERROR

THE COURT BELOW ERRED TO THE PREJUDICE OF DEFENDANT IN FAILING TO DIRECT A VERDICT FOR DEFENDANT ON THE ISSUE OF PUNITIVE DAMAGES AT THE CLOSE OF PLAINTIFF'S EVIDENCE.

"SECOND ASSIGNMENT OF ERROR

THE COURT BELOW ERRED TO THE PREJUDICE OF DEFENDANT IN ADMITTING TESTIMONY ON THE ISSUE OF ATTORNEYS FEES.

"THIRD ASSIGNMENT OF ERROR

THE COURT BELOW ERRED TO THE PREJUDICE OF DEFENDANT IN FAILING TO DIRECT A VERDICT IN FAVOR OF DEFENDANT AT THE CLOSE OF THE EVIDENCE.

"FOURTH ASSIGNMENT OF ERROR

THE COURT BELOW ERRED TO THE PREJUDICE OF DEFENDANT IN CHARGING THE JURY THAT IT MAY CONSIDER AN AWARD OF COMPENSATORY DAMAGES IN EXCESS OF NOMINAL DAMAGES.

"FIFTH ASSIGNMENT OF ERROR

THE COURT BELOW ERRED TO THE PREJUDICE OF DEFENDANT IN CHARGING THE JURY ON PUNITIVE DAMAGES.

"SIXTH ASSIGNMENT OF ERROR

THE COURT BELOW ERRED TO THE PREJUDICE OF DEFENDANT IN CHARGING THE JURY ON ATTORNEYS FEES.

"SEVENTH ASSIGNMENT OF ERROR

THE COURT BELOW ERRED TO THE PREJUDICE OF DEFENDANT IN FAILING TO ENTER A JUDGMENT FOR DEFENDANT NOTWITHSTANDING THE VERDICT.

"EIGHTH ASSIGNMENT OF ERROR

THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF
THE EVIDENCE."

At the outset, we note that the case before us presents a very difficult question (aside from the damages issue) and one, we feel, that should ultimately be decided by the Supreme Court of this state. We do not say this in an attempt to, in any way, shirk our responsibility, as we intend, herein, to squarely meet the questions presented by appellant and also to decide an issue that we, sua sponte, raise as we review the record on appeal. See App. R. 12(A).

We note that the appellant does not, in its assignments of error, supra, raise the issue of the validity of its tariff. We are aware, from oral argument, that appellant does not want this court to consider, comment, decide or make any judgment concerning the tariff authorization. We decline to follow appellant's advice as we deem that issue to be crucial to our decision and to the determination of appellant's rights to continue to act pursuant to the policy.

In this case, as in all cases coming to us for judgment on appeal, we have four options for decision. We have the authority to (1) reverse and enter final judgment for appellant, (2) reverse and remand with instructions or for further proceedings, (3) modify and enter judgment accordingly or (4) affirm. See App. R. 12(B), (C) and (D).

We first consider options 1 and 2 and, in so doing, we discuss all of appellant's assignments of error together as all of the errors alleged therein relate to the propriety of the award of damages in this case.

Appellant contends that the trial court erred in certain rulings and jury instructions, and in failing to direct a verdict in appellant's favor with respect to the award of compensatory damages in excess of a nominal amount and the awards of punitive damages and attorney's fees. In support of this contention, appellant argues that appellee failed to present any evidence which would entitle her to an award in excess of nominal damages for bare trespass.

Our review of the record reveals that appellee claimed that she had suffered mental and emotional distress as a result of her discovery of appellant's trespass upon her property and invasion of her privacy. Appellee did not claim that she had sustained any property damage or that she had suffered any physical injury as a result of appellant's conduct.

In *Columbus Finance v. Howard* (1975), 42 Ohio St. 2d 178, the Ohio Supreme Court considered the issue of awarding compensatory damages for mental distress, holding, at 184-185, that:

"In a tort action, the measure of damages is normally that amount of money which will compensate and make whole the injured party. Pryor v. Webber (1970), 23 Ohio St. 2d 104, 263 N. E. 2d 235. Plaintiffs should be neither undercompensated nor overcompensated. Ordinarily, the injured party must be able to prove not only that he suffered a particular type of injury, but also the pecuniary value thereof.

"The existence and value of damages attributable to mental anguish and humiliation are notoriously difficult to prove. Such damages are easily feigned and practically impossible to value. Nevertheless, it is a certainty that such damages are caused by some wrongful acts. In an admittedly imperfect effort to separate the valid from the invalid claims, certain rules have been developed. For example, there is liability in this state for negligent infliction of mental distress only if the complained of act also resulted in a contemporaneous physical injury. Miller v. Baltimore & Ohio Southwestern Rd. Co. (1908), 78 Ohio St. 309, 85 N. E. 499; Davis v. Cleveland Ry. Co. (1939), 135 Ohio St. 401, 21 N. E. 2d 169. The apparent rationale behind this rule is that the observable physical injury caused by the wrongdoer sufficiently corroborates the injured party's allegation of unobservable psychic injury. In the absence of a contemporaneous physical injury, damages attributable to mental distress are usually recoverable only if the wrongdoer's act is a malicious or outrageous invasion of a personal right. See Miller v. Baltimore & Ohio Southwestern Rd. Co., supra; Housh v. Peth (1956), 165 Ohio St. 35, 133 N.E. 2d 340. In such a factual situation, the courts are confronted with an innocent victim and an intentional wrongdoer, and hence it is not surprising that the interest of the victim in obtaining full compensation is placed above the interest of the wrongdoer in protecting himself against potentially speculative damage awards." (Emphasis added).

Thus, appellee's recovery of damages attributable to mental distress in the case *sub judice* would be proper only if predicated upon a determination that

appellant's conduct constituted ". . . a malicious or outrageous invasion of a personal right."

Appellee, further sought and recovered punitive damages and attorney's fees. In *Columbus Finance, supra*, the Ohio Supreme Court also addressed this issue, holding at 183, that:

> "It is an established principle of law in this state that punitive damages may be awarded in tort cases involving fraud, insult or malice. Roberts v. Mason (1859), 10 Ohio St. 277; Saberton v. Greenwald (1946), 146 Ohio St. 414, 66 N. E. 2d 224. If punitive damages are proper, the aggrieved party may also recover reasonable attorney fees. Roberts v. Mason, supra; Peckham Iron Co. v. Harper (1884), 41 Ohio St. 100; Davis v. Tunison (1959), 168 Ohio St. 471, 155 N. E. 2d 904."

Appellee's recovery of punitive damages and attorney's fees would, therefore, have been proper only upon a showing that appellant acted with the necessary malice or committed an act which constituted an outrageous invasion of a personal right. In *Detling v. Chockley* (1982), 70 Ohio St. 2d 134, the Ohio Supreme Court, citing Prosser on Torts (4th Ed.), at pp. 9-10, described the malice necessary to sustain an award of punitive damages, at 138, as ". . . such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton."

Thus, the issue underlying all of appellant's assignments of error in this case is whether appellant's conduct constituted an outrageous invasion of appellant's rights. We are constrained to find that it did.

While the record clearly establishes that appellant's employee did not act with any ill will or hatred, it also establishes that appellant's employee acted in accordance with company policy, which was based upon appellant's tariff, supra.

We find this policy constitutes an outrageous invasion of the rights to privacy and to be secure in one's home. We further find that giving judicial sanction to such an egregious violation of such rights would be tantamount to encouraging violence. One need contemplate the potential consequences of appellant's policy but for an instant to raise the spectre of a tragic confrontation between a homeowner, protecting the sanctity of his "castle", and an employee of

appellant, attempting to perform his job as directed by appellant. We, therefore, find that appellant's policy not only constitutes an outrageous violation of personal rights but also poses a threat to the peace of the community and the safety of appellant's employees and customers.

In addition to the foregoing, we raise the issue of the validity of appellant's tariff when considered in light of constitutional guarantees and matters of public policy. The Fourth Amendment to the Constitution of the United States (effective as far back as 1791) and Art. I, Section 14 of the Constitution of Ohio of 1851 (carried forward from the Constitution of 1802, Art. VIII, Section 5) read as follows:

Amendment IV

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Article I, Section 14

"Search warrants and general warrants. The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched and the person and things to be seized."

We recognize, of course, that these guarantees of rights operate on behalf of the governed in restricting action by government against its citizens. Nevertheless, we find the analogy to be pertinent. In order to invade the privacy of one's house the government, whether it be the police to investigate a crime and search for evidence, the health department to investigate violations of health codes or the inspector to check on safety or other code violations, must obtain a warrant which can only be authorized by a proper magistrate after a showing of probable cause. Is it logical, then, for us to give tacit approval to appellant to do, as a private company, what even the governments of the United States, the state of Ohio and the city of Sandusky are not permitted to do? We think not! The rights protected by

the Fourth Amendment to the United States Constitution and the similar provision of the Ohio Constitution (Article I, Section 14) are some of the most sacred of rights which the framers of our Constitutions attempted to protect from unwarranted intrusion by the government into the lives, persons, homes, offices and affairs of all the people. We find it to be proper that private companies and individuals not be given by court decision, whether directly or by implication, greater rights to invade privacy.

Finally, on this point, it occurs to us that the issue of the recovery of the telephones can be compared to questions involving secured transactions. The Ohio Uniform Commercial Code is helpful in the comparison. R.C. 1309.46 and Section 9-503 of the Uniform Commercial Code in pertinent part read as follows:

> "Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. . . ." (Emphasis added).

The quoted section authorizes a secured party to take possession of his collateral upon the default of the debtor, and to do so "without judicial process if this can be done without breach of the peace. . .". The negative implication of this sentence is that a creditor may not employ self-help techniques if doing so would result in a "breach of the peace." The meaning of the phrase "breach of the peace" has been the subject of many judicial opinions. To determine if a breach of the peace has occurred, courts inquire mainly into: (1) whether there was entry by the creditor upon the debtor's premises; and (2) whether the debtor or one acting on his behalf consented to the entry and repossession.

The general rule that entry into a debtor's residence in his absence is a breach of the peace is well-stated in *Girard v. Anderson* (1934), 219 Iowa 142, 257 N.W. 400. The *Girard* case is of further interest as in that case the person entering the home contended, as does appellant in the case at bar, that the door was unlocked. The court said:

> "Appellee contends there was no breaking and entering; that the door was unlocked, and his agents merely turned the doorknob, opened the door, and entered. Under our decisions, this would constitute a breaking and entering;"

Our own Supreme Court has not been silent on the issue. In *Morris v. First National Bank and Trust Co*. (1970), 21 Ohio St. 2d 25, at page 29, the court said:

> "In general terms, a breach of the peace is a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence or tending to provoke or excite others to break the peace, or, as is some times said, it includes any violation of any law enacted to preserve peace and good order. It may consist of an act of violence or an act likely to produce violence." (Emphasis added).

At the same page the court indicated that there is a "fundamental public policy of discouraging extrajudicial acts by citizens when those acts are fraught with the likelihood of resulting violence."

As discussed herein, *supra*, we find the possibilities - yea, even the probabilities - of confrontation resulting in violence to far outweigh any argument of right to enter as urged by appellant. In addition, we very simply find that, *per se*, trespass is a breach of the peace.

Thus for the reasons stated, we find options 1 and 2 (reverse with judgment for appellant or reverse and remand for further proceedings) not to be appropriate. We then come to option 3 - that is, to modify the jury's verdict and the judgment of the trial court.

Appellant has contended that the amounts awarded in this case were excessive when considered in light of the actual damage sustained, and thus the judgment should be modified accordingly.

The purpose of awarding punitive damages is to punish the wrongdoer and to deter such conduct, by the wrongdoer and others, in the future. An award of nominal damages in a case such as this would not act as a deterrent in that any such small penalty could be treated simply as a cost of doing business. Rather, we concur in the jury's determination and find that the amount awarded was necessary to assure that appellant would reconsider its position with respect to a policy so clearly violative of protected rights. In addition, we decline to substitute our judgment for that of a jury and a trial court who heard the witnesses, observed their demeanor, considered all the facts and arguments presented to them and determined accordingly. Thus we find option 3 - to modify the verdict of the jury and the judgment of the trial court - not to be proper or appropriate.

This then leaves us with the last option - to affirm. We do so and observe that "in reaching out to touch someone," "Ma Bell" reached too far. In the process, appellant invaded the privacy of a home, abridged constitutional rights, engaged in a breach of the peace and probably committed a criminal act. To tacitly approve and thereby judicially sanction such conduct, by reversing or modifying the judgment of the trial court, would not, in our judgment, be a wise or sound decision by a court of this level and jurisdiction. It would have been better had appellant "let its fingers do the walking" by preparing proper process to be presented to a court of competent jurisdiction for recovery of its property, absent the cooperation and/or consent of appellee regarding retrieval.

Upon consideration of the foregoing, we find appellant's assignments of error not well taken for the reason that the malice necessary to sustain awards of compensatory damages, punitive damages and attorney's fees was established by the outrageous character of appellant's policy to disregard protected rights.

Accordingly, judgment of the Erie County Court of Common Pleas is affirmed in all respects.

This cause is remanded to said court for assessment of costs. Costs to appellant.

JUDGMENT AFFIRMED.

BARBER, J., concurs; CONNORS, P.J., dissents.

CONNORS, P.J., dissenting. From the record, I can find no basis for an award of compensatory damages in the case *sub judice* as I compare the facts herein with the law as set forth by the Ohio Supreme Court in *Columbus Finance v. Howard* (1975), 42 Ohio St. 2d 178. In this case, the plaintiff was not home, the door was unlocked, a "for sale" sign was posted in the front yard, and the defendant's agent made every attempt to ascertain if anyone was in the home before he entered. In fact, it was not until three days later that plaintiff became "mentally distressed," in the three-day period, thinking that her son had come to her home and taken the two phones for use in his own home. The phones were of the jack-type variety, easily removed, and again, easily placed elsewhere. There was no contemporaneous physical injury, or property damage, "mental distress" asserted three days later, and certainly no act on the part of defendant's agent

which in any way could be construed as malicious or an outrageous invasion of a personal right. *Miller v. Baltimore and Ohio Southwestern Rd. Co*. (1908), 78 Ohio St. 309.

I would first address appellant's third assignment of error, find it well taken, and reverse the judgment of the trial court. From the record, I find no case made out by plaintiff. Coming to that conclusion, the appellant's first, second, fourth, fifth, sixth, seventh, and eighth assignments must be found well taken. The final judgment should be reversed and, pursuant to App. R. 12(B), final judgment entered for defendant-appellant.

Docusign Envelope ID: B1110CE5-9E57-4D86-8765-6B5551310CEB

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**In re:  East Palestine Train Derailment**  :  CASE NO.: 4:23-CV-00242-FYP

**In Response to Class Counsel's**
**Reply in Support of Motion for**          JUDGE:  BENITA Y. PEARSON
**Appeal Bond**

**DECLARATION OF CARLY TUNNO**

1.   I, Carly Tunno, make this declaration under penalty of perjury in accordance with 28 U.S.C. §1746; I have never been convicted of a felony or any crime involving dishonesty.

2.   I am a class member of the plaintiff class in Case No. 4:23-cv-00242-BYP.

3.   I make this declaration in response to the "Declaration of Scott M. Fenwick of Kroll Settlement Administration, LLC Regarding Carly Tunno" (ECF No. 667-1, PageID#.46377-46378).

4.    The last week of June 2024, I mailed a handwritten letter to the settlement administrator, P.O. Box 5324, New York, NY, as directed in the Long Form Class Notice (ECF No. 452-5, PageID#.6131), stating my reasons why I was objecting to the Proposed Settlement, including all other pertinent information required.

5.   In my handwritten letter, I requested to testify, and also requested a response in regards to my questions pertaining to marital household filings, noting

98

that the language formulations in the settlement and accompanying stipulations appeared contradictory in several respects.

6.  It was my understanding that, in order for my objection to be heard and considered, I had to opt into this class action regardless whether or not I agreed with the wording utilized.

7.  Although I personally visited the assistance center, none of the personnel staffing the facility was able to answer any of my questions, or even to make copies of documents needed.

8.  Given that Kroll Settlement was charging $850,000 for a few weeks of work in establishing and operating the assistance center, it would seem reasonable that Mr. Fenwick or Kroll Settlement could have provided their employees with the training, knowledge, and equipment properly to perform the tasks they were hired to accomplish.

9.  I was totally frustrated in terms of obtaining the assistance I was promised as a class member, despite multiple visits to the assistance center during which I attempted to obtain more information about:

a.) The language of the settlement agreement with respect to holding the defendants harmless;

b.) The effect of a household in which spouses were not in agreement as to whether to opt in or out, in light of forms demanding joint filing.

99



Docusign Envelope ID: B1110CE5-9E57-4D86-8765-6B5551310CEB

10.  I outlined all these questions and problems in my objection letter, and included a request to open another assistance center in Pennsylvania, both to facilitate access for class members reliant on public transportation, and to provide assistance in a location not surrounded by toxic chemical contamination (or at least further from ground zero).

11.  Possibly, Mr. Fenwick would have more "personal knowledge" of issues residents had or of the numerous accusations of residents' documents being lost "under his direct supervision" if he had actually spent the time between preliminary and final approval of the settlement in the defined 20 mile radius instead of hiding in Grove Heights, Minnesota.

12.  With letters addressed to Kroll Settlement Administration being mailed to New York City (ECF No. 452-5, PageID#.6134, ¶9), surely it was not merely possible but probable that employees "under his direct supervision" lost or misplaced my documents as well as others.

13.  I find myself in the same position as those involved in a published interview with Steve Mellon, a reporter for *Union Progress*: "Tom didn't want the settlement, nor did Carly. Nor did the 18 or so other Ohio and Pennsylvania derailment-impacted residents who packed into the room. They still had so many questions."  ([https://www.unionprogress.com/2024/09/26/a-600-million-settlement-gets-the-thumbs-up-while-derailment-nightmares-continue/](https://www.unionprogress.com/2024/09/26/a-600-million-settlement-gets-the-thumbs-up-while-derailment-nightmares-continue/))


Initial

Docusign Envelope ID: B1110CE5-9E57-4D86-8765-6B5551310CEB

14.    After mailing my letter of objection, I did not receive timely confirmation it was received; I now know from Mr. Fenwick's declaration that the reason I was never called to testify, and why my objections were ignored, is that Kroll Settlement Administration, LLC managed to "lose" or "misplace" or possibly destroy my timely letter of objection.

15.    As the September 25, 2024 final approval hearing approached, finding myself still left in limbo, it was my understanding that because I objected, I could attend the hearing and be heard by the Court.

16.    However, on the day of that hearing, most class members, myself included, were not permitted to enter the courtroom, and thus we were denied our opportunity to be heard on the record.

17.    To my consternation, my objections were never acknowledged, which I now realize is because Kroll Settlement Administration, LLC claims not to have received (or at least, not retained) my objections—although, because Kroll insisted on addressing me by my unmarried family name, Ricci, instead of my married name (Tunno) in correspondence with me regarding my claim, and makes no claim to have diligently searched its records, still less under both "Tunno" and "Ricci"-- Kroll's mishandling leaves me legally bound by a class action settlement to which I timely objected.

18.    I am outraged that, as a class member, I was represented by class


Initial

101

counsel who were unavailable to actually counsel me on my issues of concern.

19.   Unfortunately, class counsel were too occupied burying unfavorable chemical test results and running counterfactual PR campaigns.

20.   In my individual situation, my husband finds the settlement terms acceptable, and I do not, but we are a single household, meaning I had to opt in so he could claim his share because a household must file jointly.

21.   I am unwilling to hold defendants harmless in order to opt out of the medical monitoring waiver, which strikes me as a catch-22 if you will.

22.   Nowhere in my marriage vows do I recall agreeing to give up my rights as an American citizen.

23.   The foregoing was all stated in my objection letter.

24.   After the final settlement hearing, I felt I had no other choice but to appeal.

25.   I agreed in good faith to be represented by Attorney Graham in this appeal process.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 29th day of November, 2024.

**Carly Tunno**