Case No.  24-3880
# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

In re:  EAST PALESTINE TRAIN DERAILMENT
--------------------------------
ZSUZSA TROYAN, TAMARA FREEZE, SHARON LYNCH, and CARLY TUNNO,

> Interested Parties-Appellants

HAROLD R. FEEZLE, On Behalf of Themselves and All Others Similarly Situated; SUSAN E. SCHEUFELE, On Behalf of Themselves and All Others Similarly Situated; DAVID J. SCHEUFELE, On Behalf of Themselves and All Others Similarly Situated; ROLLERENA AUTO SALES, LLC, On Behalf of Themselves and All Others Similarly Situated; MARILYN FIGLEY, On Behalf of Themselves and All Others Similarly Situated; ROSEMARY MOZUCH, On Behalf of Themselves and All Others Similarly Situated; CHARLES MOZUCH, On Behalf of Themselves and All Others Similarly Situated; JON LUKE AFFELTRANGER, On Behalf of Themselves and All Others Similarly Situated; EDWARD E. BARNHOUSE, On Behalf of Themselves and All Others Similarly Situated; LAURA MANN,

> Plaintiffs - Appellees

v.

NORFOLK SOUTHERN RAILWAY COMPANY; NORFOLK SOUTHERN CORPORATION,

> Defendants – Appellees

_____/

# REPLY BRIEF OF
## ZSUZSA TROYAN, TAMARA FREEZE, SHARON LYNCH, and CARLY TUNNO,
### Interested Parties-Appellants

**Submitted by:**
David M. Graham, *pro hac vice*
**Attorney for Appellants**
210 E. Forsyth St.
Jacksonville, FL 32202
(904) 567-6529

# TABLE OF CONTENTS

Table of Contents                                                    p. i

Table of Citations                                                   p. iii

Statement of Issues in Reply                                         p. vii

Reply to Class Counsel's "Introduction"                             p. 1

Reply to Norfolk Southern's "Introduction"                          p. 1

Reply to Class Counsel's "Statement of the Case"                    p. 2

    A.  "Legal Background"                       p. 2

    B.  Factual and Procedural Background        p. 3

    C.  The Settlement                           p. 4

Reply to Norfolk Southern's "Statement of the Case"                 p. 4

Issue [Non-] Preservation                                           p. 6

Reply to Class Counsel's Argument                                   p. 7

    Issue I. The district court abused its discretion in approving
    Final Settlement of this class action                   p. 7

        A.  Adequacy of Representation         p. 7

        B.  Arms' Length Negotiation/Collusion  p. 11

        C.  Adequacy of the Settlement         p. 14

        D.  Inequitable Treatment of Class Members *Inter Sese*  p. 18

        E.  Class Counsel's Fees and Costs     p. 19

    Issue II:  The district court clearly erred in approving the class notice.  p. 20

Issue III:  On remand, this case should be reassigned to a different judge.  p. 22

Reply to NS's Argument                                                    p. 23

Issue I. The district court abused its discretion in approving
Final Settlement of this class action                                     p.  23

Conclusion                                                                p. 28

Certificate of Compliance                                                 p. 28

# TABLE OF CITATIONS

## Cases

*Ansfield v Omnicare, Inc.*, 769 F.3d 455 (6th Cir. 2014)  p. 23

*In re Bluetooth Headset Products Liab. Litig*., 654 F.3d 935
(9th Cir.2011)  p. 16

*Castelvetere v. Messer*, 611 F. App'x 250 (6th Cir. 2015)  p. 19

*In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014)  p. 6

*DiMacchia v. Burke*, 904 F.2d 36 (6th Cir. 1990)  p. 13

*In re Dry Max Pampers Litig*., 724 F.3d 713 (6th Cir.2013)  p. 16

*Gascho v. Global Fitness Holdings*, LLC, 822 F.3d 269 (6th Cir. 2016) pp. 16, 17

*In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075 (6th Cir. 1984) pp. 16-17

*First Nat'l. Bank of Durant v. Trans Terra Corp. Int'l.*, 142 F.3d 802
(5th Cir. 1998)  p. 14

*Giovanni v. U.S. Dep't of the Navy*, 906 F.3d 94, 102 (3rd Cir. 2018)  p. 24

*Grade v. BNSF Ry. Co*., 676 F.3d 680 (8th Cir. 2012)  p. 25

*Graff Trucking Co. v. Kelley*, 914 F.2d 256 (6th Cir. 1990)  p. 27

*Greene v  B.F. Goodrich Avionics Systems, Inc.*, 409 F.3d 784
(6th Cir. 2005)  pp. 3, 7, 9

*In re Hanford Nuclear Reservation Ligitation*, 534 F.3d 986
(9th Cir. 2007)  p. 26

*Hirsch v. CSX Transp., Inc.*, 656 F.3d 359 (6th Cir. 2011)  p. 17

*Indiana Harbor Belt R.R. Co. v. American Cyanamid Co.*,
916 F.2d 1174 (7th Cir. 1990)  p. 26

iii

*Liteky v. United States*, 510 U.S. 540 (1994)                    p. 22

*Littleton Stamp & Coin Co., Inc. v. Delta Airlines, Inc.*, 778 F.2d 53
    (1st Cir. 1985).                                     p. 26

*Ludlow v. BP, Inc.*, 800 F.3d 674 (5th Cir. 2015)                p. 6

*Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910 (7th Cir. 2014)  p. 6

*Michigan Pub Utilities Comm'n v. Duke*, 266 U.S. 570 (1925)      p. 26

*National Steel Service Center v Gibbons*, 693 F.2d 817 (8th Cir. 1982) p. 26

*Nickels v. Grand Trunk W.R.R. Co. Inc.*, 560 F.3d 426 (6th Cir. 2009) p. 25

*Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004)            p. 6

*Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513
    (6th Cir.1993)                                        p. 16

*Roth v. Norfalco, LLC*, 651 F.3d 367 (3rd Cir. 2011)            p. 25

*Tetro v. Elliott Popham Pontiac, etc.*, 173 F.3d 988 (6th Cir. 1999)  p. 19

*United Auto., Aerospace and Agr. Implement Workers of
    America v. General Motors Corp.*, 497 F. 3d 615 (6th Cir. 2007)  pp. 16, 17

*United States v. Am. Ry. Express Co.*, 265 U.S. 425 (1924)       p. 6

*United States v. Burch*, 781 F.3d 342 (6th Cir. 2015)            p. 6

*U.S. v. McGee*, 494 F.3d 551 (6th Cir. 2007)                    p. 10

*Youn v. Track, Inc.*, 324 F.3d 409 (6th Cir. 2003)              p. 22

## Statutes

5 U.S.C. §5704                                                  p. 18

18 U.S.C. §1821(b) and (c)(2)                                   p. 18

28 U.S.C. §144                                              p. 22

28 USC §1367                                                p. 6

42 U.S.C. §9607(a)(4)                                       p. 24

42 U.S.C. § 9614(a)                                         p. 24

42 U.S.C. § 9652(d)                                         p. 24

42 U.S.C. § 9659(h)                                         p. 24

49 U.S.C. §§5101-5128 (Hazardous Materials Transportation Act)   p 25

49 U.S.C. §20106                                            pp. 24-25

## Court Rules

F.R.A.P. 3(c)(4)                                            p. 19

F.R.A.P. 34(a)(2)(C)                                        p. 2

F.R.Civ.P. 11(c)(2)                                         p. 27

F.R.Civ.P. 23(f)                                            p. 6

F.R.Civ.P. 30(d)(1)                                         p. 18

FRE 201(a)                                                  p. 23

## Miscellaneous

https://en.wikipedia.org/wiki/Seizure_of_the_Black_Hills          p. 16

https://www.gsa.gov/travel/plan-a-trip/transportation-airfare-rates-pov-rates-etc/privately-owned-vehicle-pov-mileage-reimbursement/pov-mileage-rates-archived          pp. 18-19

Harmon-Jones and Mills, "An Introduction to Cognitive Dissonance
Theory and an Overview of Current Perspectives on the Theory"
(© 2019, Am. Psychological Ass'n)                          p. 11
https://www.apa.org/pubs/books/Cognitive-Dissonance-Intro-Sample.pdf.

https://www.hazmatschool.com/blog/most-toxic-train-spills-
in-us-history/                                             p. 14

Ohio Rule of Professional Conduct 1.8(h)                  pp. 13-14

https://stockanalysis.com/stocks/nsc/market-cap/          p. 14

https://tinyurl.com/4vb92vhh                              p. 23

## STATEMENT OF ISSUES in REPLY

**Issue I. Did the district court abuse its discretion in approving Final Settlement of this Class Action?**

**Issue II:  Did the district court clearly err in approving the class notice?**

**Issue III:  On remand, this case should be reassigned to a different judge?**

**REPLY TO CLASS COUNSEL'S "INTRODUCTION"**

Class counsel predictably commence their defense of settlement by vigorously extolling themselves, confusing bombast with barristry. Of course, every settlement achieves *something*. If merely exceeding zero accomplishment sufficed, appellate review of class action settlements would be a juristic walk in the park. Substantially more is required.

**REPLY TO NORFOLK SOUTHERN'S "INTRODUCTION"**

Norfolk Southern ("NS") applauds its own "generosity" and misrepresents that the maximum share of the settlement enjoyed by a select few class members is typical. Notably, this section of NS's brief contains no reference to the record, exposing it as *ipse dixit*.

NS also touts its allocation of money for this or that *outside the Settlement*[1], all of which is both unsupported by the record and irrelevant.

**REPLY TO CLASS COUNSEL'S "STATEMENT OF THE CASE"**

**A. "Legal Background"**

This section addresses standard of review with less detail than, and no dispute with, appellants.

---

[1] It's not until p. 18 of Norfolk Southern's brief that we learn this purported "philanthropy" merely reflects a consent decree with the Environmental Protection Agency under CERCLA.

## B.    Factual and Procedural Background

Class counsel first congratulate themselves for successfully seeking a shortened discovery and trial schedule, then immediately excuse their performance failures because they had "only six months to work" (Dkt. 39, p. 20). Eleven months of discovery separated the Master Complaint from settlement--if that was insufficient, class counsel have only themselves to blame.

Next, class counsel seek this Court's sympathy because NS's counsel repeatedly indicated "they planned to appeal any loss" (Dkt. 39, p. 21). Horrors! Apparently, class counsel are unfamiliar with posturing to induce favorable settlement. Throughout this nauseating recitation, class counsel cite only the prior *undocumented* declaration (R. 518-2) they foisted on the district court.[2]

Class counsel excoriate undersigned counsel for declining an opportunity to address the district court during the final fairness hearing. But, they admit, Judge Pearson first announced she had "read all submitted objections" (R. 553, PageID#.14480). Having said his piece in written submissions, undersigned counsel had nothing to add, and no reason to expect oral repetition would achieve a more persuasive effect. F.R.A.P. 34(a)(2)(C) permits courts of appeal to dispense with oral argument when the briefs adequately present the facts and law "and the

---

[2] Declarations are evidence, at least, but when made by counsel of record are not only self-serving and bereft of cross-examination, but based on information to which only they are privy. Appellants had no opportunity for discovery and no right to test the verisimilitude of these representations.

decisional process would not be significantly aided by oral argument". As this Court has recognized, <u>the principal value of oral argument is responding to the judge's concerns</u>. *Greene v B.F. Goodrich Avionics Systems, Inc.*, 409 F.3d 784, 792 n. 7 (6th Cir. 2005). <u>Judge Pearson had no questions for undersigned counsel</u>.

## C.     The Settlement

Class counsel detail the settlement fund's four components:

- attorney fees and expenses ($180 million);

- "direct payments" to compensate "communal or shared losses" of "use and enjoyment of property, shared personal property within the home, and communal expenses associated with relocation or displacement" (less prior payments). *Documentation is required*, and a point system ostensibly measures 12 categories of information;

- "business loss payments" (not applicable to appellants); and

- "voluntary 'personal injury payments', limited to persons living within 10 miles of ground zero, involving another point system (this time with 30 factors across 8 categories). "Voluntary" means a class member can choose to apply for a pro rata payment, or reserve the right to sue (appellants reserved).

Notably, class counsel's share is the largest component, leaving an average of $140 million each for the other three categories. Importantly, there is no category for individual losses, which could generate untold anomalies. Moreover,

class members who stayed with relatives during evacuation have no *documentation*, such as hotel receipts, regarding loss of use of their homes. Class counsel may have been strong on the minutia, but they fell woefully short on the big picture. No justification, still less a convincing one, is provided for not pursuing punitive damages, attorney fees other than from the settlement fund, or for abandoning the medical monitoring claim.

Describing Kroll Settlement Administration's involvement, class counsel assert (Dkt. 39, p. 23) Kroll provided a telephone number "for people to call if they had questions", and opened a claims center in East Palestine. Who answered the telephone or staffed the claims center? What information and knowledge did they possess? What qualified them to so function? Appellant Carly Tunno went to the claims center on multiple occasions, but her questions went unanswered (R. 711, PageID#.51593, ¶¶7-9). The "help line" and "claims center" are thus exposed as a lawyerly version of a Potemkin Village.

Class counsel complain that these appeals are delaying distribution of funds. But why that should impact *adjudication* of these appeals on the merits is unexplained—if true, it would justify a motion to expedite the appeals. But instead of seeking expedition, class counsel sought and were granted extra time to submit their brief, then filed at the deadline. Delay in settlement fund distribution reflects class counsel's shortcomings in negotiating settlement terms.

Class counsel contend that a few objectors should not stand in the way of the much larger number of class members who accepted the settlement—wholly failing to consider the 130,000 households who failed to timely opt in or out (some substantial proportion of whom did not have sufficient time because of the 31 day time frame[3]), whose rights to seek recompense from NS are now forever barred.

### REPLY TO NORFOLK SOUTHERN'S "STATEMENT OF THE CASE"

Aside from boilerplate, NS contends its attempt to dismiss all state law tort claims as preempted by unspecified federal law was denied "without prejudice", and could have been asserted by motion for summary judgment. True—but any notion NS's preemption argument has arguable merit is false, as shown below.

NS regurgitates the expected litany—"almost" 100 depositions and a "mountain" of documents, ostensibly combined to set "up substantial factual disputes." More unverifiable *ipse dixit*—no part of the discovery material is in the record. Factual disputes about *what* of *relevance* to liability or damages? This Court will find answer to those obvious questions in NS's brief.

Next, NS contends expenditures it made *de hors* the settlement for things like remediating the municipal water supply "would have posed a substantial risk

---

[3] So rigidly was the time limit designed persons with disabilities, those who were ill, and those who may have been away from home for a variety of reasons were allowed no leeway. Class counsel speak of the community desiring "closure", but their version involved slamming the door on every class member whose ability to opt in or out intelligently within 31 days may have been compromised.

to the scope of Plaintiffs' recovery"  But nowhere in the 1st Amended Master Class Action Complaint (R. 138) was there any claim for damages to "infrastructure" or evacuation expenses—meaning whatever NS expended on such things is NOT a credit against NS's tort liability in THIS lawsuit.  The City of East Palestine is NOT a class member or party hereto, either.

NS next notes class certification was not a foregone conclusion, suggesting an appeal under F.R.Civ.P. 23(f) might have significantly delayed trial or recovery of damages.  All true—here, and in essentially every class action.  But, after amendments to 28 USC §1367, toxic events have repeatedly led to class certification—*Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004); accord: *Ludlow v. BP, Inc.*, 800 F.3d 674 (5th Cir. 2015); *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014); *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910 (7th Cir. 2014).  NS proffers no clear reason, or authority, this case should be different.

Finally, NS discusses its claims for contribution against third parties, or the equivalent.  Appellants wish NS success, but third party claims are entirely irrelevant.

## ISSUE [NON-]PRESERVATION

Appellees who do not file a cross-appeal may may "urge in support of a decree any matter appearing in the record, although [their] argument may involve an attack upon the reasoning of the lower court or an insistence upon matter

overlooked or ignored by it." *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924); see also *United States v. Burch* , 781 F.3d 342, 344 (6th Cir. 2015). As shown below, appellees improperly base a major portion of their argument on matters *outside* the record.

## REPLY TO CLASS COUNSEL'S ARGUMENT

**Issue I. The district court abused its discretion in approving Final Settlement of this Class Action. [Issue II in appellants' brief.]**

**A.    Adequacy of Representation**

Class counsel begin by regarding the question of the adequacy of their representation of the class as purely a numbers game. Since they invested 59,000 hours, conducted dozens of depositions, responded to interrogatories[4], litigated one discovery motion, and filed a 92-page complaint and 104-page amended complaint, they "reason" they must have satisfied this adequacy requirement. Horsefeathers. As this Court held in *Greene, id*.:

> Simply put, Greene's statistics regarding the removal, replacement, and repairs of vertical gyroscopes and ADIs in the PHI fleet are meaningless and are not, without [evidence of expected useful life of vertical gyroscopes], probative of a manufacturing defect.

Not a scintilla of *evidence* in the record—including Ms. Graham's self-

---

[4] Class counsel seem to feel they have gone "above and beyond" merely by fulfilling the minimal obligations of the job—but crafting and answering interrogatories, deposing witnesses and parties, drafting and revising complaints, are things every lawyer involved in litigation does every day. It's quotidian, not superlative.

serving declaration—provides a basis for concluding those "59,000" hours of effort were beneficial to the class. Judge Pearson made no effort to look behind the numbers for a *qualitative assessment* of class counsel's performance. Any *quantitative* argument is meaningless absent actual proof every hour, deposition, etc. was focused, productive, and well-conceived.

Next, class counsel assert the district court "witnessed firsthand Counsel's dedication to the class". When? How? There were a handful of court appearances, most of which were pro forma:

6/12/23 conference call on ESI discovery 2 hrs 16 min
6/26/23 case management conference via Zoom 1hr 33 min
8/30/23 telephonic discovery dispute conference (23 pg transcript per R. 166)
9/27/23 telephonic status conference (R. 214 53 pg transcript)
11/8/23 telephonic status conference 2 hrs 10 min.(R. 258 85 pg transcript)
11/28/23 telephonic status conference 4 min (R. 214 53 pg transcript)
11/29/23 telephonic status conference  before Magistrate Judge Henderson 30 min
2/9/24 status conference 3 hrs 55 min
9/25/24 final approval hearing 2 hrs 45 min

Start to finish, Judge Pearson held only 8 hours of corporeal hearings plus 6 hours by telephone, with only three hearings involving a dispute yielding an adjudication. How Judge Pearson thereby gained insight into the amount or quality of class counsel's 58,986 hours of work *outside of court* cannot be explained. Even if such minimal sampling allowed Judge Pearson to assess the skills of the few attorneys with whom she interacted, it couldn't possibly give her reliable insight into the *behind the scenes* contributions of some *135 other lawyers*.

Class counsel demand credit for defeating NS's motion to dismiss (R. 76). Give it to them. They submitted a single brief (R. 103)—how many of the 59,000 hours that consumed is not specified. Motions to dismiss are routine; attributing a $162 million attorney fee for briefing *one* boggles the mind. Again, the issue is whether class counsel fulfilled their duty to the class and put the interests of the class ahead of their own. Submitting a single brief on a single motion does nothing to definitively satisfy that requirement.

Class counsel resort to sly word games—they dispute that the million-plus documents they reviewed were not shown to be "relevant, substantive, or even reviewed". But they offer only citations to other cases (non-precedential district court cases from other circuits) for the proposition class action discovery can generate large document tranches—which *evades* appellants' point. Appellants challenge the *quality* of class counsel's performance, and *quantitative* measures do nothing to inform *qualitative* evaluations. *Greene, supra*.

Finally, class counsel argue the contention they suppressed key sampling data is flawed in multiple respects. The toxic data clearly [also] address *property damage* compensation, in which appellants *will* participate. Indeed, that's the quiddity of appellant's point—the pittance appellants will receive for property damage are attributable to class counsel's misleading campaign suggesting minimal residual toxic pollution, when the actual levels are significantly more

hazardous.

Next, class counsel maintain Dr. Carson was not retained as their expert—based on their unsworn *ipse dixit* during the final hearing. Class counsel do not deny that: Carson was proffered *by them* to assuage concerns; his credentials were publicized *by them* or with their connivance; and his sobriquet, "Dr."—not "neighbor", "concerned citizen with no expertise", "random guy"—was *always* mentioned whenever his name was invoked. That class counsel made additional, *ipse dixit* arguments during the final hearing, wholly unsupported by any *evidence in the record*, does nothing to efface their fraudulent manipulations. Arguments of counsel are simply not evidence. *U.S. v. McGee*, 494 F.3d 551, 555 (6th Cir. 2007).

Class counsel next represent they retained "numerous experts". Really? Where in the record are the names of these paragons of scientific wisdom? The only known experts utilized by class counsel are Dr. Carson (whom class counsel now disavow as *an* expert, still less as *their* expert) and Stephen Petty.

Class counsel claim they "debunked" the new data submitted by Rev. Sheely—but class counsel themselves have no known expertise as toxicologists, chemists, or medical professionals. Yet their supposed "debunking" consists solely of class counsel's *unsworn* arguments that "we knew this", even though their *own expert* considered this data both new *and* concerning. Stephen Petty Declaration (R. 543-4, PageID#.13268-9, 13270-3). Meanwhile, class counsel have refused to

disclose whatever expert reports they claim to have considered when negotiating settlement, or to justify their refusal to seek renegotiation when the later data demonstrated to their *own expert* they had been operating under false assumptions as to residual toxicity levels. And Judge Pearson had no basis, other than class counsel's *ipse dixit*, for concluding "Class Counsel had an adequate basis of information to fairly assess the claims". Correlatively, Judge Pearson's determination that "Objectors' declarations had no bearing on the adequacy of Class Counsel's representation or the fairness of the settlement" reflects only that she had her mind made up, just as class counsel (after securing their $162 million fee) did, and that this cognitive dissonance[5] made them incapable of revising their positions when the facts drastically changed.

## B.      Arms' Length Negotiation/Collusion

Predictably, class counsel [and NS separately] contend the involvement of

---

[5] "A psychological state of discomfort that occurs when a person's beliefs, values, or actions are in conflict." "The existence of dissonance, being psychologically uncomfortable, motivates the person to reduce the dissonance and leads to avoidance of information likely to increase the dissonance." Harmon-Jones and Mills, "An Introduction to Cognitive Dissonance Theory and an Overview of Current Perspectives on the Theory" (© 2019, Am. Psychological Ass'n). https://www.apa.org/pubs/books/Cognitive-Dissonance-Intro-Sample.pdf.

*N.B.*    Undersigned counsel has no intention of diagnosing either Judge Pearson or class counsel, psychologically or otherwise. This is an attempt to explain why dispositive information has been vehemently ignored by apparently intelligent people in order to approve settlement herein.

retired Judge Phillips establishes that negotiations were arms' length, good faith, and collusion free. However, Judge Phillips was not involved when class counsel negotiated their fee with NS, which, since it left the total settlement price unchanged, had no dog in the fight. Moreover, Judge Phillips' participation ended before the new data came to light (*e.g.*, R. 540)—which led class counsel's expert, Stephen Petty, to revise *his* position (R. 543-4). So granting that involvement of a reputable mediator ordinarily provides some assurance everything is kosher, *here, no such assumption can be indulged* because the mediator was absent at the relevant junctures.

Class counsel accuse appellants of charging them with colluding with Norfolk Southern, and even provide references to appellants' briefs—but <u>no</u> such allegation can be found therein. Make no mistake—appellants DO contend class counsel withheld their expert report(s) from the class they supposedly represent, misrepresented the magnitude of merit in NS's preemption defense (see below pp. 23-26), and falsely claimed support from reports of retained experts which are not in the record, *inter alia*.[6]

Note also class counsel's blatant flip-flops. First, they contend the 11

---

[6] One is reminded of President Truman's clarification at a whistlestop during his 1948 presidential campaign that featured his usual speech about a "do nothing Congress". When an audience member shouted, "Give 'em hell, Harry!" Mr. Truman responded, "I just tell the truth about them, and they think it's Hell." Class counsel react similarly when their shortcomings are exposed.

months between filing the Master Complaint and settlement evidences good faith and fairness.  Then, in the very next paragraph, they argue they never exchanged expert reports during discovery because settlement was achieved.  The point is not whether class counsel exchanged expert reports with Norfolk Southern; the gravamen of the problem is class counsel withheld their expert report(s) *from their own clients* and sold them a bill of goods based on discounting the remaining toxic hazards to induce class members to opt in to settlement.

Perhaps class counsel were misled by the early data, as Stephen Petty was; there's no shame in that.  *The inexcusable dereliction involves refusing to recognize that the later data change everything*.  Class counsel's insistence on adhering to their original position after its factual foundation has evaporated is obscenely discreditable, and unacceptable in the context of a class action settlement.

The idea that class counsel negotiated with NS to include a provision in the settlement agreement purportedly barring class counsel from allowing their clients to review their expert report(s) (class counsel's brief, p. 43) suggests attorneys may contract with adverse parties to insulate themselves from ethical obligations to clients.  Let there be no doubt—class counsel's primary obligation, *at all times*, was to the plaintiff class.  *DiMacchia v. Burke*, 904 F.2d 36, fn. 3 (6th Cir. 1990).  Class counsel could not contract it away.  Ohio Rule of Professional Conduct

1.8(h); *First Nat'l. Bank of Durant v. Trans Terra Corp. Int'l.*, 142 F.3d 802, 810 (5th Cir. 1998).

Next, class counsel scornfully dismiss appellants' discussion of attorney-client and work-product privilege, urging that "Nothing about attorney-client privilege or the like was raised below.[7]" Excellent—class counsel are abandoning *their* previous *off the record* invocation of privilege as justifying their refusal to share their expert reports with their own clients.

## C. Adequacy of the Settlement

Class counsel contend—as usual, absent supporting *evidence* in the record (their own prior self-serving bloviations not being evidence of anything)—that $600 million "is one of the largest-ever amounts in a railroad-derailment class-action suit". Even if true, this statistic is meaningless —*this* was also the worst and most toxic derailment in history, involving a mushroom cloud of poisons over 30 miles in diameter. https://www.hazmatschool.com/blog/most-toxic-train-spills-in-us-history/. The issue is not whether $600 million is the largest settlement in a derailment, but whether $600 million is *adequate* given the initial and residual toxic dangers to class members. NS has a market value of $57.36 billion, and an enterprise value of $72.92 billion. https://stockanalysis.com/stocks/nsc/market-

---

[7] Class counsel's invocation of privilege appeared in correspondence with counsel for various *other* objectors. Appellants had no occasion or opportunity to challenge privilege claims raised *outside the record*, so *class counsel* failed to preserve the issue for appeal.

cap/. In a situation where NS has strict liability and, under Ohio law, is liable to pay attorney fees, $600 million for disrupting the lives and poisoning the homes of 195,000 households (many consisting of multiple individuals) represents only a bit more than $3,000 per family (and, as class counsel are at pains to elucidate, that is an overstatement, because a big chunk of the $600 million is for businesses, another chunk for those accepting personal injury compensation, and $180 million for attorney fees and expenses). In that context, the only way to describe $600 million—less than 1% of NS's enterprise value—is "chump change".

Class counsel tout Judge Pearson's inclusion of "indirect recovery"—presumably meaning the amount the EPA compelled Norfolk Southern to pay under CERCLA to remediate the pollution on public lands and navigable watercourses—in her evaluation. But why should class counsel get any credit for that? They contributed nothing to achieving it, and it does not compensate *their clients* for economic or other losses.

Mirroring NS's arguments, class counsel suggest—citing no authority and providing no analysis—that NS's threats to appeal any adverse judgment and the "risks of litigation" justified a settlement. Every settlement eliminates risk in favor of certainty. Every defendant facing mass tort liability raises a panoply of defenses, postures and threatens endless appeals, and makes every effort to frighten the faint-hearted into settling on dictated terms. If such scenery-chewing theatrics

justify class counsel's pusillanimous acceptance of a pittance, appellate review is pointless, because these excuses apply in every class action defended by lawyers with any kind of pulse.

Class counsel claim, again *ipse dixit*, they provided the community a sense of "closure". Nothing in the record supports this purported "closure". Just as when the United States offered the Siouan Native Americans $106 million in 1979 to settle the tribes' claim to the Black Hills did not result in "closure" (https://en.wikipedia.org/wiki/Seizure_of_the_Black_Hills), here, "closure" exists only in class counsel's imagination.

Class counsel contend their determination to release medical monitoring claims "was fair, reasonable and adequate", classic boilerplate eagerly swallowed by Judge Pearson without critical scrutiny. Class counsel simply have no real answer to the authorities cited in appellants' brief, which require a district court to conduct an actual, searching inquiry in order to fulfill its fiduciary duty to the class. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir.2013); see also *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir.1993); *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 947 (9th Cir.2011); *Gascho v. Global Fitness Holdings*, LLC, 822 F.3d 269, 297-8 (6th Cir. 2016); *United Auto., Aerospace and Agr. Implement Workers of America v. General Motors Corp.*, 497 F. 3d 615, 631 (6th Cir. 2007); *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d

1075, 1086 (6th Cir. 1984). Of these authorities, class counsel's brief cites only two—*Gascho* for the abuse of discretion standard of review and the propriety of negotiating attorney fees prior to or as part of settlement, and *UAW* as to notice.

To justify abandoning medical monitoring claims, class counsel claim *ipse dixit* that "all agree it's going to be decades from now before any symptoms manifest". But appellant Lynch already has worrying symptoms (R. No. 516-6, PageID#.10830-10832). The record flatly contradicts Class counsel's self-serving assurance[8].

Class counsel cite *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359 (6th Cir. 2011), where summary judgment in favor of a railroad after a toxic derailment was affirmed. Post-derailment, dioxin levels were some 3 to 4 times *assumed* background levels, representing an increased cancer risk of 1 in 1 million exposed persons. *Id.* at 362. But class counsel (and the record) provide no discussion as to what medical experts opined about increased health various risks (not limited to cancer) following *this* derailment. From this omission, all we can reasonably conclude is that class counsel failed to consult appropriate experts, unjustifiably assumed class members' risks of adverse health consequences also increased by no more than 1 in 1 million, and sold out the class to protect their $162 million fee.

---

[8] Lynch's symptoms were reported before class counsel offered their *ipse dixit* assurances during the September 25, 2024 hearing. So here, class counsel choose to ignore their own client's report in order to perpetrate a false narrative that serves their goals.

Class counsel argue appellants "never lodged that complaint" (that Judge Pearson's boilerplate reasons for approving settlement indicated a failure to properly scrutinize the matter). Of course not—Judge Pearson made her failure manifest contemporaneously with entry of final judgment. Appellants timely appealed; class counsel identifies no authority requiring they first seek reconsideration.

## D. Inequitable Treatment of Class Members *Inter Sese*

Attempting to justify the (comparatively) exorbitant awards to named plaintiffs, class counsel argue those individuals sat for depositions, allowed their homes and property to be inspected, provided pertinent information about their losses, searched for and provided documents and information in response to discovery requests, regularly communicated with class counsel, and approved the settlement. Almost all those rather duplicative actions are required of ordinary class members who opt in—class counsel early in their brief note that such claims must be documented (and presumably the Settlement Administrator could seek to inspect claimants' properties). F.R.Civ.P. 30(d)(1) limits depositions to 1 day not exceeding 7 hours, while 18 U.S.C. §1821(b) limits lay witness fees to $40 per day, plus travel expenses under (c)(2) per 5 U.S.C. §5704 (65 cents/mile in 2024--https://www.gsa.gov/travel/plan-a-trip/transportation-airfare-rates-pov-rates-etc/privately-owned-vehicle-pov-mileage-reimbursement/pov-mileage-rates-

archived), *less than $100 for each deponent*, so awarding named plaintiffs an extra $12,000 (R. 452-2, PageID#.6029) was obscenely profligate.

## E. Class Counsel's Fees and Costs

Citing no authority[9], class counsel question whether appellants have standing to raise this issue, which they purport to confine to the personal injury fund component, claiming (falsely) none of present objectors opted into that fund.

Class counsel contend Appellants had to separately designate the order (R. 556) approving attorney fees and costs in order to challenge it on appeal[10]. Wrong again. Appeal of final judgment (R. 557) brings up for review *all* prior orders. *Tetro v. Elliott Popham Pontiac, etc.*, 173 F.3d 988, 993 (6th Cir. 1999); F.R.A.P. 3(c)(4).

Class counsel generally concede appellants' other points—they negotiated their fee with NS, without Judge Phillips' oversight, in a fashion not costing NS one additional farthing. Note: even Norfolk Southern did not concede class counsel earned a $162 million fee—Norfolk Southern only promised not to dispute a $162 million fee *or less* (paid entirely from the settlement fund)—R. 520-1,

_____

[9] Which is tantamount to abandoning their argument. *Castelvetere v. Messer*, 611 F. App'x 250, 255 (6th Cir. 2015)...
[10] F.R.A.P. 3(c)(4) provides:

> The notice of appeal encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order. It is not necessary to designate those orders in the notice of appeal.

PageID#.11322).  The fee amounts to more than $3,000 per hour for every hour claimed by every attorney, which is 5-12 or more times the market rate in the vicinage.

Finally, class counsel, admitting the class had a viable claim for punitive damages—and, therefore, for attorney fees on top of whatever damages were recovered—contend their decision to settle is no indication they surrendered any claim for punitive damages.  To the contrary, the very fact attorney fees are being paid *entirely* out of the settlement fund is proof positive of that surrender.

**Issue II:  The district court clearly erred in approving the class notice. (Appellants' Issue I)**

Class counsel contend all authorities recognize that a 30 day notice period is the absolute minimum.  They seem to think that because they allowed one extra day, *their* notice period must be sufficient.  As usual, class counsel view the issue from the wrong end of the telescope.  They offer no justification for a minimum notice period, when an average notice period is 60 days.

Class counsel further urge that no prejudice is shown.  Necessarily, Appellants had to satisfy the 31 day notice provision to avoid having their claims barred, as did those who opted out (and thus lack standing to appeal at all).  But that leaves 130,000 class member households who neither opted in or out within the time allowed, whose claims are now barred—nothing can be more prejudicial than that.  Moreover, appellants had to make their decisions to opt in with

insufficient time and inadequate information, and as more information became available, they were not allowed to re-evaluate their choices.

Once again, class counsel rely on *ipse dixit* and speculation to substantiate the adequacy of the notice period, *e.g.*, "it is hard to believe that class members were not aware of this litigation even before the notice process began." "The derailment escaped no one's notice." These blandishments are supported by absolutely no record *evidence*. Perhaps Class counsel themselves regularly read newspapers, watch televisions news broadcasts, and listen to radio news programs. Not everyone does—which explains why newspapers are going out of business, or reducing to skeleton staffs, and why TV and radio are filled with talking heads. Even those addicted to various "news" sources are finding that the verisimilitude of what they learn ranges from dubious at best to outrageously false at worst. The *record* provides no basis for assuming a 31-day notice period was adequate; the fact that 130,000 class member households did not respond within the allowed time powerfully evidences its *inadequacy*.

As for the contents of notice, class counsel clearly believe every class member, regardless of educational attainment, is able to read and comprehend the notice itself, and also possesses the computer literacy (and computer) to access and read the settlement agreement for him/herself. Class counsel obviously possess zero understanding of the differences between, say, reading a newspaper

(journalists are trained to write for an eleventh grade level) and comprehending the impenetrable prose of Faulkner's *The Sound and the Fury* or Toni Morrison's *Beloved*—or the Settlement Agreement.

**Issue III:  On remand, this case should be reassigned to a different judge.**

Class counsel argue that Judge Pearson's bias against appellants and their counsel cannot serve as grounds for reassignment on remand because it does not emanate from an "extrajudicial source" (Dkt. 39 and 44, p. 67), citing *Youn v. Track, Inc*., 324 F.3d 409, 423 (6th Cir. 2003).  But to the extent *Youn* so holds, it is flatly inconsistent with *Liteky v. United States*, 510 U.S. 540, 549-550 (1994), where the Supreme Court not only buried the "extrajudicial source" doctrine, but pounded a proverbial stake through its heart, declaring that bias is "never appropriate" whatever its origin.

Class counsel—having admitted (Dkts. 39 and 44, p. 65) reassignment is governed by iterated factors, none of which involves an affidavit—close by contending appellants had to file a supporting affidavit per 28 U.S.C. §144.  But §144 requires an affidavit only when moving to disqualify a judge.  Judge Pearson's bias did not become manifest until after final judgment—reassignment is done by an appellate court in the interest of justice.  Reassignment is not disqualification, and §144 does not apply.

**REPLY TO NS's ARGUMENT**

**Issue I. The district court abused its discretion in approving Final Settlement of this Class Action.**

At the outset, NS offers more boilerplate—all litigation carries risk, settlements mitigate those risks, and settlement are favored. Rote application of boilerplate principles is NOT the order of the day.

First, NS contends the declaration of an EPA employee in *another lawsuit* somehow demonstrates the evidence central to *this* appeal could have been opposed. But not only is the cited declaration *not part of the record in this case* (never having been presented to Judge Pearson, she could hardly have evaluated it in approving the settlement), it is not subject to judicial notice here—no suggestion is made that the prerequisites of FRE 201(a) are satisfied[11]. Where, as here, the issue concerns weighing a *non-record* declaration against evidence actually in the record to assess judicial discretion, judicial notice is *entirely inappropriate.* *Ansfield v Omnicare, Inc.*, 769 F.3d 455, 468 (6th Cir. 2014).

NS contends its CERCLA remediation costs reduce its liability to class plaintiffs. That is discreditably misleading. Among CERCLA's provisions are:

42 U.S.C. § 9614(a):
Nothing in this [Act] shall be construed or interpreted as preempting

---

[11] NS proceeds to assert the declarant averred that "Air testing by the US EPA immediately after the derailment found no contaminants of concern * * *." That is demonstrably *untrue*—because the EPA air sampling involved use of an EPA sensor aircraft that was not flown over the relevant area until 4 days after the derailment. See https://tinyurl.com/4vb92vhh, cited in class counsel's answer opposing objectors' Motion to Eliminate Appeal Bond (Dkt. 36, p. 9 footnote 8).

any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State.

42 U.S.C. § 9652(d):
Nothing in this [Act] shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants."

42 U.S.C. § 9659(h):
This [Act] does not affect or otherwise impair the rights of any person under Federal, State, or common law, except with respect to the timing of review as provided [elsewhere * * *].

And the claim for medical monitoring, R. 31, PageID#.713-716; R. 138, PageID#1825-1827)), abandoned in class counsel's settlement, is likewise *not* barred by CERCLA—because CERCLA itself distinguishes health assessments from response costs. 42 U.S.C. §9607(a)(4); *Giovanni v. U.S. Dep't of the Navy*, 906 F.3d 94, 102 (3rd Cir. 2018).

NS's preemption argument, predicated on the FRSA, ignores Congress' retroactive amendment of 49 U.S.C. §20106, following judicial rulings in favor of preemption in relation to a toxic release from a 2006 derailment in Minot, ND:

Nothing in [the FRSA] shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party—

(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

49 U.S.C. § 20106(b)(1)(A)-(C). See *Grade v. BNSF Ry. Co*., 676 F.3d 680, 684-6 (8th Cir. 2012) for a discussion of the amendatory statute's retroactivity. Here, the 1st Amended Master Complaint alleges violation of ongoing federal standards of care AND NS's own "industry standards". R. 138, PageID#.1795, ¶154, 1828-33, ¶¶278-9, 1838-9, ¶¶299-304, 1871-4, ¶472), and there is NO preemption[12, 13].

Next, NS urges that, as a common carrier, it cannot be held strictly liable for the catastrophic consequences of transporting hazardous materials, citing *Indiana*

---

[12] NS's reliance on *Nickels v. Grand Trunk W.R.R. Co. Inc.*, 560 F.3d 426, 430 (6th Cir. 2009) is misplaced—the issue there was whether compliance with a FRSA regulation *requiring* uniform ballast size along railroad tracks could be negligence for FELA purposes. No question arose whether *state* tort law was preempted in its entirety. NS identifies no federal or state regulation which *required* it to do anything which inevitably produced the derailment and toxic disaster in East Palestine.

[13] Similarly, NS's cursory citations to the Hazardous Materials Transportation Act, 49 U.S.C. §§5101-5128 and *Roth v. Norfalco, LLC*, 651 F.3d 367 (3rd Cir. 2011) as preempting state tort law grossly overreaches. The HMTA only preempts common law requirements concerning the design of a container qualified for use in commercially transporting hazardous materials. No allegation in the Master Class Action Complaint asserts the tank cars involved in the East Palestine derailment were improperly *designed*. Class plaintiffs' claims concern negligent operation of NS's train (some form of the word "operate" appears 71 times in the Master Complaint, R. 138), negligent inspection (some form of "inspect" appears 24 times in R. 138), etc.—not one word about negligent design ("design" is entirely absent from the Master Complaint).

*Harbor Belt R.R. Co. v. American Cyanamid Co.*, 916 F.2d 1174, 1180 (7th Cir. 1990) based on the "common carrier" exception—common carriers must accept lawful cargos for transport. That position has been rejected by the 8th Circuit, deferring to Iowa law as governing the tort claim pending before it. *National Steel Service Center v Gibbons*, 693 F.2d 817 (8th Cir. 1982). The 1st Circuit has noted that strict liability for common carriers is the historical norm. *Littleton Stamp & Coin Co., Inc. v. Delta Airlines, Inc.*, 778 F.2d 53, 55 (1st Cir. 1985). The 9th Circuit rejects the idea of such immunity. *In re Hanford Nuclear Reservation Ligitation*, 534 F.3d 986, 996 (9th Cir. 2007). Meanwhile, all these decisions appear to have overlooked the Supreme Court's statement in *Michigan Pub Utilities Comm'n v. Duke*, 266 U.S. 570, 577 (1925) that common carriers are indeed strictly liable in tort generally.

NS further contends there is no evidence of requisite "recklessness" or "wanton behavior" to justify punitive damages. But "reckless" or a related cognate appears 27 times, and "wanton" 21 times, in the 1st Amended Master Complaint, R. 138). Because the case was settled, the evidence supporting these claims is not part of the record. But, by NS's own lights, the "experienced [plaintiffs'] counsel" who made these allegations necessarily had *some* reasonable basis for doing so— NS did NOT challenge *any* of those claims by motion for summary judgment, nor did NS follow the steps specified by F.R.Civ.P. 11(c)(2) to position itself to recover

attorney fees for defending baseless allegations. So appellants' contention class counsel's failure to pursue punitive damages before settlement is unexplained and unjustified on the record stands unrebutted by NS.

Exemplary of NS's inexplicable incomprehension of the concept of an "appeal limited to the record", *Graff Trucking Co. v. Kelley*, 914 F.2d 256 (6th Cir. 1990) (In an appeal from "the judgment of the district court", "we are, of course, limited to the record before us on appeal.")[highlighting added.], NS propounds multiple absurdities (NS's brief, Dkt. 43, pp. 22-23), *e.g.*, it performed all required inspections, and relied on shippers' Safety Data Sheets to recommend vent-and-burn. Notably, in discussing class plaintiffs' allegations, NS cites the record. But every time NS refers to "the evidence" or "the record", it fails to reference the record (or anything else), *because NS cannot do so*—no such "evidence" appears in the record (partially explaining why NS is suing the shippers). Meanwhile, sophistry underlies NS's "recommendation" to "reduce" the risk of "potentially catastrophic explosions" *by deliberately causing a catastrophic explosion* (see the photos of NS' euphemistically-denominated "vent-and-burn", 1st Amended Master Complaint, R. 138, PageID#.1799-1801, 1805-6)). Any "debunking" exists solely in the imaginations of NS's attorneys, but nowhere in the record.

**CONCLUSION**

The district court's judgment and pertinent prior orders should be vacated, and the cause remanded to a different judge.

Respectfully submitted,

David M. Graham, *pro hac vice*
Attorney for Appellants Troyan, Freeze, Lynch and Tunno
210 E. Forsyth St.
Jacksonville, FL 32202
(904) 567-6529

**CERTIFICATE OF COMPLIANCE per FRAP 32(g)(1) and 6 Cir. R. 32(a)**

David M. Graham, appearing *pro hac vice*, certifies, under FRAP 32(a)(7)(B) that this Brief contains 6,450 words, inclusive of headings, footnotes, citations and quotations, as counted by Microsoft Word 2010, the word processing software used to create this Brief. The typeface is Times New Roman 14 point, a serif font in conformity with FRAP 32(a)(6).

By: /s/ David M. Graham                     Dated: February 25, 2025
David M. Graham, *pro hac vice*
Attorney for Appellants